UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
HADIYAH CHARLES,                                  :
                                                  :
                         Plaintiff,               :
                                                  :
     -versus-                                     :
                                                  :  **AMENDED COMPLAINT**
The CITY OF NEW YORK; RAYMOND                     :
KELLY, Commissioner of the New                    :  12-cv-6180 (SLT)(SMG)
York City Police Department; PAMELA               :
BENITES, a New York City Police Officer;          :
RAYMOND WILLIAMS, a New York City                 :
Police Officer; and ANTHONY                       :  **JURY TRIAL DEMANDED**
FAMIGHETTI, a New York City Police                :
Sergeant,                                         :
                                                  :
                         Defendants.              :
------------------------------------------------------------x

## PRELIMINARY STATEMENT

1.     This civil rights action challenges the constitutionality of the New York City Police Department's practice of interfering with the right of individuals to film police activity in public places. In particular, this lawsuit challenges retaliatory measures taken by three New York City Police Department officers against the plaintiff, Hadiyah Charles, for filming a stop and frisk that took place across the street from her residence.

2.     The right of citizens to document the public activities of police ensures that the police remain accountable to the public. The New York City Police Department's Stop, Question, and Frisk program has grown over 700% over the past decade and has become one of the cornerstone policies of law enforcement in the city. The controversy surrounding this program has grown alongside it, with the legitimacy and efficacy of the program questioned in a multitude of articles, reports, and lawsuits. As public awareness of the issues associated with this program has grown, citizens and journalists have increasingly taken to monitoring these

1

controversial police practices, often documenting them with video cameras and smartphones. Without the right to document police activity in public places, citizens of New York City would lose a vital tool for holding the police accountable for their actions, including those actions related to this controversial program.

3. The plaintiff in this action, Hadiyah Charles, lives in the Bedford-Stuyvesant neighborhood in Brooklyn, one of the epicenters of stop, question, and frisk activity in the city. One day, on her walk home from work, Ms. Charles witnessed two officers conducting what she thought might be an unjustified stop, question, and frisk and she proceeded to use her smartphone to make a recording of the incident. The officers attempted to prevent Ms. Charles from documenting the incident by using physical force against her, arresting her, holding her in a cell in the 79th Precinct for an hour and a half, and ultimately issuing her a summons based on spurious charges.

4. Defendants' policies, practices, and actions have violated Ms. Charles's rights under the First and Fourth Amendments to the United States Constitution, Article I, Sections 8 and 12 of the New York Constitution, and common law. Ms. Charles requests monetary relief to redress the damages caused to her.

## PARTIES

Plaintiff

5. Plaintiff HADIYAH CHARLES is a resident of Brooklyn, New York. Ms. Charles has a long history of community activism with a particular emphasis on developing health policies affecting marginalized women. Ms. Charles now works as the Hepatitis C Advocacy Manager for the Harm Reduction Coalition, a not-for-profit organization that seeks to address adverse effects of drug use, including infectious diseases such as HIV and Hepatitis C.

Defendants

6. Defendant THE CITY OF NEW YORK is a municipal corporation duly incorporated and existing pursuant to the laws of the state of New York. The City of New York has established and maintains the New York City Police Department (NYPD) as a constituent department or agency.

7. Defendant RAYMOND W. KELLY is the Police Commissioner for the City of New York, with supervisory authority over all officers and operations of the NYPD, including responsibility for training, recruiting, and managing all NYPD officers. He is sued in his official capacity.

8. Defendant Police Officer PAMELA BENITES, tax registration number 946728, is or was an employee of the NYPD at all relevant times. She is sued in her official and individual capacities.

9. Defendant Police Officer RAYMOND WILLIAMS, tax registration number 947610, is or was an employee of the NYPD at all relevant times. He is sued in his official and individual capacities.

10. Defendant Police Sergeant ANTHONY FAMIGHETTI, tax registration number 932617, is or was an employee of the NYPD at all relevant times. He is sued in his official and individual capacities.

## FACTS

### The Stop, Question, and Frisk Program

11. In recent years, the New York City Police Department's Stop, Question, and Frisk program has grown into a controversial cornerstone of police activity in New York. In the last 10 years alone, the program has grown sevenfold, from 97,296 stops in 2002 to nearly 700,000

stops in 2011. The controversy surrounding this program has grown with it, with activists, news organizations, and others focusing substantial attention on the program and calling for reform on a variety of issues related to the program. Controversial aspects of the program include the alleged pervasive use of racial profiling and a widespread pattern of stops being made without adequate legal justification.

12. One of the most controversial aspects of this program is the apparent racial bias in the targeting of both neighborhoods and individuals. This controversy has been extensively covered by major media outlets and other news organizations and has culminated in multiple lawsuits, including *Floyd v. City of New York*, a class action pending in the Southern District of New York that seeks to enjoin the program in its current form on, among other bases, the racial imbalances in its execution. The NYPD's most recent data demonstrate these racial disparities, showing that while the population of New York City is only 54 percent black or Hispanic, over 87 percent of those individuals actually stopped in 2011 were black or Hispanic. This phenomenon can be observed citywide, where 70 out of 76 precincts reported that greater than 50 percent of those stopped were black or Hispanic in 2011, and 33 precincts reported that more than 90 percent of those stopped were black or Hispanic. This racial imbalance in the implementation of the Stop, Question, and Frisk program extends beyond the individuals stopped to the neighborhoods targeted for enforcement. For example, each the four most active precincts for Stop, Question, and Frisk activity has a population that is majority black and Hispanic.

## Arrest and Detention of Hadiyah Charles

13. Hadiyah Charles is a 34-year-old black woman of Caribbean descent. Ms. Charles has a long history of community activism. She holds a Masters of Arts in Women's Health and has been an activist for health policy affecting marginalized individuals for about 12

4

years, with a focus on improving treatment, access, and prevention. She has extensive experience advocating on behalf of women with communicable diseases, such as HIV and Hepatitis C, and has worked on combatting the spread of these diseases with the women affected, their families, and their communities. She has also led several initiatives to improve awareness of these diseases, including advocacy and media training, community outreach, and educational workshops. For her work in HIV advocacy, Ms. Charles has been recognized as a Champion of Change as part of President Obama's *Winning the Future Across America* program (see http://www.whitehouse.gov/champions/fightAIDS/hadiyah-charles).

14. Ms. Charles resides in Bedford-Stuyvesant, one of the neighborhoods most affected by the dramatic expansion of the Stop, Question, and Frisk program. This neighborhood includes the 79th and 81st Precincts, and is one of the epicenters of the execution of the Stop, Question, and Frisk program. Over twenty-eight thousand stops were made in the 79th and 81st Precincts in 2011. Ms. Charles resides in the area patrolled by the 79th Precinct, which accounted for over fourteen thousand stops in 2011. In fact, in 2011 there were over sixty stops just on the two block stretch from Ms. Charles's subway stop to her apartment, a walk she typically makes twice daily. The stops in the 79th Precinct predominantly involve minorities, with nearly 92 percent involving black or Hispanic individuals. Finally, despite the immense number of stop, question, and frisks that occur in the 79th Precinct, the fourteen thousand stops made in 2011 led to arrests less than 4 percent of the time.

15. During her time in Brooklyn, Ms. Charles has become aware of the increasing prevalence of the NYPD's use of stop, question, and frisk tactics. She has also become aware of some of the controversies surrounding the Stop, Question, and Frisk program, including the

5

racial disparities in its implementation, and the allegations that a significant number of the stops, questions, and frisks made under the program are meritless.

16. Ms. Charles has several male relatives who visit her in Bedford-Stuyvesant. One, who is in his early twenties and lives in the Bronx, has been subjected to several unjustified stop, question, and frisks in the past few years. Ms. Charles also has a sixteen-year-old male cousin. When he visits her in Bedford-Stuyvesant, she fears that he will be harassed by the police if he does not stay inside. Ms. Charles has a thirty-one year-old brother who lives outside of New York City. She is concerned that if he were stopped during one of his visits, he would have no idea how to handle the situation.

17. On the evening of June 5, 2012, as Ms. Charles was returning home from work, she noticed two NYPD officers, who she subsequently learned were Officers Pamela Benites and Raymond Williams, questioning and frisking three teenaged black males in front of a residence on her street, Clifton Place. Ms. Charles recognized the three youths from the neighborhood, and knew that at least one of them lived on the block. There was an upside-down bicycle at the scene, and it appeared to Ms. Charles that they had been working on fixing the bicycle. Officer Williams was frisking the three young men while Officer Benites stood nearby. Throughout this process, the youths protested their treatment. They repeatedly told the officers that they had not done anything and that they were just fixing the bicycle. They also repeatedly asked the officers why they were being stopped and questioned.

18. Ms. Charles considered simply walking past the scene, but after all she had heard about the controversies surrounding the Stop, Question, and Frisk program, she wanted to see whether the stop was justified. She decided that she would not forgive herself if she walked away while the teenagers were being hassled without justification. Further, Ms. Charles realized

6

that these young men were in a position that her brother or cousins could very easily find themselves in when they came to visit. Ms. Charles therefore chose to approach the officers and youths.

19. Upon arriving at the scene, Ms. Charles asked the officers to explain what was happening. Officer Williams replied that it was police business. Ms. Charles then said that, as a concerned taxpaying citizen who lives on the block, she would like to know what was going on. The officers replied by stating that the youths knew why they were being questioned and frisked. Ms. Charles then asked the youths why they were being questioned and frisked, and they responded that they did not know. Ms. Charles then told the police officers that it did not appear that the three young men knew why they were being questioned and frisked. At this point, Officer Benites asked Ms. Charles to step away from the scene.

20. After being asked to step away, Ms. Charles stepped back, took out her smartphone, and began filming the incident. Ms. Charles intended, if the stop turned out to be unjustified, to forward her video to news organizations as an example of police harassment.

21. When Officer Benites noticed that Ms. Charles had started filming, she tried to get her to stop filming by repeatedly asking her to step further away, even though Ms. Charles was already a reasonable distance away from Officer Williams and the three young men. Ms. Charles eventually backed onto the street and moved around the scene. When Ms. Charles changed her position, Officer Benites followed her.

22. After Ms. Charles changed viewpoints, the mother of one of the teenagers arrived, and Officer Benites began speaking to her. Ms. Charles asked the mother whether it was okay to film the incident. She agreed and encouraged Ms. Charles to continue filming.

7

23. Immediately following this exchange, Officer Benites approached Ms. Charles and forcefully shoved her. Ms. Charles asked Officer Benites why she had pushed her and Officer Benites ignored the question. After several onlookers also made comments about the shove, Officer Benites called her supervisor, Sergeant Anthony Famighetti, who arrived at the scene shortly thereafter. When Sergeant Famighetti arrived on the scene, Ms. Charles told him that she wished to file a formal complaint.

24. Directly after voicing her desire to file a complaint, Ms. Charles was handcuffed and placed into the back of the police van, despite there being no probable cause for her arrest. Ms. Charles asked the officers numerous times why she had been arrested, but they did not answer.

25. At no point during the encounter did Ms. Charles raise her voice above the levels of the three youths or the officers involved. Further, at no point did Ms. Charles intend to cause, or actually cause, any public inconvenience, annoyance, or alarm.

26. Upon information and belief, none of the three youths was found to have engaged in any illegal activity. None was found to have contraband, and none was arrested or issued a summons.

27. Ms. Charles was taken in the police van to the 79th Precinct. While in transit, Officer Benites made derisive remarks about Ms. Charles being a "street lawyer." Ms. Charles continued to ask why she had been arrested, but the officers again refused to explain why.

28. Upon arrival at the 79th Precinct, Officer Benites searched Ms. Charles and placed her in a small holding cell. Once Ms. Charles was in the cell, Officer Benites continued to make derisive remarks about her. In particular, Officer Benites said, "This is what happens when you get involved."

29. At one point while Ms. Charles was in the holding cell, Officer Benites approached and asked her to enter the password to her phone, but Ms. Charles refused. Officer Benites then said that she needed contact information from the phone so that the officers could confirm Ms. Charles's identity. At this time, the officers had already confiscated Ms. Charles's bag, which contained her wallet and identification. Ms. Charles also told Officer Benites that she could provide contact information without unlocking her phone, but Officer Benites insisted that Ms. Charles provide a contact from her phone. Fearing further ill treatment if she did not comply, Ms. Charles ultimately relented and unlocked her phone.

30. After Ms. Charles unlocked her phone, Officer Benites took the phone away from her view. Upon information and belief, the officers searched the contents of Ms. Charles's phone.

31. About 45 minutes to an hour after obtaining the password to Ms. Charles's phone, Officer Benites unlocked the cell, told Ms. Charles to hold her hands behind her back as if she was still handcuffed, and escorted her outside. Ms. Charles had been held in the cell for about an hour and a half by the time she was removed.

32. Once outside, Officer Benites, Officer Williams, and Sergeant Famighetti asked Ms. Charles if she still wanted to file a complaint. At that point, Ms. Charles just wanted to go home and believed that if she told the officers that she still intended to file a complaint, she would be held longer. Hoping to be released, Ms. Charles told the officers that she no longer intended to file a complaint. The officers then reprimanded Ms. Charles for getting involved, and issued her a summons, charging her with violating section 240.20(2) of the New York Penal Law, Disorderly Conduct, a noncriminal violation. They then asked again whether Ms. Charles wanted to file a complaint. After again stating that she did not want to file a complaint, the

officers told her that she was free to go. Ms. Charles was then given back her confiscated bag and phone.

33.     Although the officers told her that she was free to leave at that point, Ms. Charles feared that the officers might change their minds and detain her again. In fact, Ms. Charles was so afraid that she ran the three blocks from the precinct to her home.

34.     Upon information and belief, the repeated attempts by Officer Benites to get Ms. Charles to step further and further away from the incident, the shove by Officer Benites, the unlawful arrest, the unlawful search of her person and her belongings, the contents of her phone, and the unlawful issuance of a summons, were intended to intimidate Ms. Charles and prevent her from filming the incident and filing a complaint regarding the incident.

35.     Upon getting home, Ms. Charles contacted members of her community in an attempt to help organize a know-your-rights seminar concerning the NYPD's Stop, Question, and Frisk program. Ms. Charles believes that the filming of stop, question, and frisk activity is a powerful tool that can be used to hold the NYPD accountable.

36.     As a result of the incident, Ms. Charles worries about being apprehended again by the police. She is also nervous, apprehensive, and scared when she sees police officers, which happens several times per week. Ms. Charles also has a particular fear that she will encounter the three officers involved in her detention, especially Officer Benites.

37.     Ms. Charles is unsure whether she would again film police stop and frisk activity. She is worried that if she does so she will again be subjected to intimidation and be arrested without justification. Still, despite her apprehension, she may choose to film such activity because she cannot stand to see the injustice of police harassment of minority youths in her neighborhood.

38.     Ms. Charles's summons was ultimately dismissed on October 5, 2012.

39.     On September 4, 2012, Ms. Charles served a notice of claim upon the Comptroller of the City of New York, pursuant to section 50-e of the New York General Municipal Law. On December 13, 2012, Ms. Charles appeared for her hearing pursuant to Section 50-h of the New York General Municipal Law.

<u>The NYPD's Failure to Train Its Officers to Respect<br>the Right to Photograph or Film Police Activity in Public</u>

40.     Small portable cameras have become increasingly affordable, and as a result, their use has become widespread in recent years. In addition to taking still photographs, these cameras also frequently have the ability to make audio and video recordings. Smartphones, which include integrated cameras capable of both still photography and audio and video recording, have also become widely used in recent years. The vast majority of adults in the United States use mobile phones, and as of August 2012, over half of the mobile phone subscribers in the United States used smartphones. The increasing affordability of small portable cameras with video capability, and the advent and popularity of smartphones has, in effect, resulted in a large portion of the public carrying an audio and video recording device with them at all times.

41.     As smartphones and small portable cameras have become more prevalent, they have increasingly been used to film police activity. In the past few years, there have been several highly publicized incidents of police abuse, including by NYPD officers, that have been recorded by such cameras. Footage recorded by members of the public in those incidents has been used to hold police officers accountable for their misconduct.

42.     For example, in 2008, at a Critical Mass protest, NYPD Officer Patrick Pogan was involved in a collision with a bicyclist, Christopher Long. Officer Pogan filed a criminal

complaint against Mr. Long, alleging that Mr. Long knocked him down by intentionally steering his bicycle into him. A video recording of the incident, made by a witness with a portable camera, however, showed Officer Pogan moving toward Mr. Long and violently shoving Mr. Long off his bicycle. Due in part to the video recording of the incident, Officer Pogan was convicted of filing a criminal complaint containing false statements and was discharged from the NYPD. The incident and subsequent prosecution of Officer Pogan received publicity from both local and national news sources. On the popular video sharing website, YouTube, the video recording of the incident has been viewed almost three million times.

43. In another high-profile incident, NYPD Deputy Inspector Anthony Bologna was captured on a portable camera using pepper spray on two women during an Occupy Wall Street protest in September 2011. The video engendered significant negative publicity for the NYPD and was reported on local and national news outlets. The NYPD disciplined Deputy Inspector Bologna as a result of this incident. In addition, when the protesters sued Officer Bologna, the City decided not to defend him in court.

44. Several other cities have faced lawsuits as a result of police retaliating against individuals seeking to exercise their constitutional right to document police activity in public places. The City of Boston recently reached a settlement with an individual who was wrongfully arrested and prosecuted in retaliation for filming an arrest. The City of Baltimore is also facing litigation regarding officers arresting individuals in retaliation for filming police abuse.

45. Due to the ubiquity of smartphones and the controversy surrounding the Stop, Question, and Frisk program, the New York Civil Liberties Union has been distributing a stop and frisk phone application that is specifically designed to facilitate the filming of stop, question,

and frisk activity in the city since June 2012. This application has been downloaded by more than ten thousand smartphone users to date.

46. Given the recent explosion in the use of smartphones and small portable cameras, the NYPD should have known that officers would come into contact with individuals attempting to film police activity in public places. Additionally, given the controversy surrounding the Stop, Question, and Frisk program and the growing public awareness of the program's constitutional infirmities, the NYPD should have known that officers would come into contact with individuals attempting to film stop, question, and frisk activity. Further, the NYPD should have known that the failure to train their officers regarding how to respond to such attempts to film would result in officers taking inappropriate actions when confronting these situations. Finally, the NYPD should have known that officers taking inappropriate actions in these situations would inevitably result in deprivations of constitutional rights.

47. The NYPD has received numerous letters in recent years describing attempts by NYPD officers to intimidate individuals seeking to document police activity. In a letter to Deputy Commissioner Paul Browne, dated November 21, 2011, representatives of several news and advocacy organizations described numerous incidents in which NYPD officers interfered with, intimidated, assaulted, and detained individuals attempting to document Occupy Wall Street demonstrations. The letter requested a meeting with Deputy Commissioner Browne and Commissioner Kelly to discuss the deteriorating relationship between the NYPD and the media. This meeting occurred on November 23, 2011. In response to the meeting, Commissioner Kelly merely issued a "FINEST message," reminding officers of their obligations to cooperate with those attempting to photograph public demonstrations. Upon information or belief, neither Commissioner Kelly nor any other NYPD official has initiated any further training, implemented

13

any accountability measures, or followed up in any meaningful way after being made aware of this issue. Since the meeting, NYPD officers have continued to interfere with photographers and videographers as they record police activity in public locations.

48.     The General Counsel of the National Press Photographer's Association (NPPA) sent a letter to Deputy Commissioner Browne on August 6, 2012, describing an incident in which police officers intimidated, assaulted, and arrested a photographer for taking pictures of an arrest that occurred in a public place in the Bronx. On September 30, 2012, the NPPA sent another letter to Deputy Commissioner Browne describing an incident that occurred on September 17, 2012, in which NYPD officers interfered with, assaulted, detained, and arrested members of the media who were covering the anniversary of the Occupy Wall Street protests.

49.     Upon information and belief, these frequent incidents also violate the NYPD Patrol Guide, which forbids officers from harassing those documenting arrests in public places. Specifically, Section 208-03 (Arrests – General Processing) dictates that "speech, … taking photographs, videotapes or tape recordings… [and] remaining in the vicinity of the stop or arrest" do not constitute probable cause for the arrest or detention of an onlooker unless the officers or others are directly endangered, or the law is otherwise violated. Despite this provision in the Patrol Guide, numerous NYPD officers have harassed, intimidated, assaulted, and arrested individuals attempting to document police activity. High-level NYPD officials, including Commissioner Kelly, are aware of such repeated violations.

50.     Upon information and belief, the violation of Ms. Charles's rights resulted from the improper training of Officer Benites, Officer Williams, and Sergeant Famighetti. Specifically, they were insufficiently trained on how to respect the rights of onlookers attempting to film police officers making stops and arrests in public places, as required by the NYPD Patrol

Guide. Upon information and belief, the current training for NYPD officers does not include sufficient training on the circumstances under which officers must allow people who observe police activity to photograph or film it.

## JURISDICTION AND VENUE

51.     This action is brought pursuant to 42 U.S.C. § 1983. Subject matter jurisdiction is conferred by 28 U.S.C. §§ 1331 and 1343(a)(3). This Court has supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367(a).

52.     Venue is proper in the United States District Court for the Eastern District of New York under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims in this action occurred in this District.

## CAUSES OF ACTION

53.     As a direct result of the acts, omissions, and policies of the Defendants, Ms. Charles was deprived of her rights under the First Amendment of the United States Constitution and 42 U.S.C. § 1983.

54.     As a direct result of the acts, omissions, and policies of the Defendants, Ms. Charles was deprived of her rights under the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983.

55.     As a direct result of the acts, omissions, and policies of the Defendants, Ms. Charles was deprived of her rights under Article I, Section 8 of the New York Constitution.

56.     As a direct result of the acts, omissions, and policies of the Defendants, Ms. Charles was deprived of her rights under Article I, Section 12 of the New York Constitution.

57.     As a direct result of the acts, omissions, and policies of the Defendants, Ms. Charles was deprived of her rights under New York common law to be free from false arrest, false imprisonment, assault, and battery.

## REQUESTS FOR RELIEF

WHEREFORE the Plaintiff respectfully requests that the Court:

    A.    Assume jurisdiction over this matter;

    B.    Award compensatory damages for the injuries sustained by Ms. Charles;

    C.    Award punitive damages to Ms. Charles from the officers who effectuated the retaliatory arrest and issued the spurious summons;

    D.    Award Ms. Charles reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

    E.    Grant any other relief the Court deems necessary and proper.

Dated: New York, New York  
       April 15, 2013

Respectfully submitted,

ALEXIS KARTERON,  
CHRISTOPHER DUNN  
ROBERT PICKENS*  
MARTIN SAWYER*  
New York Civil Liberties Union Foundation  
125 Broad Street, 19th Floor  
New York, New York 10004  
(212) 607-3300  
akarteron@nyclu.org

Counsel for Plaintiff

* Law Students at New York University School of Law in the Civil Rights Clinic.