UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                                :

HADIYAH CHARLES,                        :
                                                :

                 Plaintiff,         :
                                                :

             -against-              :     12 Civ. 6180 (SLT)(SMG)
                                                :

THE CITY OF NEW YORK, et al.,     :
                                                :

                Defendants.      :
                                                :
----------------------------------------------------------------x

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS
PURSUANT TO LOCAL RULE 56.1 AND
PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Plaintiff Hadiyah Charles submits this response to

Defendants' Statement of Material Facts in support of their motion for Summary Judgment

(served on Plaintiff September 16, 2014).[1] In addition, in accordance with Local Civil Rule

56.1(b), Plaintiff includes a Counterstatement of Material Facts.

---

[1] All references in this document to "Defendants' Statement of Material Facts" concern the final
version of this document served on Plaintiff on September 16, 2014, pursuant to this Court's Order
of August 12, 2014 (Doc. 61).

**Plaintiff's General Objections to Defendants' Statement of Material Facts Pursuant to Local Rule 56.1**

Plaintiff objects to Defendants' Statement of Material Facts pursuant to Local Rule 56.1 to the extent that it incorporates improper legal characterizations and conclusions, neither of which belong in a 56.1 Statement. "[L]egal arguments . . . belong in briefs, not Rule 56.1 statements, and so are disregarded in determining whether there are genuine issues of material fact." *Alliance Sec. Prods., Inc. v. Fleming Co.*, 471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007).

**Plaintiff's Responses to Defendants' Statement of Material Facts Pursuant to Local Rule 56.1**

**DEFENDANTS' STATEMENTS**

1.       On June 5, 2012, defendant NYPD police officers Raymond Williams and Pamela Benites were attempting to conduct a lawful stop of three young males huddled around a bicycle on Clifton Place in Brooklyn who fit the description of perpetrators of a robbery/grand larceny pattern that existed in the neighborhood. The robbery/grand larceny pattern was documented in the NYPD Command Conditions Reports for that week and the pattern consisted of the theft of cell phones/electronics by one or more young black males who then escaped on bicycle. The officers were informed at their roll call that the theftswere made with the threat of physical violence. The officers observed a suspicious bulge in the pockets of one of the young males as they approached and prior to conducting the stop, as well as suspicious movements by the male with the bulge in his pocket, thus a "pat down" frisk of one of the males' waist area was conducted. P.O. Benites feared for her safety as she approached the males. (Declaration of Mark D. Zuckerman of July 18, 204, hereinafter "Zuckerman Decl.," Ex. A, Williams dep, 20: 16-24, 32: 15-21, 35: 9-13, 39: 7-10, Benites dep., 34: 2-10, 47: 7-48: 5, 67: 23-68: 2; 73: 8-14, 74: 12-75: 3; Ex. C; Declaration of Anthony Famighetti of July 17, 2014).

2

**RESPONSE**: Plaintiff disputes the facts as stated in Defendants' paragraph 1 because the sources cited do not establish the facts cited therein.

Plaintiff disputes the facts as stated in Defendants' paragraph 1 to the extent that the statement "NYPD police officers Raymond Williams and Pamela Benites were attempting to conduct a lawful stop of three young males" is a legal conclusion.

Plaintiff further disputes the facts as stated in Defendants' paragraph 1 to the extent that they state that the defendant officers were acting based on the existence of or a belief that there was a "robbery pattern" or "robbery/grand larceny pattern" "in the neighborhood" when the officers stopped the three young males on Clifton Place on June 5, 2012. Officer Dumelle testified that he was present at roll call with Sergeant Famighetti, Officer Benites, and Officer Williams on June 5, 2012; that he was Sergeant Famighetti's driver that day; and that he did not remember being told of a robbery pattern by Sergeant Famighetti or any other officer at roll call or at any other time during his tour that day. Pl. Ex. 1 (Dumelle Dep.) 45:15–46:9.

Plaintiff further disputes the facts as stated in Defendants' paragraph 1 to the extent that the Defendants' claim the young men stopped "fit the description of perpetrators" is a legal conclusion. Plaintiff further disputes that statement to the extent that the existence of "perpetrators" with whom the young males allegedly matched is contradicted by Plaintiff's Exhibit 2, the "Command Conditions Report," which states that there was only one perpetrator.

Plaintiff further disputes the facts as stated in Defendants' paragraph 1 that the alleged robbery pattern consisted of theft by "one or more" young black males. According to Plaintiff's Exhibit 2, the "Command Conditions Report," there was only one perpetrator.

Plaintiff further disputes the facts as stated in Defendants' paragraph 1 "that [t]he officers were informed at their roll call that the thefts may have been at gunpoint." Defendant Sergeant

Famighetti, who led the roll call, testified that the alleged robbery pattern described "strong-arm robberies," with "no weapons involved." Pl. Ex. 3 (Famighetti Dep.) 49:11–16; Pl. Ex. 4 (Benites Dep.) 30:23–31:18; Pl. Ex. 5 (Williams Dep.) 21:5–10; Pl. Ex. 1 (Dumelle Dep.) 45:8–9; Pl. Ex. 6 (Famighetti Decl.) ¶ 2.

Plaintiff further disputes the facts as stated in Defendants' paragraph 1 that "the officers observed a suspicious bulge" to the extent that it incorporates the legal conclusion that the alleged bulge was "suspicious."

Plaintiff further disputes the statement in Defendants' paragraph 1 that "the officers observed . . . suspicious movements." Only Officer Benites testified to observing a suspicious movement. Plaintiff further disputes that fact as stated to the extent that it incorporates the legal conclusion that the alleged movements were "suspicious." Pl. Ex. 4 (Benites Dep.) 65:17–66:23; Pl. Ex. 5 (Williams Dep.) 39:23–40:10.

Plaintiff further disputes the facts as stated in Defendants' paragraph 1 to the extent that "thus a 'pat down' frisk . . . was conducted" both (1) incorporates the misstatement noted above about who allegedly observed a suspicious movement and (2) includes the legal conclusion that the alleged suspicious bulge and movement justified the frisk. Further, Officer Williams testified that the other two young men were frisked as well, and the sole reason he gave for that frisk was, "if we were standing there having a conversation with them, we would be sure that they didn't have anything dangerous to us on them." Pl. Ex. 5 (Williams Dep.) 167: 14–22, 168:19–22.

Plaintiff further disputes the facts as stated in Defendants' paragraph 1 to the extent that they imply that a frisk of only one of the three males was conducted. Officer Williams testified that all three young men were frisked. The two extant stop-question-and-frisk reports (or "UF-250s") from this incident— the defendants only produced two reports, although Officer Benites testified to

filling out three— indicate that both of those males (D.C. and J.M.) were frisked.  Non-party

witness Ivory Cannady testified that the officers removed items from the young men's pockets.

Non-party witness D.C. testified that the officers frisked him. Pl. Ex. 7 (UF-250s); Pl. Ex. 8

(Cannady Dep.) 15:19–23, 32:23–25; Pl. Ex. 9 (D.C. Dep.) 19:18–20:16; Pl. Ex. 10 (Charles Dep.)

34:24–42:7.

 Plaintiff further objects to paragraph 1 insofar as the statement, "[t]he officers were

informed at their roll call that the thefts may have been at gunpoint," is inadmissible hearsay.


 2. Upon her return from work in the early evening of June 5, 2012, plaintiff Hadiyah

Charles observed the aforementioned interaction involving NYPD police officers Willaims and

Benites and the three males on a sidewalk on Clifton Place in Brooklyn. (Zuckerman Decl., Ex. D,

Charles dep, 21: 18-21, 28: 13- 17).

**RESPONSE**: Plaintiff disputes Defendants' paragraph 2 to the extent that "the aforementioned

interaction" incorporates the legal conclusions and mischaracterizations that Plaintiff disputes in

Defendants' paragraph 1.


 3. Plaintiff passed her residence on Clifton Place and instead approached the

interaction between P.O.s Williams and Benites and the three males. (Zuckerman Decl., Ex. D,

Charles dep, 22: 4-9; 25: 5-7).

**RESPONSE**: Plaintiff disputes Defendants' paragraph 3 to the extent that it suggests that the

Plaintiff passed her residence for the purpose of approaching the interaction between the NYPD

officers and the three males. In fact, the Plaintiff testified that she had already passed her residence

when she first observed the interaction for the purpose of moving her car in order to "comply with

alternate side of the street parking rules." Pl. Ex. 10 (Charles Dep.) 22:4–23:11, 25:5–7, 26:14–19.

4.      As plaintiff approached, she got close enough to the aforementioned interaction to hear the conversation between the three males and P.O.s Williams and Benites. (Zuckerman Decl., Ex. D, Charles dep., 27:1-4).

**RESPONSE**: Plaintiff objects to Defendants's paragraph 4 to the extent that it mischaracterizes the Plaintiff's testimony to suggest that she intentionally moved within hearing range of the interaction after becoming aware of the interaction. In fact, in the portion of the Plaintiff's transcript Defendants refer to, she answered affirmatively when asked whether she was "close enough to hear the conversation" when she "first observed" the interaction. Pl. Ex. 10 (Charles Dep.) 26:20–25; 27:1–4.

Plaintiff further disputes defendants' paragraph 4 to the extent that "the aforementioned interaction" incorporates the legal conclusions and mischaracterizations that Plaintiff disputes in Defendants' paragraph 1.

5.      Plaintiff did not know any of the three males personally who were stopped by P.O.s Williams and Benites. (Zuckerman Decl., Ex. D, Charles dep., 28:18–20).

**RESPONSE**: Plaintiff does not dispute the facts as stated in defendants' paragraph 5 but objects to Defendants' paragraph 5 to the extent that it implies the Plaintiff did not know the young men at all by omitting her testimony as to what "not personally" meant to her. When asked, "[w]hen you say not personally, what do you mean?" the Plaintiff testified, "[r]ecognized from being on the block having lived there for six years." Pl. Ex. 10 (Charles Dep.) 28:21–23.

6.      As plaintiff approached the afformentioned police interaction, she "wondered" why the males were being stopped. (Zuckerman Decl., Ex. D, Charles dep., 30:8-33: 5).

**RESPONSE**:  Plaintiff does not dispute the facts as stated in Defendants' paragraph 6 but objects to Defendants' paragraph 6 to the extent that it suggests the Plaintiff had no independent basis for "wondering" why the young black males were being stopped. Plaintiff testified, "[the males'] question was why are you stopping me, we didn't do anything wrong. At that point I wondered why they were being stopped," and "I was only interested in finding out why they were being stopped in the same way they were interested in finding out why they were being stopped." Pl. Ex. 10 (Charles Dep.) 31:20–22, 32:14–24.


7.      Plaintiff believed that because she was a "taxpaying citizen that lives on the block, [she could choose] to utilize [her] rights as a citizen to ask a question about a process on the block that [she] reside[s] on." (Zuckerman Decl., Ex. D, Charles dep., 33: 6-11).

**RESPONSE**: Plaintiff does not dispute Defendants' paragraph 7.


8.      Plaintiff then proceeded to ask the males who were stopped, "Are the cops bothering you?," to which one of the males answered, "Yes." (Zuckerman Decl., Ex. E, D.C. dep., 7: 11-13, 24: 4-7) Plaintiff was two feet from the officers when she asked that question of one of the males. (Zuckerman Decl., Ex. E, D.C. dep., 25: 20- 23).

**RESPONSE**: Plaintiff disputes the facts as stated in Defendants' paragraph 8. Plaintiff testified that when she arrived, she was about six feet away when she heard one of the males asking "loudly," "[w]hy are you stopping me, we didn't do anything, we are just fixing the bike." Pl. Ex. 10 (Charles Dep.) 27:5–13, 29:1–11. After the young man asked that question, and before the

Plaintiff spoke, "[p]olice continued to touch [one of the young men]." Id. at 33:23–34:4, 35:15–21.

She then "asked the officer what was going on," using the question, "Why are they being stopped?"

She was five feet away from the officers when she asked this question. Id. at 35–36.

Plaintiff further disputes Defendants' paragraph 8 because the facts as stated cannot be established by the evidence cited. Because the record reveals varying accounts of the position the Plaintiff was in when she asked why the young men were being stopped, facts such as those stated in Defendants' paragraph 8 cannot be evaluated without evaluating the credibility of the testimony. See Pl. Response to Def. 56.1 ¶ 21, infra; Pl. Ex. 10 (Charles Dep.) 36:1–15, 44:14–19; Pl. Ex. 8 (Cannady Dep.) 44:24–45:20; Pl. Ex. 11 (Brown Dep.) 24:17–25.

9.      Then, according to plaintiff, one of the males asked the officers why he was being stopped, at which time plaintiff was just six feet away from the interaction. (Zuckerman Decl., Ex. D, Charles dep., 33: 16-21).

**RESPONSE**: Plaintiff disputes the facts as stated in Defendants' paragraph 9 to the extent that Defendants' use of "then" in paragraphs 8 and 9 indicates that "one of the males asked the officers why he was being stopped" *after* the Plaintiff "wondered" why the males were being stopped. In fact, as stated in Plaintiff's Response to Paragraph 6, supra, the Plaintiff only wondered why the young males were being stopped after one of the young men asked that himself. Pl. Ex. 10 (Charles Dep.) 31:20–22,  32:14–24.

10.      Plaintiff contends that she then asked the police officers why the males had been stopped, while she was just five feet away from them. (Zuckerman Decl., Ex. D, Charles dep., 36: 1-14) P.O. Williams testified at deposition that plaintiff's first words to the officers were, "excuse

me, why are you harassing these boys?" (Zuckerman Decl., Ex. A, Williams dep., 55: 9-14).

**RESPONSE**: Plaintiff does not dispute the first sentence of Defendants' paragraph 10.

Plaintiff disputes the second sentence of Defendants' paragraph 10. Plaintiff asked the officers, "Why are they being stopped." Pl. Ex. 10 (Charles Dep.) 36:1-10. Plaintiff further disputes the second sentence of Defendants' paragraph 10 to the extent that it suggests that the Plaintiff had reached a legal conclusion about the legality of the officers' actions toward the young men.

11.    Plaintiff contends that the officers ignored her question. (Zuckerman Decl., Ex. D, Charles dep., 36: 19-24).

**RESPONSE**: Plaintiff does not dispute Defendants' paragraph 11.

12.    Plaintiff contends that she then asked the officers a second time why the males had been stopped. (Zuckerman Decl., Ex. D, Charles dep., 37: 4-5).

**RESPONSE**: Plaintiff does not dispute Defendants' paragraph 12.

13.    According to plaintiff, P.O. Williams responded that the interaction was "police business." (Zuckerman Decl., Ex. D, Charles dep., 38: 15-20).

**RESPONSE**: Plaintiff disputes the facts as stated in Defendants' paragraph 13 to the extent that Officer Williams's statement is inadmissible hearsay.

14.    Plaintiff then contends that she said to P.O. Williams that she was "a tax paying citizen and as such was asking him what this process was." (Zuckerman Decl., Ex. D, Charles dep., 38: 24-39, 4).

**RESPONSE**: Plaintiff does not dispute Defendants' paragraph 14.

15.　　　According to plaintiff, P.O. Williams again answered that the officers were conducting "police business" and that plaintiff was interfering with the officers' work after she asked yet again why the officers had stopped the males. (Zuckerman Decl., Ex. D, Charles dep,, 42: 8-24; 43: 4-10, 43: 17-25).

**RESPONSE**: Plaintiff disputes Defendants' paragraph 15 to the extent that it mischaracterizes the chronological order of statements by the parties in the interaction. Plaintiff testified that Officer Williams said for the second time that "this was police business"; that then the Plaintiff asked, "Why are you stopping these three boys"; and that then Officer Williams said that the Plaintiff was "interfering with police business." Pl. Ex. 10 (Charles Dep.) 42:8–44:3.

Plaintiff further disputes the facts as stated in Defendants' paragraph 15 to the extent that, if offered to show that the officers were carrying out "police business" or that the Plaintiff was "interfering with police business," Officer Williams's statements are inadmissible hearsay. Plaintiff further disputes paragraph 15 to the extent that it says the Plaintiff testified that Officer Williams said she was interfering with "the officers' work." Plaintiff testified that Officer Williams described what was going on as "police business," not as "the officers' work." Id. at 42:8–43:7.

16.　　　According to plaintiff, she then took a step back voluntarily and said, "if you don't mind, I will videotape your process," leaving her 6 feet away from the interaction according to her. (Zuckerman Decl., Ex. D, Charles dep., 44: 4-8, 13-21).

**RESPONSE**: Plaintiff disputes defendants' paragraph 16 to the extent that it invokes the order of events as stated in Defendants' paragraph 15.

17.     The officers told plaintiff that she could video record the incident, but at a "safe" distance."(Zuckerman Decl., Ex. A, Williams dep., 61: 18-22; Ex. B, Benites dep., 92: 2-9).

**RESPONSE**: Plaintiff disputes the facts as stated in Defendants' paragraph 17. Of the four non-party witnesses present at the scene on June 5, 2012, who were deposed in this case, none of them recalled the officers telling the Plaintiff she could video record the incident from a safe distance. Instead, the three of those four witnesses who recalled the officers making any statements about video recording all testified that the officers told the Plaintiff to stop recording.

One non-party witness testified that the officers told the Plaintiff, "Back up and turn your camera off. . . . This has nothing do with you"; that they told her to "put her phone away"; and that they told her to "stop recording." When asked whether she ever heard the male officer "say to Hadiyah Charles that she could record if she moved back?", that witness replied "No." To the contrary, that witness testified that the officer stated, "Move back. Move back. Turn your camera off. Turn your camera off." She testified that both the male and female officers told the Plaintiff to stop recording at least five times. Pl. Ex 8 (Cannady Dep.) 16:24–17:1, 51:4-6, 51:16-18, 70:17–71:5.

Another non-party witness testified that "The police ask[ed] Hadiyah to stop filming or to stop with the phone, and she[] stepp[ed] back and sa[id], "I have my rights. I can stand here," and that the officers told her "[t]hat she had to move along. And she couldn't film there." Pl Ex. 11 (Brown Dep.) 25:11–13; 35:9–13.

A third non-party witness testified that the next thing that happened once the Plaintiff started recording was that "[o]ne of the officers approached her, touching her, like, trying to get her to move away from the premises." Pl. Ex. 9 (D.C. Dep.) 27:22–25.

11

Plaintiff further disputes the facts as stated in Defendants' paragraph 17 to the extent that, if offered to show that Plaintiff was not already at a safe distance, the officers' alleged statements are inadmissible hearsay.

18.     According to plaintiff, P.O. Benites then "proceeded to ask her to step back some more" and that plaintiff was continuing to interfere with "police business." (Zuckerman Decl., Ex. D, Charles dep., 45: 15- 25).

**RESPONSE**: Plaintiff disputes Defendants' paragraph 18 to the extent that Defendants' use of "then" in paragraph 18 mischaracterizes Plaintiff's testimony by suggesting that Plaintiff accepted the alleged facts as stated in Defendants' paragraph 17. As noted in Plaintiff's Response to paragraph 17, supra, the officers repeatedly told Plaintiff to stop recording.

Plaintiff further disputes the facts as stated in Defendants' paragraph 18 to the extent that the statement that "plaintiff was continuing to interfere with 'police business'" is a legal conclusion.

Plaintiff further disputes the facts as stated in defendants' paragraph 18 to the extent that, if offered to show that the Plaintiff ever interfered in police work or "police business," Officer Benites's alleged statements are inadmissible hearsay.

Plaintiff further disputes the facts as stated in Defendants' paragraph 18 to the extent that the grammatical structure of the sentence could suggest to a reader that according to the Plaintiff's own testimony, she was "continuing to interfere with 'police business.'"

19.     Plaintiff contends that she then stepped back "probably another foot" in response to P.O. Benites' order. (Zuckerman Decl., Ex. D, Charles dep., 46: 1-4).

**RESPONSE**: Plaintiff disputes Defendants' paragraph 19 to the extent that Defendants' use of

"then" in paragraph 19 mischaracterizes Plaintiff's testimony by suggesting that Plaintiff accepted the alleged facts as stated in Defendants' paragraph 18.

Plaintiff further disputes paragraph 19 to the extent that it mischaracterizes the Plaintiff's testimony by suggesting that she only stepped back once in response to Officer Benites's order, when, in fact, according to the Plaintiff, she stepped back twice in response to two separate orders from Officer Benites. Further, a non-party witness testified that the Plaintiff stepped back two feet after each of "several" requests to move back, to the point where she was standing next to that non-party witness. Pl. Ex. 10 (Charles Dep.) 45:16–49:5; Pl. Ex. 8 (Cannady Dep.) 51:19–52:17.

20.     Plaintiff contends that she then started to videotape using an IPhone, which continued even as a police back up vehicle arrived and at least until plaintiff was eventually handcuffed. (Zuckerman Decl., Ex. D, Charles dep., 46:10–14, 62:18–20, 63:9–15).

**RESPONSE**: Plaintiff does not dispute Defendants' paragraph 20.

21.     One of the males stopped testified at deposition that plaintiff was only "two feet" from the officers when she began to videotape. (Zuckerman Decl., Ex. E, D.C. dep., 27: 9-21) His mother, a non-party witness, testified at deposition that at one point, plaintiff and P.O. Benites were "face to face," "one foot apart." (Zuckerman Decl., Ex F, L. Cannon dep., 22: 10-18) Two other non-party witness testified at deposition that plaintiff's outstretched arm was "three to four feet" away from the officers when plaintiff had the camera in her hand and tried to video the officers, including but not limited to their badge numbers. (Zuckerman Decl., Ex  G, Brown dep., 24: 17-25)(Zuckerman Decl., Ex. H, Cannady dep., 42: 15-16) P.O. Williams and P.O Benites testified at their depositions that plaintiff "was walking back and forth around [them]," "got in their faces with

the camera" (within six inches) and came "right up to their "name and shield number" as plaintiff attempted to video their badge numbers. (Zuckerman Decl., Ex. A, Williams dep., 60: 22-61: 4, 61: 16-17; 56: 14-20, Ex. B, Benites dep., 85:14-24).

**RESPONSE**: Plaintiff disputes Defendants' paragraph 21 because it does not even purport to present an undisputed fact. The varying accounts described cannot be evaluated without evaluating the credibility of the witnesses. Officer Williams states that Plaintiff came within six inches of him. The closest that Plaintiff's testimony places her to the officers is five feet. Aside from non-party witness Louise Cannon (discussed below), the shortest distances that non- party witnesses report Plaintiff ever being from the officers—not including when Officer Benites approached and pushed Plaintiff—range from two feet to four feet. Pl. Ex. 5 (Williams Dep.) 61:14–17; Pl. Ex. 10 (Charles Dep. 44:6–21, 46–49); Pl. Ex. 11 (Brown Dep.) 24:17–25; Pl. Ex. 8 (Cannady Dep.) 42:15–43:20.

Plaintiff further disputes the facts as stated in defendants' paragraph 21 because they omit crucial context when citing testimony of non-party witness Louise Cannon. Non-party witness Louise Cannon's statement that she at one moment saw Officer Benites and the plaintiff one foot apart came in the context of Ms. Cannon's repeatedly testifying to her lack of knowledge with regard to the Plaintiff's location in relation to the officers, because she "wasn't paying attention to [Plaintiff]" and her back was turned to the incident, because her focus was on talking to Officer Williams, who was standing in the street, in order to "find out if everything was okay" with her son. Her lack of attention to the Plaintiff was to such an extent that she could not even say whether the Plaintiff was holding a cell phone. Her only testimony about Plaintiff's location in relation to the officers, in which she said Officer Benites and the Plaintiff were one foot apart, came as follows: "Okay. As I said, once again, my back was turned when I heard her, so I don't know how, you know, her and the officer were. When I turned around to go in the house, the officer and her

was face-to-face." Pl. Ex. 12 (Cannon Dep.) 20:10–17, 20:25–21:2, 21:9–13, 21:19–25, 22:13–18;

26:12–16; Pl. Ex. 11 (Brown Dep.) 24:17–25; Pl. Ex. 8 (Cannady Dep.) 42:15–43:6)

Officer Benites's testimony as cited in Defendants' paragraph 21 is further contradicted not

only by deposition testimony that Plaintiff was not filming as she approached and never yelled or

screamed, but also by Defendants' own paragraphs 8 through 20. In the portion of her deposition

testimony that Defendants' paragraph 21 cites, Officer Benites testified that Plaintiff was "putting

her phone in our faces" on her initial approach to the scene. According to Defendants' paragraphs 8

through 20, however, the Plaintiff was not recording when she approached, a verbal exchange

occurred before she began recording, and the Plaintiff stepped back as she began to record. Def.

56.1 ¶¶ 8–20; Pl. Ex. 8 (Cannady Dep.) 41:14–15; Pl. Ex. 10 (Charles Dep.) 58:20–59:11, 60:11–20;

Pl. Ex. 9 (D.C. Dep.) 35:13–22; Pl. Ex. 4 (Benites Dep.) 85:14–24.


22.      Plaintiff contends that P.O. Benites "kept asking me to move back," (Zuckerman

Decl., Ex. D, Charles dep., 47: 6-17), but that plaintiff didn't comply with P.O. Benites' third

request to move further back because she believed that she was "within the law." (Zuckerman

Decl., Ex. D, Charles dep., 48: 8-12) This is consistent with the officers' testimony that plaintiff

remained right next to them despite their attempts to have move back [*sic*] to a safe distance from the

interaction. (Zuckerman Decl., Ex. A, Williams dep., 63: 3-21).

**RESPONSE**: Plaintiff disputes Defendants' paragraph 22 because it mischaracterizes both the

Plaintiff's testimony and the officers' testimony by saying they are "consistent" on a point on

which they are in clear dispute. When Defendant Officer Williams testified that the Plaintiff was

"right next to me," as cited in Defendants' paragraph 22, he was testifying to Plaintiff's being

"within a foot" of him. Pl. Ex. 5 (Williams Dep.) 62:12–63:21. In contrast, Plaintiff stated that,

starting from a distance of five feet from the officers, she stepped back on her own to a distance of six feet "from the interaction" because she "was interested in getting a full shot of what was going on, so I had to step back further."  Plaintiff further stepped back twice at Officer Benites's request. Pl. Ex. 10 (Charles Dep.) 44:6–21; 44:46–49. Non-party witness Ivory Cannady's testimony also clearly disputes Officer Williams's testimony in that she testified that Plaintiff stepped back, retreating two feet after every request to move back. Pl. Ex. 8 (Cannady Dep.) 52:3–17.

Defendants' testimony as referred to in Defendants' paragraph 22 is further inconsistent with Plaintiff's testimony as referred to in Defendants' paragraph 22 because Defendant Officer Williams testified that Plaintiff only ever moved "from six inches to a foot" of distance from him, and that besides that she did not back up at all in response to either his or Officer Benites's direction. Pl. Ex. 5 (Williams Dep.) 63:17–21; 68:2–9.

Plaintiff further disputes Defendants' paragraph 22 because it mischaracterizes the Plaintiff's testimony by including only part of what she testified to regarding why she did not comply with Officer Benites's third request. Plaintiff testified that she was "within the law" *because* she was "so many feet away" when Officer Benites asked her to move back the last time. Pl. Ex. 10 (Charles Dep.) 47:18–48:20.


23.     Plaintiff also testified at her deposition that if she moved back any further, it would have put her "without reach of being able to videotape the incident," so she did not. (Zuckerman Decl., Ex. D, Charles, 47: 18-24).

**RESPONSE:** Plaintiff disputes Defendants' paragraph 23 because it mischaracterizes Plaintiff's testimony by stating only part of what she testified to regarding why she did not comply with Officer Benites's third request. Paragraph 23 suggests that the Plaintiff's being put "without reach

of being able to videotape the incident" was her sole reason for not moving back. Plaintiff also testified that she was already "so many feet away" when Officer Benites asked her to move back the last time that she was "within the law," implying that she intended to exercise her right to video record police activity without interfering with police activity. Pl. Ex. 10 (Charles Dep.) 47:18–48:20.

24.     Throughout the incident, plaintiff was "spewing out the numbers around the stop and frisk law and it's *[sic]* disproportionate targeting of Black and Latino youth" as she videotaped. (Zuckerman Decl., Ex. I and Ex. D, Charles dep., 145: 14-146: 5).
**RESPONSE**: Plaintiff disputes the facts as stated in Defendants' paragraph 24.

Plaintiff did not make statements about numbers throughout the incident. She testified, "*As I stepped back to videotape the process*, I said, black and Latinos are stopped eight to ten times more than the general population." Pl. Ex. 10 (Charles Dep.) 146:12–14 (emphasis added).

Plaintiff further disputes Defendants' paragraph 24 because it mischaracterizes her statement by excluding a pertinent portion of her testimony. Plaintiff testified that she only stated the numbers for the cell phone video, and only said it loud enough for the cell phone video to record it. Pl. Ex. 10 (Charles Dep.) 146:12–24.

25.     The mother of one of the males stopped who claims to have observed the incident testified that plaintiff was yelling throughout the incident, "Why are you stopping them? Why are you frisking them? Why are they being stopped?" (Zuckerman Decl., Ex. F, L. Cannon dep., 23: 17-21) The police officers  conducting the stop testified to the same thing, that plaintiff was "screaming and yelling that we don't have a reason to be annoying these kids, stopping them or

speaking to them." (Zuckerman Decl., Ex. B, Benites dep., 85:14-19).

**RESPONSE**: Plaintiff disputes the facts as stated in Defendants' paragraph 25.

Plaintiff first disputes the facts as stated in paragraph 25 to the extent that they say that the Plaintiff was yelling or screaming. Non-party witness Ivory Cannady stated, "[Plaintiff] wasn't yelling, but her voice was a little raised," and "[Plaintiff's] voice was a little louder than normal, but she wasn't screaming." Pl. Ex. 8 (Cannady Dep.) 41:14–15. Non-party witness D.C. stated that plaintiff was not screaming or yelling. Pl. Ex. 9 (D.C. Dep.) 35:13–22. Non-party witness Louisa Brown's testimony further disputes defendants' alleged fact that the Plaintiff was being very loud. Despite the facts that her apartment is right above the sidewalk where the incident occurred, she is only on the third floor, and her window was open, among the "loud voices" she could hear, she could only say that a few people were speaking and could not even say whether any one male or female voice was louder than the others. Pl. Ex. 11 (Brown Dep.) 22:1–23:6.

Plaintiff testified that she did not raise her voice at all toward the officers until Officer Benites shoved her. After Officer Benites shoved her, the Plaintiff asked, "in a slightly raised voice," "[a] little bit high pitched in a distressed way," why Officer Benites shoved her. Pl. Ex. 10 (Charles Dep.) 58:20–59:11, 60:11–20.

Plaintiff further disputes the facts as stated in Defendants' paragraph 25 to the extent that they state that Louise Cannon, the mother of one of the stopped males, "claims to have observed the incident," and that her testimony concerned the entire incident. Ms. Cannon did not claim to observe the incident; she could not speak to what occurred "throughout the incident" because, as she testified, she was not present for the entire incident. She arrived at the scene of the incident once the Plaintiff was already there. Further, she testified that, once at the scene, she did not "pay attention" to the Plaintiff or other elements of the incident, and at various points did not know what

the Plaintiff was saying or even that plaintiff was holding a cell phone. Pl. Ex. 12 (Cannon Dep.) 12:2–11, 20:19–21, 21:19–25, 23:7–10, 25:2–12.

26.     Plaintiff admits to interacting with police officers in a tone "slightly above normal," though she denies screaming or yelling." (Zuckerman Decl., Ex. D, Charles dep., 58: 20-59: 4) One of the non-party witnesses, the mother of one of the males stopped, testified at deposition, however, that plaintiff was "talking really loud" and "yelling," (Zuckerman Decl., Ex. F, L. Cannon dep., 15: 14-23, 21: 3-6), while another testified that plaintiff was "excited" and her voice was "a little louder than normal…" and "raised." (Zuckerman Decl., Ex. H, Cannady dep., 41: 4-15) The police officers present testified that plaintiff was "screaming" "at the top of her lungs." (Zuckerman Decl., Ex. A, Williams dep., 54: 4-21, 56: 2-5, 66: 11-22; Benites dep., 85: 14-19).

**RESPONSE**: Plaintiff disputes the facts as stated in Defendants' paragraph 26.

Plaintiff first notes that Defendants' citation of the testimony of "the mother of one of the males stopped" that the Plaintiff was "yelling" is duplicative of Defendants' citation of that witness's testimony in paragraph 25. As such, Plaintiff incorporates her response to paragraph 25, and repeats that two of the three other non-party witnesses who witnessed the incident explicitly stated that the Plaintiff never was yelling, and the third did not remember the Plaintiff's voice being louder than the others she was hearing. Pl. Ex. 8 (Cannady Dep.) 41:6–7; Pl. Ex. 9 (D.C. Dep.) 35:16–22; Pl. Ex. 11 (Brown Dep.) 22:1–15.

Plaintiff further disputes Defendants' paragraph 26 to the extent that it does not indicate when or for how long the Plaintiff allegedly spoke in a louder-than-normal voice. Plaintiff testified that she only spoke in a louder-than-normal voice after Officer Benites shoved her, that the only

things she said in a louder-than-normal voice were "[w]hy did you push me, why did you put your

hands on me?" when she was "shocked" and "traumatized" by being shoved. Pl. Ex. 10 (Charles

Dep.) 58:1–6, 58:20–59:11, 59:22–24, 60:11–20.


27.     According to plaintiff's social media page on the night of the incident, "the

neighbors were watching from their windows, at first. When **I interceded** [people] started to come

out and get involved. **There was about to be a riot**." (Zuckerman Decl., Ex. I, emphasis added)

The police officers present observed approximately ten people coming out of their apartment

buildings as well who began to also state the officers were "harassing" the boys. (Zuckerman Decl.,

Ex. A, Williams dep., 58: 8-13, 59: 8-13; Zuckerman Decl., Ex. B, Benites dep., 91:15-20) Just as

plaintiff thought that here was about to be a "riot," the officers felt the crowd was "on the verge of

becoming violent." (Zuckerman Decl., Ex. A, Williams dep., 75:17-25; Ex. B, Benites 121, 15-17)

P.O. Dumelle specifically got out of the police car that had arrived for back-up to "make sure that

the outside groups did not interfere with what was going on." (Zuckerman Decl., Ex. J, Dumelle

dep., 93: 1-5).

**RESPONSE**: Plaintiff disputes the facts as stated in Defendants' paragraph 27.

The undisputed evidence establishes that the attentions of people in the neighborhood—

who were already outside because it was a nice day—were drawn to the incident and verbally

questioned the officers' actions *before* the Plaintiff arrived, and what onlookers said *did not change*

after the Plaintiff arrived. About ten onlookers, on both sides of the street, loud enough to be heard

from their yards across the street, repeatedly asked the officers ""Why are you harassing the boys?"

*before* the Plaintiff arrived. The onlookers were saying "[j]ust the same things over and over

because no one really knew why the police officers were stopping them." What onlookers said *did*

*not change* after the Plaintiff arrived. At least one of the non-party witnesses made such statements to the officers herself. Pl. Ex. 8 (Cannady Dep.) 15:15–16:1, 17:25–18:6, 19:11–14, 22:2–17, 26:21–23, 32:7–16, 33:19–35:9, 39:4–12.

Plaintiff testified, "There were -- it was the summertime, so people are naturally outside, so it is not fair to say that a crowd was beginning to form." Pl. Ex. 10 (Charles Dep.) 54:18–20.

When asked if he saw anyone approaching the scene at any time before the Plaintiff was arrested, non-party witness D.C. testified to events indicative of the fact that Plaintiff was not causing annoyance, inconvenience, or alarm: "[I]t was a workday, so people were walking past," and "[m]y neighbors went inside my building. . . ," indicating that people could freely travel both down the sidewalk and into the building. Pl. Ex. 9 (D.C. Dep.) 38:6-12.

Plaintiff further disputes the last two sentences of Defendants' paragraph 27 as inadmissible because the officers lacked personal knowledge of the intentions of bystanders.


28.     Plaintiff contends that she was then "shoved" with three fingers by P.O. Benites on the right shoulder, causing her to have to take a "step and a half" back, which she admits would have been captured by the videotape if it had been preserved and for which she suffered no injury. (Zuckerman Decl., Ex. D, Charles dep., 52, 20-53: 24) One of the males stopped testified that it was a "touch." (Zuckerman Decl., Ex. E, D.C., 29: 20-30: 16, 47: 17-19) P.O. Benites testified at deposition that slight contact was made inadvertently because plaintiff was so close to the interaction. (Zuckerman Decl., Ex. B, Benites dep., 107: 6-108: 4).

**RESPONSE**: Plaintiff objects to the facts as stated in Defendants' paragraph 28. First, Defendants' paragraph 28 excludes crucial portions of the Plaintiff's testimony describing the force used by Officer Benites when she shoved the Plaintiff. Plaintiff testified, "Officer Benites, walked over,

shoved me in the shoulder," using "[o]ne hand, maybe three fingers," and "[i]t was a significant shove" that caused her to step back "probably a step and a half." Pl. Ex. 10 (Charles Dep.) 52:20–53:16.  Non-party witness Ivory Cannady testified Officer Benites "pushed" the Plaintiff, "pushed [the Plaintiff] back," and that "[i]t was a defensive push, maybe, because they were telling her to stop recording. But [the Plaintiff] is saying that it's not illegal to record. So, you know. [Officer Benites] shoved her back." Pl. Ex. 8 (Cannady Dep.) 17:2–6, 40:6–9, 45:9–11, 45:24–46:2.

Plaintiff further disputes Defendants' paragraph 28 to the extent that it excludes pertinent portions of Officer Benites's testimony in a manner that avoids demonstrating significant material differences between Officer Benites's description of the push versus Plaintiff's and non-party witnesses' descriptions. Omitted from defendants' paragraph 28 is Officer Benites's testimony that the physical contact occurred because Officer Benites was *turning around* and accidentally touched Plaintiff with her *elbow*. This is directly contradicted by Plaintiff's and non-party witnesses' testimony, supra, that Officer Benites approached Plaintiff and pushed her.

Further, Officer Benites testified that her turning around came after the Plaintiff touched Officer Benites with her cell phone. Even D.C., the non-party witness who characterized Benites's contact with Plaintiff as a "touch," testified that the Plaintiff never touched either of the officers and that Officer Benites's "touch" of the Plaintiff occurred when "[t]hey were trying to push [plaintiff] away." He further testified that the Plaintiff had to move back because of the touch. Pl. Ex. 4 (Benites Dep.) 103:20–104:9; Pl. Ex. 9 (D.C. Dep.) 28:14–21, 48:14–49:5.

Plaintiff further objects to defendants' use of "then" in paragraph 28 to the extent that it suggests that Plaintiff accepts any of the facts as stated in Defendants' paragraph 27 or sets any of the facts stated in Defendants' paragraph 28 within any timeline Defendants attempt to create.

29.     According to plaintiff at her deposition, "people on the street started to "comment on [P.O. Benites] shoving [plaintiff]," as "[plaintiff] said that [she] couldn't believe that [P.O. Benites] just pushed [her]." [*sic*] (Zuckerman Decl., Ex. D, Charles dep., 54: 9-13, 54: 16-23).

**RESPONSE:** Plaintiff does not dispute Defendants' paragraph 29.


30.     According to plaintiff, P.O. Benites then talked into her "walkie-talkie." (Zuckerman Decl., Ex. D, Charles dep., 57: 22-58: 11) In fact, P.O. Benites called for her supervisor over the radio. (Benites, 109: 5-20).

**RESPONSE**: Plaintiff does not dispute Defendants' paragraph 30.


31.     A second police car then arrived with two police officers in it, defendant Sgt. Anthony Famighetti and non-party P.O. Adam Dumelle. (Zuckerman Decl., Ex. D, Charles dep., 58: 15-19).

**RESPONSE**: Plaintiff does not dispute Defendants' paragraph 31.


32.     As plaintiff was arrested, according to plaintiff at her deposition, "the people on the side said, why are you guys arresting her." (Zuckerman Decl., Ex. D, Charles dep., 66: 23-67: 3).

**RESPONSE**: Plaintiff does not dispute Defendants' paragraph 32.


33.     Plaintiff was handcuffed, brought back to an NYPD precinct and released after spending 33 minutes in a holding cell upon the issuance of a summons for disorderly conduct. (New York Penal Code § 240.20(2). (Zuckerman Decl., Exs. K and L)

**RESPONSE**: Plaintiff disputes the portion of Defendants' paragraph 33 that refers to the length of time the Plaintiff was detained. Plaintiff stated that she was detained in a holding cell for one hour

and twenty minutes. Pl. Ex. 10 (Charles Dep.) 88:4–10.

34.     The officers were unable to complete their work with respect to the stop of the

males at the scene of the incident due to plaintiff's interference. (Zuckerman Decl., Ex. B, Benites

dep., 149: 4-14).

**RESPONSE**: Plaintiff disputes the facts as stated in Defendants' paragraph 34 to the extent that

"plaintiff's interference" consists of a legal conclusion.

Plaintiff further disputes the fact as stated by defendants that the officers "were unable to

complete their work." Officer Benites testified that before the plaintiff arrived the young men were

free to leave because the officers had determined that "the bulge was not a firearm." All that the

officers allegedly could not complete due to the plaintiff's actions was "talking to [the young men]

and trying to explain to them what we were doing," but the Defendants present no evidence of how

the Plaintiff's actions prevented them from completing that task. In fact, Officer Benites indicated

on the two produced UF-250 forms she filled out for the stops of the young men—the defendants

only produced two reports, although Officer Benites testified to filling out three—that the officers

did complete that task. Further, Officer Williams testified that when Sergeant Famighetti arrived,

"[w]e -- at that point, we had finished -- we had just finished copying down whatever information

we needed from the teens." Pl. Ex. 4 (Benites Dep.) 149:2–18, 224:16–25; Pl. Ex. 5 (Williams Dep.)

77:22–25; Pl. Ex. 8 (UF-250 Forms).

35.     Plaintiff never saw P.O. Benites go through plaintiff's phone nor knows if P.O.

Benites has ever seen the video, yet alleges in her complaint that P.O. Benites "searched the

contents of her phone." (Zuckerman Decl., Ex. D, Charles dep., 92: 23- 93: 15 and First Amended

Complaint at ¶30) P.O. Benites denies ever having seen plaintiff's video. (Zuckerman Decl., Ex. B, Benites dep., 188:11-15).

**RESPONSE**: Plaintiff disputes Defendants' paragraph 35 to the extent that it implies that the Plaintiff's complaint alleges that the Plaintiff witnessed Officer Benites search her phone.  Instead, Plaintiff's allegation was made "upon information and belief," resting on the following interaction between the Plaintiff and Defendant Benites: After the Plaintiff had been in the holding cell for some time, Officer Benites came to the cell with the Plaintiff's phone and told the Plaintiff, "I need you to pick a number so we can call and verify who you are." Plaintiff tried to give Officer Benites the number of her friend Jaldaire "JD" Anderson, which the Plaintiff knew by memory, "but [Officer Benites] was adamant about having to look through getting a number from [Plaintiff's] phone." She told the Plaintiff to "just pick someone from your favorite list, I can call them and verify who you are." Plaintiff then unlocked the phone for Officer Benites, and Officer Benites left the cell with the Plaintiff's unlocked phone. As Plaintiff testified, when the phone is unlocked, it is "unlocked for all purposes." Pl. Ex. 10 (Charles Dep.) 88:15–24, 89:2–3, 89:13–19, 90:14–91:16, 92:1–10.


36.     In an email of plaintiff produced in this litigation, plaintiff gave her motivation for her "interception" of the stop: "Our quest for justice sometimes puts us in situations where we simply cannot acquiesce…. Sometimes I wish I didn't care so much…My life would certainly be easier...but I kept looking at those boys, I saw the humiliation in their eyes. And all I kept thinking was, my God anyone of those boys could have been my brother…God knows I wanted to turn a blind eye, but I simply could not. Something w/n me just wouldn't let me go on about my business." (Zuckerman Decl., Ex., M) "…[M]y organizing and advocate spirit wouldn't allow it."

(Zuckerman Decl. Ex. N).

**RESPONSE**: Plaintiff disputes Defendants' paragraph 36 to the extent that it refers to only one email but actually contains portions of two emails.  Plaintiff further disputes Defendants' paragraph 36 to the extent that the quoted text characterizes Plaintiff's statement as her motivation for her questioning and filming the officers' actions. Additionally, the text as quoted leaves out an important portion of one of the emails that should also be considered as part of Plaintiff's motivation: "I am aware that crime has increased in the neighborhood, and I understand that NYPD has a job to do, but when it borders harassment of our young brothers, we should never tolerate it. Every man, woman and child deserves to live and exist w/o being targeted b/c of their race, age, or gender." Pl. Ex. 16 (email from Hadiyah Charles to the Clifton Place Block Association, June 6, 2012).


37.     As of the day after the incident, plaintiff confirmed that the video was intact and contained footage from the beginning of her videotaping to her handcuffing. (Zuckerman Decl., Ex. D, Charles dep., 105: 5- 106: 11).

**RESPONSE**: Plaintiff does not dispute Defendants' paragraph 37.


38.     However, plaintiff claims that she lost the video on her IPhone at a gala or in a taxi just two days after the incident, the first time she had lost a phone in 5-7 years, without ever preserving the video she took. (Zuckerman Decl. Ex. D, Charles dep., 111: 22-114: 2, 122: 15-123: 2)

**RESPONSE**:  Plaintiff does not dispute Defendants' paragraph 38.

.

39.      Plaintiff's own social media posting, on the night of the incident, following her posting about causing a "riot," states that **"I have to figure out how to make this summons disappear."** (emphasis added, Zuckerman Decl. Ex. I).

**RESPONSE**: Plaintiff disputes Defendants' paragraph 39 to the extent that it excludes the context of Plaintiff's social media post in an effort to describe the Plaintiff's state of mind. The full post states, "It was an experience to say the least. The officers and I spoke – they explained their side, how at the end of the day they just want to go home safely to their families. I understood. I really just wanted to ask them to revoke the summons. Now I have to figure out how to make this summons disappear. ☹" Zuckerman Decl. Ex. I.

40.      Another of plaintiff's own social media postings the day after the incident stated, "I know that I have a case…" (Zuckerman Decl., Ex. I).

**RESPONSE**: Plaintiff disputes Defendants' paragraph 40 to the extent that it excludes the end of Plaintiff's statement in her social media post, in an apparent attempt to show Plaintiff's litigious state of mind. The entire context reads, "I know that I have a case but I'm not going to pursue it. I'm more concerned with the young men knowing their rights." Zuckerman Decl. Ex. I.

41.      Plaintiff's phone records indicate that her phone which contained her video of the incident went missing on June 7, 2012, two days after the underlying incident.  (Supplemental Declaration of Mark D. Zuckerman of September 16, 2014, hereinafter "Supp. Zuckerman Decl.," Ex. O).

**RESPONSE**: Plaintiff does not dispute Defendants' paragraph 41.

42.     June 7, 2012 was the date when plaintiff attempted to contact the ACLU for the first time to seek assistance with her case, though she was unable to talk to anyone from the ACLU on that date.  (Supp. Zuckerman Decl., Ex. P, pp. 180-181, 187).

**RESPONSE**: Plaintiff disputes Defendants' paragraph 42 to the extent that it claims Plaintiff contacted the "ACLU" rather than the NYCLU.  Plaintiff further disputes Defendants' paragraph 42 to the extent that it characterizes Plaintiff's initial, unsuccessful, call to the NYCLU as an attempt to "seek assistance with her case."  As of June 7, 2012, Plaintiff did not have a case, and she had not spoken with anyone from the NYCLU, lawyer or otherwise.  Charles Decl. ¶ 7.

## PLAINTIFF'S LOCAL RULE 56.1 COUNTERSTATEMENT
## OF ADDITIONAL MATERIAL FACTS[2]

1.      Plaintiff Hadiyah Charles is a 36-year-old black woman of Caribbean descent. Charles Decl. ¶ 2.

2.      Plaintiff Hadiyah Charles was an advocacy manager at the Harm Reduction Coalition, located in Manhattan, from March 2011 until May 2014. Charles Decl. ¶ 2.

3.      On June 5, 2012, Plaintiff Hadiyah Charles lived on Clifton Place between Bedford Avenue and Nostrand Avenue in the Bedford-Stuyvesant neighborhood of Brooklyn. Pl. Ex. 10 (Charles Dep.) 6:3–6.

4.      On June 5, 2012, Defendant Sergeant Anthony Famighetti, Defendant NYPD Officer Pamela Benites, Defendant NYPD Officer Raymond Williams, and NYPD Officer Adam Dumelle were all members of the Conditions Unit of the NYPD's 79th Precinct. Pl. Ex. 3 (Famighetti Dep.) 29:2–8; Pl. Ex. 4 (Benites Dep.) 15:8–20; Pl. Ex. 5 (Williams Dep.) 13:18–14:4; Pl. Ex. 1 (Dumelle Dep.) 10:24–11:3.

5.      On June 5, 2012, Defendant Sergeant Anthony Famighetti conducted roll call for the Conditions Unit at the NYPD's 79th Precinct stationhouse. Defendant Officer Pamela Benites, Defendant Officer Raymond Williams, and NYPD Officer Adam Dumelle attended the roll call. Each of these officers was on duty at the time of the plaintiff's arrest. Pl. Ex. 3 (Famighetti Dep.) 33:15–22, Pl. Ex. 4 (Benites Dep.) 31:19–32:11.

6.      The individual defendants—Defendant Sergeant Anthony Famighetti, Defendant Officer Pamela Benites, and Defendant Officer Raymond Williams—claim that Defendant Sergeant Famighetti described a robbery pattern at this roll call. Pl. Ex. 3 (Famighetti Dep.) 48:20–22; Pl.

---

[2] Discovery in this lawsuit has been bifurcated and the plaintiff has therefore not yet completed discovery related to her claims under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The scope of this counterstatement of disputed material facts, prepared according to Local Rule 56.1, therefore excludes facts necessary to establish *Monell* liability.

Ex. 4 (Benites Dep.) 29:22–31:14; Pl. Ex. 5 (Williams Dep.) 20:20–24. However, Officer Adam Dumelle, who was allegedly the only non-party witness present at the roll call, did not recall discussion of any robbery pattern. Pl. Ex. 1 (Dumelle Dep.) 45:15–47:7.

7.      Defendant Sergeant Anthony Famighetti claims that he informed Defendant Officers Pamela Benites and Raymond Williams that the robberies did not involve weapons. Pl. Ex. 3 (Famighetti Dep.) 49:11–16. To the contrary, Defendant Officer Raymond Williams claims that Sergeant Famighetti described a pattern that involved robberies at gunpoint. Pl. Ex. 5 (Williams Dep.) 20:20–24.

8.      The only documentation the defendants have presented as evidence of this alleged robbery pattern is in the Command Conditions Report from the week beginning June 4, 2012. It describes a single black male who snatched electronics and fled on a bicycle. This document does not mention the involvement of any weapons. See Pl. Ex. 2. Defendant Sergeant Anthony Famighetti claims that the conditions set forth in this Command Conditions Report was the pattern discussed at roll call with Defendant Officers Pamela Benites and Raymond Williams. Pl. Ex. 6 (Famighetti Decl.) ¶ 2.

9.      The Command Conditions Report that was produced as documentation of the alleged robbery pattern does not give detailed location information. See Pl. Ex. 2.  However, Defendant Sergeant Anthony Famighetti testified that the robbery pattern had specific boundaries—an area outlined by DeKalb, Lexington, Marcy, and Bedford Avenues. Pl. Ex. 3 (Famighetti Dep.) 48:25–49:7. Defendant Officer Pamela Benites claims that she was instructed that the alleged pattern took place in the vicinity of Clifton Place between Bedford and Nostrand Avenues. Pl. Ex. 4 (Benites Dep.) at 36:11–15. Defendant Officer Raymond Williams testified that Sergeant Famighetti specifically mentioned Greene Avenue and Lafayette Avenue. Pl. Ex. 5 (Williams Dep.) 21:17–25.

10.     The Command Conditions Report describes a "grand larceny" pattern. Pl. Ex. 2. To the contrary, Defendant Sergeant Anthony Famighetti, Defendant Officer Pamela Benites, and Defendant Officer Raymond Williams each testified about a "robbery pattern." Pl. Ex. 3 (Famighetti Dep.) 48:25–49:1; Pl. Ex. 4 (Benites Dep.) 29:19–25; Pl. Ex. 5 (Williams Dep.) 35:9–13.

11.     On the evening of June 5, 2012, following roll call, Defendant Officers Pamela Benites and Raymond Williams were on patrol together in an NYPD van. As the officers drove down Clifton Place, they observed three black youths who were repairing a bicycle on the sidewalk in front of 281 Clifton Place. The bicycle was upside down and had a flat rear tire. Pl. Ex. 9 (D.C. Dep.) 6:23–7:6, 10:10–20; Pl. Ex. 4 (Benites Dep.) 47:9–10, 51:24–25; Pl. Ex. 5 (Williams Dep.) 31:24–32:13; Pl. Ex. 8 (Cannady Dep.) 15:8–9.

12.     On June 5, 2012, all three of these youths lived on the block where the incident occurred. Pl. Ex. 9 (D.C. Dep.) 3:9–16, 8:16–10:3; see also Pl. Ex. 10 (Charles Dep.) 28:18–25.

13.     Defendant Officers Benites and Williams circled the block, returned to 281 Clifton Place, and stopped the van near the building. The officers then approached the three youths and informed them that they matched the description of the suspects in a robbery pattern. In fact, the youths did not match the pattern described in the Command Conditions Report. Pl. Ex. 9 (D.C. Dep.) 6:25–7:10; Pl. Ex. 4 (Benites Dep.) 76:25–77:9; Ex. 3.

14.     Defendant Officer Pamela Benites claims that one of the three youths had a bulge around his waistband, Pl. Ex. 4 (Benites Dep.) 47:9–12, while Defendant Officer Raymond Williams claims to have noticed a bulge in one of the youths' pockets, Pl. Ex. 5 (Williams Dep.) 39:15–19.

15.     Defendant Officer Pamela Benites could not describe the bulge, except to say that it was less than six inches wide, and that the bulge's shape could have been indicative of any sort of object. Pl. Ex. 4 (Benites Dep.) 58:2-20. Defendant Officer Raymond Williams described the bulge

as a large object in the youth's front right pocket. Pl. Ex. 5 (Williams Dep.) 37:24-38:5.

16.      Defendant Officer Pamela Benites searched the pockets of the youth with the bulge and

concluded that it was not a firearm. Pl. Ex. 4 (Benites Dep.) 78:8–79:12. Both of the other two

youths were also frisked. Pl. Ex. 5 (Williams Dep.) 168:6–170:11; Pl. Ex. 8 (Cannady Dep.) 15:19–

23, 32:23–33:5; Pl. Ex. 9 (D.C. Dep.) 19:18–20:16; Pl. Ex. 10 (Charles Dep.) 34:24–42:7.

17.      Defendant Officer Raymond Williams did not feel that his safety was threatened either by

the youth with the alleged bulge or by the other two youths. Pl. Ex. 5 (Williams Dep.) 48:18–21,

169:20–23.

18.      Defendant Officers Pamela Benites and Raymond Williams both claim that only one of the

youths had a bulge, and that it was not caused by a weapon. See Pl. Ex. 4 (Benites Dep.) 47:9–14,

78:8–79:12; Pl. Ex. 5 (Williams Dep.) 36:13–20, 47:3–8.

19.      Defendant Officer Pamela Benites testified that the alleged "robbery pattern" was the sole

reason for the suspicion of the two youths who did not have bulges. Pl. Ex. 4 (Benites Dep.) 68:10–

69:20.

20.      Defendant Officer Pamela Benites completed UF-250 forms in connection with the

incident in front of 281 Clifton Place. A "suspicious bulge" was cited as a reason for the frisking of

at least two of the youths on these forms. Pl. Ex.7 (UF-250 Forms). These forms also affirmatively

indicate that the reason for the stops was explained. Id.

21.      Before and during the stop and frisks, the youths verbally protested the police action.

Pl. Ex. 9 (D.C. Dep.) 22:1–6. One of the youths said, "Why are you stopping me, we didn't do

anything, we are just fixing our bike." Pl. Ex. 10 (Charles Dep.) 29:10–11.

22.      Other people on the street verbally protested the stop and frisk before Hadiyah Charles

arrived. Non-party witness Ivory Cannady said that other onlookers were saying, "Why are you

digging in their pockets? They're not doing anything," "They're just kids from the neighborhood,"

32

and  "Why are you harassing these boys? They're not doing anything wrong." Pl. Ex. 8 (Cannady Dep.) 24:21:22, 26:19, 32:7–16; see also id. 18:1–3.

23.     The memobook entries of Defendant Officer Pamela Benites and Defendant Officer Raymond Williams that correspond to the search of these three youths do not indicate that contraband was found on any of the three youths or that any of the three youths was issued a summons. Pl. Ex. 14; Pl. Ex. 15. Further, neither of the two UF-250 forms completed in connection with this incident indicates that a summons was issued. Pl. Ex. 7.

24.     After Defendant Officers Pamela Benites and Raymond Williams were satisfied that the alleged suspicious bulge was not created by a weapon, the three youths were "free to go." Pl. Ex.  4 (Benites Dep) 148:25–149:3; Pl. Ex. 5 (Williams Dep.) 47:20–48:17.

25.     On the evening of June 5, 2012, Plaintiff Hadiyah Charles left her office and took the subway to the G-train stop at Bedford-Nostrand Avenues. Pl. Ex. 10 (Charles Dep.) 17:8–19:20.

26.     Before returning to her home from the subway stop, Plaintiff Hadiyah Charles walked down Clifton Place toward her car, which was parked beyond 281 Clifton Place, so she could move it to remain in compliance with New York City Alternate Side Parking regulations. Pl. Ex. 10 (Charles Dep.) 23:3–11.

27.     As Plaintiff Hadiyah Charles approached her car, she observed the stop and frisk of the three youths that was being conducted by Defendant Officers Pamela Benites and Raymond Williams. Pl. Ex. 10 (Charles Dep.) 24:20–25:4.

28.     Plaintiff Hadiyah Charles recognized the three youths as residents of her block. Pl. Ex. 10 (Charles Dep.) at 28:18–25.

29.     Plaintiff Hadiyah Charles heard one of the three youths ask, "Why are you stopping me, we didn't do anything, we are just fixing the bike." Pl. Ex. 10 (Charles Dep.) 29:9–11.

30.     As Plaintiff Hadiyah Charles approached the incident, she asked,  "Why are they being stopped." Pl. Ex. 10 (Charles Dep.) 36:10; Pl. Ex. 11 (Brown Dep.) 32:16–18.

31.     Officer Williams responded, "This is police business," and, "You're interfering with police business." Pl. Ex. 10 (Charles Dep.) 42:12–43:7.

32.     Plaintiff Hadiyah Charles then informed Defendant Officers Pamela Benites and Raymond Williams that she would videotape the incident. She voluntarily stepped back to get a better angle for video recording, and then complied with two requests from Officer Benites to step back further, leaving her approximately seven feet from the incident. Pl. Ex. 10 (Charles Dep.) 44:6–46:9.

33.     Plaintiff Hadiyah Charles began to use her personal iPhone to film the stop and frisk of the three youths. Pl. Ex. 10 (Charles Dep.) 46:14–16.

34.     While filming, Plaintiff Hadiyah Charles narrated her video by reciting statistics about the disproportionate impact of stop-and-frisk on minority populations. She spoke into her cell phone at a low volume so that her cell phone would record her words. Pl. Ex. 10 (Charles Dep.) 145:19–146:22. Charles was recording the incident with the intent to share the video with an audience, either through a social-media website such as Facebook, or through a video-sharing platform such as Youtube. Charles Decl. ¶ 6.

35.     Defendant Officers Pamela Benites and Raymond Williams repeatedly ordered Plaintiff Hadiyah Charles to stop filming. Pl. Ex. 8 (Cannady Dep.) at 70:17–71:5; Pl. Ex. 9 (D.C. Dep.) 26:18–20; Pl. Ex. 11 (Brown Dep.) 25:11–13, 32:22–23; Pl. Ex. 13 (Poellot Dep.) 20:5–7. The Defendant Officers told her, "turn your camera off." Pl. Ex. 8 (Cannady Dep.) 16:23–25, 51:16–17. They also said that Ms. Charles "had to move along," and that she "couldn't film there." Pl. Ex. 11 (Brown Dep.) 35:12–13.

35.     While Plaintiff Hadiyah Charles was still positioned seven feet away from the interaction,

Defendant Officer Pamela Benites ordered Ms. Charles to step back to a distance that would have placed her out of filming range. After complying with two requests to back up, Ms. Charles did not comply with this third request to back up, which would have prevented her from filming the incident. Pl. Ex. 10 (Charles Dep.) 47:22–48:22.

36.     Defendant Officer Pamela Benites then approached Plaintiff Hadiyah Charles and shoved Ms. Charles in the shoulder. Pl. Ex. 10 (Charles Dep.) 52:20–53:16. Non-party witness testimony corroborates this fact, which is disputed by the defendants. Non-party witness Ivory Cannady said, "The female officer pushed her." Pl. Ex. 8 (Cannady Dep.) 17:3–4. Non-party witness D.C. said "They were trying to push her away. They touched her." Pl. Ex. 9 (D.C. Dep.) 28:16; see also Pl. Ex. 12 (Cannon Dep.) 21:9–13.

37.     From the time she saw the officers frisking the three young men, until Defendant Officer Pamela Benites shoved her, Ms. Charles's voice did not rise above a regular speaking tone. Pl. Ex. 10 (Charles Dep.) 58:15–23.

38.     After Defendant Officer Pamela Benites shoved Plaintiff Hadiyah Charles, Ms. Charles asked Officer Benites why she had pushed her in a tone of voice that was slightly louder than normal, but she did not scream or yell. Pl. Ex. 10 (Charles Dep.) 59:1–5; Pl. Ex. 9 (D.C. Dep.) 35:16–36:15.

39.     Plaintiff Hadiyah Charles asked several times why she had been pushed. Pl. Ex. 12 (Cannon Dep.) 21:12–13; Pl. Ex. 10 (Charles Dep.) 54:2–13.

40.     On June 5, 2012, at the time of the stop-and-frisk of the three youths, the weather was pleasant and street traffic was heavy. Some people who were outside were close enough to observe the interaction between Plaintiff Hadiyah Charles and Defendant Officers Pamela Benites and Raymond Williams, but they did not approach.  Pl. Ex. 8 (Cannady Dep.) 31:20–32:2; Pl. Ex. 9

(D.C. Dep.) 38:2–7; Pl. Ex. 12 (Cannon Dep.) 18:11-19:4.

41.    During the incident, residents of 281 Clifton Place were not impeded from walking past and through the area where the interaction between Plaintiff Hadiyah Charles and the Defendants took place, and entered their building. See Pl. Ex. 9 (D.C. Dep.) 38:2–12.

42.    After Plaintiff Hadiyah Charles asked Defendant Officer Pamela Benites why she had pushed her, Officer Benites used her radio to request the presence of a supervisor. Pl. Ex. 4 (Benites Dep.) 110:6–10.

43.    Defendant Sergeant Anthony Famighetti responded to the call with his driver, Officer Adam Dumelle, by driving to 281 Clifton Place. Pl. Ex. 3 (Famighetti Dep.) 62:2–3, 66:12–14.

44.    When Defendant Sergeant Anthony Famighetti arrived at the scene, he informed Plaintiff Hadiyah Charles that he and the rest of the officers were all going to leave the scene. Pl. Ex. 10 (Charles Dep.) 62:6–7.

45.    After Plaintiff Hadiyah Charles informed Defendant Sergeant Anthony Famighetti that she wanted to file a formal complaint against Defendant Officer Pamela Benites for having shoved her, Sergeant Famighetti conferred with Officer Benites. Ms. Charles was then handcuffed and placed under arrest. Pl. Ex. 10 (Charles Dep.) 64:1–14.

46.    From the time Plaintiff Hadiyah Charles saw the officers frisking the three young men until the time she was arrested, her voice did not rise to more than slightly above normal. Ms. Charles described her voice during that period as, "[a] little  bit high pitched in a distressed way." Pl. Ex. 10 (Charles Dep.) 60:11–20. Non-party witness statements corroborate this testimony. Non-party witness Ivory Cannady said, "Her voice was a little louder than normal." Pl. Ex. 8 (Cannady Dep.) 41:4–15. Non-party witness D.C. said that she was not screaming or yelling before her arrest, describing it instead as merely "louder than we are talking [in this deposition]." Pl. Ex. 9 (D.C.

Dep.) 35:16–36:5. Non-party Brown stated that, even when speaking in a tone of voice slightly

louder than normal, Plaintiff Hadiyah Charles spoke at the same volume as the Defendant Police

Officers.  Pl. Ex. 11 (Brown Dep.) 25:1–15.

47.     From the time Plaintiff Hadiyah Charles saw the officers frisking the three young men

until the time she was arrested, she did not initiate physical contact with any of the officers. Pl. Ex.

9 (D.C. Dep.) 47:7–10.

48.     After having witnessed the incident from her apartment, non-party witness Louisa Brown

called the NYPD's 79th Precinct stationhouse to complain about Ms. Charles's arrest. She testified,

"I went and I got my phone and called the local precinct and complained . . . they were not within

their rights to arrest her." Pl. Ex. 11 (Brown Dep.) 44:2–5. Following Charles's arrest, other

individuals on the block began to gather and question the officers as to why Charles was being

arrested. Pl. Ex. 10 (Charles Dep.) 148:3-11.

49.     At or around the time of her arrest, officers confiscated Plaintiff Hadiyah Charles' cell

phone and pocketbook. Pl. Ex. 10 (Charles Dep.) 73:10–12.

50.     Plaintiff Hadiyah Charles was transported to the NYPD's 79th Precinct stationhouse in a

marked police van. Pl. Ex. 10 (Charles Dep.) 69:25–70:1.

51.     During the ride, she asked why she had been arrested. Defendant Officer Pamela Benites

replied, "You were trying to be a street lawyer." Pl. Ex. 10 (Charles Dep.) 71:17–21.

52.     Plaintiff Hadiyah Charles was held in custody in the NYPD's 79th Precinct stationhouse

for ninety minutes, about 80 minutes of which was spent in a holding cell. Pl. Ex. 10 (Charles

Dep.) 88:4–10.

53.     While in custody at the NYPD's 79th Precinct stationhouse, Plaintiff Hadiyah Charles

expressed disbelief that she was in a holding cell, and Defendant Officer Pamela Benites replied,

"This is what happens when you get involved." Pl. Ex. 10 (Charles Dep.) 85:5–7.

54.      While Plaintiff Hadiyah Charles was in a holding cell in the NYPD 79th Precinct stationhouse, Defendant Officer Pamela Benites approached the cell with Ms. Charles' phone and asked her to unlock it so she could "verify" her by calling one of her contacts. Ms. Charles asked to use the phone at the precinct desk instead, but Defendant Officer Benites insisted that she needed to "verify" Ms. Charles. Pl. Ex. 10 (Charles Dep.) 81:3–5, 88:15–24, 89:17–19. Defendant Officer Benites then left the cell area with the phone unlocked. Pl. Ex. 10 (Charles Dep.) 92:4.

55.      After issuing Plaintiff Hadiyah Charles a summons, Defendant Sergeant Anthony Famighetti said, "I want to talk to you before you leave." Then Defendant Famighetti, Defendant Officer Pamela Benites, and Defendant Officer Raymond Williams escorted Ms. Charles outside of the Precinct. Pl. Ex. 10 (Charles Dep.) 96:4–12.

56.      With Defendant Officers Pamela Benites and Raymond Williams standing behind him, Defendant Sergeant Anthony Famighetti then asked Plaintiff Hadiyah Charles if she was still interested in filing a complaint. Pl. Ex. 10 (Charles Dep.) 96:11–12, 97:25–98:1.

57.      The conversation outside the NYPD's 79th Precinct stationhouse, between Defendant Sergeant Anthony Famighetti and Plaintiff Hadiyah Charles, in the presence of Defendant Officers Pamela Benites and Raymond Williams, before Ms. Charles was released from custody, discouraged her from filing a formal complaint. Pl. Ex. 10 (Charles Dep.) 97:25–98:2, 148:20–25.

58.      Plaintiff Hadiyah Charles did not file a formal complaint on June 5, 2012, because she feared further retaliation from Defendant Sergeant Anthony Famighetti and Defendant Officers Pamela Benites and Raymond Williams. Pl. Ex. 10 (Charles Dep.) 98:23–99:5.

59.      After having been released from custody at the NYPD's 79th Precinct stationhouse, Plaintiff Hadiyah Charles ran to her residence on Clifton Place. Pl. Ex. 10 (Charles Dep.) 98:9–10.

She was "terrified, traumatized, and scared out of [her] mind." <u>Id.</u> 99:7–8.

60.      At her place of work on June 6, 2012, Plaintiff Hadiyah Charles showed the video of the incident that she had recorded on her iPhone to her colleague, non-party witness Erica Poellot. Pl. Ex. 13 (Poellot Dep.) 10:15-16; Pl. Ex. 10 (Charles Dep.) 107:13-22.

61.      Plaintiff Hadiyah Charles placed a call the NYCLU on June 7, 2014, but she "didn't get through," and she "did not get to a person."  Pl. Ex. 10 (Charles Dep.) 181:14-20; Charles Decl. ¶ 7.  Monday, June 11, 2014, was the first date she communicated with an employee of the NYCLU. Charles Decl. ¶ 7.

62.      On the evening of June 7, 2014, Plaintiff Hadiyah Charles attended a social event in honor of the 25th anniversary of the National Black Leadership Commission on AIDS and took a taxi home at the end of the night.  Pl. Ex. 10 (Charles Dep.) 111:24–112:13.  The next morning, while preparing for a flight to Atlanta to visit a gravely ill friend, when Charles went to use her phone, she realized that she did not have it, and she suspected that she had left it in the taxi the previous evening.  *Id.* at 113:23–116:3, 117:4–25. She attempted to locate the phone in her apartment and workplace by calling it, attempted to track it down by calling the cab service she had utilized the night before, and, after being told by the cab service that they could not help her, she attempted to track it herself by utilizing the "Find My iPhone" application linked to her phone.  *Id.* at 114:4-115:22; 117:12-17. Ultimately, despite her repeated diligent efforts, she was unable to locate the phone.  *Id.* at 117:24-25.

Dated: New York, New York
      Sept. 23, 2014

Respectfully submitted,


      s/ Alexis Karteron
ALEXIS KARTERON
JORDAN WELLS
ROBERT HODGSON
CHRISTOPHER DUNN
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004
Phone: (212) 607-3300
Fax: (212) 607-3318
Email: akarteron@nyclu.org

*Counsel for Plaintiff*