UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

HADIYAH CHARLES,                              :
                                              :
                                              :
            Plaintiff,                        :
                                              :
        -versus-                              :
                                              :        12-cv-6180 (SLT) (SMG)
The CITY OF NEW YORK, et al.,                 :
                                              :
                                              :
            Defendants.                       :

-------------------------------------------------------------- x


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT
AND SPOLIATION SANCTIONS**

ALEXIS KARTERON
JORDAN WELLS
ROBERT HODGSON
CHRISTOPHER DUNN
New York Civil Liberties Union
   Foundation
125 Broad Street, 19th Floor
New York, New York 10004
Phone: (212) 607-3300
Fax: (212) 607-3318
Email: akarteron@nyclu.org

*Counsel for Plaintiff*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 1

ARGUMENT .......................................................................................................................... 3

I.      The Defendants Are Not Entitled To Summary Judgment Because The Few Undisputed Facts Do Not Establish That There Was Probable Cause To Arrest Ms. Charles. ................... 4

        A.    A reasonable jury could conclude that there was not probable cause to arrest Ms. Charles for obstruction of governmental administration. ............................... 4

            1. Physical interference with the stop-and-frisk......................................................... 4

            2. A reasonable jury could conclude that the stop-and-frisk of the three young men on Clifton Place was not an "official function."................................... 7

        B.    A reasonable jury could conclude that there was not probable cause to believe that Ms. Charles had committed disorderly conduct. ..................................... 9

            1. Unreasonable noise. ...................................................................................... 10

            2. Officer Benites's Third Order to "Step Back." ........................................... 11

II.     Summary Judgment Is Inappropriate On The Plaintiff's First Amendment Claim Because A Reasonable Jury Could Conclude That The Defendants Arrested Ms. Charles In Retaliation For Her Speech And Her Filming Of The Stop-And-Frisk. .......................... 12

III.    The Defendants Are Not Entitled To Qualified Immunity ..................................................... 13

        A.    Factual disputes make it impossible to determine whether there was arguable probable cause to arrest Ms. Charles. .......................................................... 13

        B.    The right to film in public was clearly established at the time of the arrest. ............... 15

            1. Second Circuit authority establishes that there is a right to film in public. ............ 16

            2. At the time of Ms. Charles's arrest, there was also a consensus among courts that the First Amendment protects the right to record police activity in public............................................................................................... 18

IV.    The Plaintiff's Inadvertent Loss Of Her Cellular Phone Does Not Warrant The Extreme Sanctions Of Dismissal Or An Adverse Inference Instruction. ............................ 21

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) .......................................... 19, 20

*Adonis v. Court Officer Coleman,* 2009 WL 3030197 (S.D.N.Y. Sept. 23, 2009) ........................ 10

*Berger v. Schmitt*, 91 Fed. Appx. 189 (2d Cir. 2004) ........................................ 5

*Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996) ...................................... 17

*Blue v. Koren*, 72 F.3d 1075 (2d Cir. 1995) ................................................ 12

*Breitkopf v. Gentile*, -- F. Supp. --, 2014 WL 4258994 (E.D.N.Y. Aug. 29, 2014) ........................ 5

*Brown v. City of Oneonta*, 221 F.3d 329 (2d Cir. 1999) .................................... 8

*Buehler v. City of Austin/Austin Police Dep't.*, No. 13-1100, slip. op. (W.D. Tex. July 24, 2014) .. 21

*Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93 (2d Cir. 2001) ........................... 22

*Cameron v. City of New York*, 598 F.3d 50 (2d Cir. 2010) .................................. 7

*Charles v. City of New York*, 2014 WL 1284975 (S.D.N.Y. Mar. 31, 2014) .................... 5, 7, 14

*Christou v. Beatport, LLC*, 2013 WL 248058 (D. Colo. Jan. 23, 2013) .......................... 24

*City of Houston v. Hill*, 482 U.S. 451 (1987) .............................................. 5, 6, 8

*Cook v. Sheldon*, 41 F.3d 73, 78 (2d Cir. 1994) ............................................ 14

*Crawford v. Geiger*, 2014 WL 554469 (N.D. Ohio Feb. 10, 2014) .................................. 21

*Crenshaw v. City of Mount Vernon*, 372 Fed. Appx. 202 (2d Cir. 2010) ......................... 11

*Decker v. Campus*, 981 F. Supp. 851 (S.D.N.Y. 1997) ...................................... 6

*Donato v. Fitzgibbons*, 172 F.R.D. 75 (S.D.N.Y. 1997) .................................... 22

*Dowling v. City of New York*, 2013 WL 5502867 (Sept. 30, 2013) .................... 5, 7, 14, 15

*Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. Aug. 12, 2013) ...................... 9

*Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995) ............................................ 19, 20

*Genia v. N.Y. State Troopers*, 2007 WL 869594 (E.D.N.Y. Mar. 20, 2007) ................... 13

*Gilk v. Cunnife*, 655 F.3d 78 (1st Cir. 2011) ...................................... 19

*Husain v. Springer*, 494 F.3d 108 (2d Cir. 2007) ............................................... 16

*Jackson v. City of New York*, 939 F. Supp. 2d 219 (E.D.N.Y. 2013) ....................................... 5, 7, 14

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) ....................................... 16

*Kelly v. Carlisle*, 622 F.3d 248 (3d Cir. 2010) ............................................... 20

*Kerman v. City of New York*, 261 F.3d 229 (2d Cir. 2001) ............................................... 12

*Khaytin v. Stern & Stern, Esqs.*, 2013 WL 5520000 (E.D.N.Y. Sep. 13, 2013) ......................... 12, 16

*Lee v. McCue*, 410 F. Supp. 2d 221 (S.D.N.Y. 2006) ....................................... 14

*Lennon v. Miller*, 66 F.3d 416 (2d Cir. 1995) ............................................... 4, 13

*Linehan v. State*, 201 A.D. 2d 706 (App. Div. 1994) ............................................... 6

*Lutalo v. Nat'l R.R. Passenger Corp.*, 2013 WL 1294125 (D. Colo. Mar. 28, 2013) ....................... 24

*Marcavage v. City of New York*, 689 F.3d 98 (2d Cir. 2012) ............................................... 5

*Malone v. City of Glens Falls*, 674 N.Y.S.2d 502 (App. Div. 1998) ................................... 6

*McClain v. Norfolk S. Rwy. Co.*, 2009 WL 701001 (N.D. Ohio Mar. 16, 2009) .............................. 24

*McClellan v. Smith*, 439 F.3d 137 (2d Cir. 2006) ............................................... 4, 14

*Mesa v. City of New York,* 2013 WL 31002 (S.D.N.Y. Jan. 3, 2013) ................................. 21

*Nagle v. Marron*, 663 F.3d 100, 115 (2d Cir. 2011) ............................................... 17, 18

*Ortiz v. City of New York*, 2013 WL 5339156 (S.D.N.Y. Sept. 24, 2013) ................................. 20, 21

*People v. Arko*, 199 N.Y.S. 402 (App. Term 2d Dep't 1922) ............................................... 11

*People v. Baker*, 984 N.E.2d 902 (N.Y. 2013) ............................................... 10, 11

*People v. Benjamin*, 185 Misc.2d 466 (Crim. Ct. N.Y. 2000) ............................................... 11

*People v. Brooks*, 266 A.D.2d 864 (App. Div. 1999) ............................................... 8

*People v. Case*, 365 N.E.2d 872 (N.Y. 1977) ............................................... 5

*People v. Dubinsky*, 289 A.D.2d 415 (App. Div. 2001) ............................................... 8

*People v. Phillips*, 602 N.Y.S.2d 101 (App. Div. 1993) ............................................... 8

iii

*People v. Romeo*, 9 A.D.3d 744 (App. Div. 2004) .............................................................. 6

*People v. Stevenson*, 779 N.Y.S. 2d 498 (App. Div. 2004) ................................................... 9

*People v. Yiu C. Choy*, 173 A.D.2d 883 (App. Div. 1991) ................................................... 8

*Petway v. City of New York*, 2014 WL 839931 (E.D.N.Y. 2014) ......................................... 5

*Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014) ...................................................................... 19

*Pomykacz v. Borough of W. Wildwood*, 438 F. Supp. 2d 504 (D.N.J. 2006) ...................... 19

*Provost v. City of Newburgh*, 262 F.3d 146 (2d Cir. 2001) .................................... 10, 11, 13

*Rasmussen v. City of New York*, 766 F. Supp. 2d 399 (E.D.N.Y. 2011) ......................... 4, 7

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99 (2d Cir. 2002) ............... 22, 24, 25

*Robinson v. Fetterman*, 378 F. Supp. 2d 534 (E.D. Pa. 2005) ............................................ 19

*Saucier v. Katz*, 533 U.S. 194 (2001).................................................................................. 16

*Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000) ......................................... 19, 20

*Southerland v. City of New York*, 680 F.3d 127 (2d Cir. 2012),
    *cert denied* 133 S. Ct. 980 (2013) .............................................................................. 13

*Szymecki v. Houck*, 353 Fed. Appx. 852 (4th Cir. 2009) ................................................... 20

*Terebesi v. Torreso*, -- F.3d --, 2014 WL 4099309 (2d Cir. Aug. 21, 2014) .............. 19, 20

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014) ............................................................................ 13

*Tunick v. Safir (Tunick I)*, 209 F.3d 67 (2d Cir. 2000) ...................................................... 17

*Tunick v. Safir (Tunick II)*, 228 F.3d 135 (2d Cir. 2000) ................................................... 17

*United States v. Olavarria*, 2011 WL 1529190 (S.D.N.Y. Apr. 20, 2011) .......................... 7

*United States v. Perez*, 732 F. Supp. 347 (E.D.N.Y. 1999) ................................................. 9

*United States v. Swindle*, 407 F.3d 562 (2d Cir. 2005) ....................................................... 8

*Valentine v. Museum of Modern Art*, 29 F.3d 47 (2d Cir. 1994) ........................................ 22

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776 (2d Cir. 1999) ................................... 22

*Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996) ........................................................... 4, 13, 14

*Wilder v. Village of Amityville*, 288 F. Supp. 2d 341 (E.D.N.Y. 2003) ................................................. 5

*Ying Jing Gan v. City of New York,* 996 F.2d 522 (2d Cir. 1993) ........................................................ 7

*Zubulake v UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004) ..................................................... 25

**Statutes**

N.Y. Penal Law § 240.20(2) ............................................................................................................... 10

## PRELIMINARY STATEMENT

This case, which the plaintiff brought to vindicate her civil rights following her arrest by the NYPD for filming and protesting the stop-and-frisk of three youths on her block, is rife with conflicting accounts of every relevant event. The parties dispute not only critical facts about the plaintiff's arrest, such as how close she stood to the stop-and-frisk and the volume of her voice, but also the circumstances that the defendants cite to justify the underlying stop-and-frisk. Nonetheless, the defendants move for summary judgment, mischaracterizing the accounts offered by the plaintiff and numerous non-parties and repeatedly failing to acknowledge that their version is not the one the Court must accept at this stage. As a reasonable jury could easily conclude that the defendants did not have probable cause to arrest the plaintiff and that their actions constituted retaliation in violation of clearly established First Amendment law, the defendants' motion must fail.

The defendants also move for sanctions, attempting to twist the accidental loss of the plaintiff's personal cellular phone, an unquestionably common mishap, into an intentional act of spoliation. Resting on only inflammatory speculations, the defendants cannot meet the high burden for sanctions of any kind here, and their application should be denied.

## FACTUAL BACKGROUND

Plaintiff Hadiyah Charles has laid out a comprehensive response to all of the defendants' asserted facts, highlighting each of the numerous disputed issues of material fact. *See* Pl. 56.1; Pl. Resp. to Def. 56.1. She provides a summary of the most relevant factual background here.

On the evening of June 5, 2012, Charles left her office at the end of the work day. Pl. 56.1 ¶ 24. On her way home, while stopping by Clifton Place to move her car in accordance with parking regulations, she observed an ongoing stop-and-frisk of three boys that she recognized as residents of her block. *Id.* ¶¶ 25-27. The stop-and-frisk that Charles stumbled upon was being conducted by defendant Officers Pamela Benites and Raymond Williams. *Id.* ¶¶ 13, 15, 19.

Officers Benites and Williams claim to have approached the young men, all of whom are black, after allegedly observing a "suspicious bulge" around one of their waistbands, although neither could describe what was "suspicious" about it. *Id.* ¶¶ 14, 19. The officers informed the boys that they were being stopped because they matched the description of suspects in a robbery pattern that the officers had allegedly been informed of at roll call. *Id.* ¶¶ 6-9, 13. In fact, the only thing about the boys matching the "pattern" was their race and their presence around a bicycle, and one key witness does not recall a "robbery pattern" even being discussed at the roll call in question. *Id.* ¶¶ 6-9.

Once Charles came upon the scene, she asked the officers why the boys were being stopped. *Id.* ¶ 30. Officer Williams responded by saying, "This is police business," and, "You're interfering with police business." *Id.* at ¶ 31. Charles then informed the officers that she would be videotaping the incident. *Id.* at ¶ 32. To get a better angle for her video, Charles stepped back, and then she complied with two requests from Officer Benites to step back even farther. *Id.* ¶¶ 32, 35. Charles filmed with her personal iPhone, intending to share the video through social media and quietly reciting statistics about stop-and-frisk practices into the phone. *Id.* ¶¶ 33-34, 37. The volume of her voice, her distance from the officers at all times during this exchange, and her compliance with their initial orders to move back are all in dispute. Pl. Resp. to Def. 56.1 ¶¶ 8, 16, 19, 21-27.

Officers Benites and Williams repeatedly ordered Charles to stop filming, telling her to "turn your camera off," and that she "had to move along," and "couldn't film there." Pl. 56.1 ¶ 35. The officers deny this. Def. 56.1 ¶ 17. Charles did not stop filming, and Officer Benites approached Charles and shoved her in the shoulder. Pl. 56.1 ¶ 36. Benites claims that any touch was "inadvertent." Def. 56.1 ¶ 28. Officer Benites then radioed for a supervisor, Defendant Sergeant Anthony Famighetti. Pl. 56.1 ¶¶ 42-44. When he arrived on the scene, Famighetti informed Charles that he and the rest of the officers would be leaving. *Id.* Charles informed Sergeant Famighetti that she wanted to file a formal complaint against Officer Benites for shoving her. *Id.* ¶ 45. The officers conferred together, and when they returned to Charles they handcuffed her and placed her under

arrest. *Id.* Witnesses to the interaction did not understand why Charles had been arrested and asked the police officers for the reason. *Id.* ¶ 48. One neighbor who witnessed Charles's arrest called the police to complain because the officers "were not within their rights to arrest her." *Id.*

Throughout the entirety of her interaction with the arresting officers, Charles's voice only rose to a level slightly above normal, and it never rose above the volume of the police officers. *Id.* ¶ 46. The officers dispute this, claiming that she was "screaming . . . at the top of her lungs." Def. 56.1 ¶ 26. Following her arrest and the confiscation of her cell phone and pocketbook, Charles asked why she had been arrested. Pl. 56.1 ¶¶ 49-51. Officer Benites replied, "You were trying to be a street lawyer." *Id.* ¶ 51. Charles was transported in a marked police van to the NYPD's 79th Precinct stationhouse, where she was held for ninety minutes. *Id.* ¶ 52.

At the Precinct, Officer Benites had Charles unlock her iPhone, rendering it completely searchable, and then left Charles's holding cell with the phone. *Id.* ¶ 54. Later, as Charles was being released, Sergeant Famighetti and the officers discouraged Charles from filing a complaint against Officer Benites. *Id.* ¶ 57. Charles then ran from the 79th Precinct stationhouse to her home. *Id.* ¶ 59. The next day, she showed the incident video to her colleague Erica Poellot. *Id.* ¶ 60.

On the evening of June 7, 2014, Charles attended a social event and, at some point during the night, lost her phone. *Id.* ¶ 62. The next morning, while preparing for a flight to Atlanta to visit a gravely ill friend, when Charles went to use her phone, she realized that she did not have it. *Id.* She attempted to locate it in her apartment and workplace by calling it; attempted to track it down by calling the cab service she had utilized the night before; and, after being told that the cab service could not help her, attempted to track it herself by utilizing the "Find My iPhone" application linked to her phone. *Id.* Ultimately, despite her repeated efforts, she was unable to locate the phone. *Id.*

## ARGUMENT

The defendants cannot meet the high burden that applies to their motion. "Summary judgment may be granted only where there is no genuine issue as to any material fact . . . . A genuine

factual issue derives from the 'evidence [being] such that a reasonable jury could return a verdict for the nonmoving party.'" *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); internal citation omitted). In considering the motion, "the district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). The defendants cannot meet their burden and therefore are not entitled to summary judgment.

I. **The Defendants Are Not Entitled To Summary Judgment, Because The Few Undisputed Facts Do Not Establish That There Was Probable Cause To Arrest Ms. Charles.**

    A. **A reasonable jury could conclude that there was not probable cause to arrest Ms. Charles for obstruction of governmental administration.**

The defendants claim that they are entitled to summary judgment that there was probable cause to arrest Ms. Charles for obstruction of governmental administration ("OGA"). Def. Br. at 8-14. They correctly cite the elements of that charge: "(1) prevention or attempt to prevent (2) a public servant from performing (3) an official function (4) by means of intimidation, force or interference." *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995). The remainder of the defendants' argument for summary judgment rests on disputed factual claims and a misunderstanding of New York law.

    1.   Physical interference with the stop-and-frisk.

A reasonable jury could conclude that the plaintiff did not physically interfere with the defendants' stop-and-frisk and thus that there was not probable cause to arrest Ms. Charles for OGA. The defendants cite *Rasmussen v. City of New York* for the following proposition: "Under New York law, merely approaching the police, or speaking during the course of a police action or disregarding police instructions, will support a conviction for OGA." 766 F. Supp. 2d 399, 406 (E.D.N.Y. 2011); Def. Br. at 9. This statement conflicts with clear authority from the Supreme Court and the Court of Appeals of New York. The First Amendment protects the right "verbally to oppose or challenge

4

police action," *City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987).  Moreover, the OGA statute

prohibits only <u>physical</u> interference with an official function.  *See People v. Case*, 365 N.E.2d 872,

875 (N.Y. 1977) ("[M]ere words alone do not constitute 'physical force or interference' such as to

support the charge of [OGA]."); *Breitkopf v. Gentile*, -- F. Supp. --, 2014 WL 4258994, at *32

(E.D.N.Y. Aug. 29, 2014) ("[T]he interference must be physical in nature at least in part.").

Accordingly, a reasonable jury could conclude that there was not probable cause to arrest Ms.

Charles for any of the three reasons the defendants suggest: (1) that she was "too close" to the stop-

and-frisk; (2) that she refused Officer Benites's third order to step back; and (3) she was "talking

loudly,"  Def. Br. at 13-14.  The Court should reject the defendants' arguments.

*First*, the defendants rely primarily on *Petway v. City of New York*, 2014 WL 839931

(E.D.N.Y. 2014), for the notion that Ms. Charles was "too close," but that case is distinguishable.

There, the plaintiff blocked the officers' access to the van into which they were trying to place an

arrestee, took an object from the arrestee, and did not comply with numerous lawful orders to back

up from the arrest scene.  *Id.* at *6.  Here, the plaintiff was peacefully filming and commenting on the

stop-and-frisk without coming close enough to interfere with it.  Pl. 56.1 ¶¶ 32-34.  Moreover, there

is no *per se* rule setting forth a distance that is "too close" to police action.  *See Charles v. City of

New York*, 2014 WL 1284975, at *5 (S.D.N.Y. Mar. 31, 2014) (denying summary judgment where

evidence showed only that plaintiff was "in close proximity to the arrest"); *Dowling v. City of New

York*, 2013 WL 5502867, at *4-6 (E.D.N.Y. Sept. 30, 2013) (denying summary judgment where

plaintiff was within three or four feet of arrest and did not obey the order to back up).

*Second*, the lawfulness of Officer Benites's order is in dispute.  If it was unjustified—as the

plaintiff submits—there was not probable cause to arrest Ms. Charles for OGA.[1]  *See Jackson v. City*

---

[1] The other cases cited by the defendants are distinguishable because they involved orders to disperse in
dangerous or volatile situations.  *See Marcavage v. City of New York*, 689 F.3d 98 (2d Cir. 2012) (order to
disperse protestors who were blocking traffic ruled constitutional); *Berger v. Schmitt*, 91 Fed. Appx. 189
(2d Cir. 2004) (plaintiff returned to scene of dispute that had been "volatile situation"); *Wilder v. Village*

*of New York*, 939 F. Supp. 2d 219, 230 (E.D.N.Y. 2013) ("Plaintiff's failure to comply with an

(unjustified) order to exit her vehicle cannot, without more, create the predicate probable cause to

justify her arrest for [OGA]."). Here, after weighing all the evidence, a reasonable jury could

conclude that Officer Benites's order was arbitrary and unjustified because it was made with the goal

of impeding Ms. Charles's effort to film the stop-and-frisk and in retaliation for her speech regarding

the NYPD's stop-and-frisk practices rather than with the goal of promoting public order. The

following evidence supports that conclusion: at least two officers told Ms. Charles to stop filming, Pl.

56.1 ¶ 35; Ms. Charles was the same distance from the scene as non-party witness Ivory Cannady,

who was not arrested, Pl. Resp. to Def. 56.1 ¶ 19; Ms. Charles was not immediately arrested for

refusing to step back for the third time but was only arrested after she asked to file a complaint

against Officer Benites, Pl. 56.1 ¶ 45; and Ms. Charles did not block the sidewalk so that pedestrians

could not pass or otherwise disturb the peace, Pl. Resp. to Def. 56.1 ¶ 27. The defendants contend

that the question of whether the order was arbitrary "is one of law, not fact," Def. Br. at 16, but

because there are disputes regarding the character and application of the order, the order's

arbitrariness depends on the outcome of those factual disputes, *see Malone v. City of Glens Falls*, 674

N.Y.S.2d 502 (App. Div. 1998) (reversing summary judgment where a reasonable jury could

conclude that order to disperse was not legitimate).

*Third*, the defendants cite no case where talking loudly was held to justify an arrest for OGA,

and the plaintiff submits that such an arrest would be unconstitutional. *See Hill*, 482 U.S. at 457,

458-67 (overturning statute "employed to make arrests for, *inter alia,* 'arguing,' '[t]alking,'

'[i]nterfering,' '[f]ailing to remain quiet,' '[r]efusing to remain silent,' '[v]erbal abuse,' '[c]ursing,'

---

*of Amityville*, 288 F. Supp. 2d 341 (E.D.N.Y. 2003) (zone of danger created by tree removal); *Decker v. Campus*, 981 F. Supp. 851 (S.D.N.Y. 1997) (high-risk rescue operation); *People v. Romeo*, 9 A.D.3d 744 (App. Div. 2004) ("attempt[] to subdue and transfer an arrested person from one police vehicle to another"); *Linehan v. State*, 201 A.D. 2d 706 (App. Div. 1994) ("disturbance was taking place" in area).

'[v]erbally yelling,' and '[t]alking loudly" (alterations in original)).[2]  Thus, this case most closely

resembles *Charles*, *Dowling*, and *Jackson*, where courts did not find probable cause for OGA.

      2.      <u>A reasonable jury could conclude that the stop-and-frisk of the three young<br>men on Clifton Place was not an "official function."</u>

      The defendants also claim that they are entitled to summary judgment that they were engaged

in the official function of "an approach and stop of three males . . . based on a grand larceny/robbery

pattern that was occurring in the neighborhood in which the perpetrator(s) threatened the use of

violence, stole electronics and fled on bicycle(s)." Def. Br. at 10.  A reasonable jury could conclude,

however, that the defendants were conducting a stop-and-frisk that did not conform to legal standards

and therefore were not performing an "official function."  Police activity is an "official function"

only if it is lawful.  *See Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir. 2010).  "Where the

police are engaged in an illegal arrest, other unlawful seizure, or an unlawful search, no charge for

[OGA] will lie" against a third party accused of obstructing that activity.  *United States v. Olavarria*,

2011 WL 1529190, at *7 (S.D.N.Y. Apr. 20, 2011) (collecting cases).

      Here, a jury could conclude that the stop-and-frisk was not an official function because: (1)

the defendants did not rely on their knowledge of the crime pattern described in the command

conditions report when they stopped the three young men, and even if they did, that knowledge was

not sufficient to create reasonable suspicion; (2) Officers Benites and Williams did not observe a

"suspicious bulge" on one of the three young men; and (3) there was no legal basis to frisk the young

men.  The defendants are not, therefore, entitled summary judgment.[3]

---

[2] *Rasmussen*, cited by the defendants, is distinguishable.  There, the Court found that there was probable cause because the plaintiff had physically interfered with her brother's arrest, not because of her speech. 766 F. Supp. 2d at 403-04.

[3] The defendants' claim—that "[a]ny attempt by plaintiff to defeat probable cause for obstruction of governmental administration by arguing that the officers' acts that she interfered with lacked legitimacy is nothing more than an attack on the credibility of the officers that is not sufficient to defeat summary judgment," Def. Br. at 11—is plainly incorrect.  The case they cite in support of their position, *Ying Jing Gan v. City of New York*, stands for the unremarkable proposition that a party opposing summary

*First*, the defendants' alleged knowledge of a "grand larceny" pattern described in the command conditions report is in serious doubt. There are numerous inconsistencies between the report and the defendants' descriptions of a "robbery pattern." Pl. 56.1 ¶¶ 6-10. In addition, non-party Adam Dumelle testified that he attended the same roll call as the officer defendants but did not recall any mention of a robbery pattern. *Id.* ¶ 6. Further, even if the defendants did rely on it— requiring an inference to which they are not entitled on their motion—the crime pattern described by the report was too vague to justify stopping the three young men on Clifton Place.[4] *See United States v. Swindle*, 407 F.3d 562, 569-70 (2d Cir. 2005) ("[C]ourts agree that race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop."); *Brown v. City of Oneonta*, 221 F.3d 329, 334 (2d Cir. 1999) ("[A] description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure."); *People v. Phillips*, 602 N.Y.S.2d 101, 102 (App. Div. 1993) ("A bare description of black youths on bicycles, in a neighborhood full of black youths on bicycles, did not justify the officer's detention . . . of defendant.").[5] A reasonable jury will almost certainly conclude that the defendants stopped the three young men in contravention of legal standards.

---

judgment "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible," 996 F.2d 522, 532 (2d Cir. 1993). The plaintiff cites evidence in support of her position, not just conclusory statements and contentions.

[4] The defendants stopped three young black men standing by a bike, while the report described a single black male who fled on a bike. Pl. 56.1 ¶ 8. The report provided no other identifying information about the suspect and did not indicate when the crimes took place. *Id.* ¶¶ 8-9. This description therefore did not sufficiently narrow the universe of possible suspects to provide reasonable suspicion to stop the three young men—days or possibly weeks after the reported robberies—who had nothing in common with the suspect other than their gender, their proximity to a bicycle, and the color of their skin.

[5] Courts routinely find that a match to vague descriptions of crime suspects does not constitute reasonable suspicion. *See, e.g.*, *People v. Dubinsky*, 289 A.D.2d 415 (App. Div. 2001) (finding stop unjustified where "the only description that the police officers had of the robbers was that they were two white males, 15 to 16 years old, who were wearing dark jackets that might be black or blue"); *People v. Brooks*, 266 A.D.2d 864 (App. Div. 1999) (same, where stop was "based entirely upon information that a robbery had been committed by three black males in a green automobile"); *People v. Yiu C. Choy*, 173 A.D.2d

*Second*, a reasonable jury could conclude that Officers Benites and Williams did not observe a "suspicious bulge" on any of the young men. Officer Benites could not describe the bulge, except to say that it was less than six inches wide, and Officers Benites and Williams differed about the location of the bulge. Pl. 56.1 ¶¶ 14-15. In these circumstances, there was no reason to find the bulge "suspicious." *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 614-615 (S.D.N.Y. Aug. 12, 2013) ("[T]he outline of a commonly carried object such as a wallet or cell phone does not justify a stop or frisk . . . ."); *People v. Stevenson*, 779 N.Y.S. 2d 498, 499 (App. Div. 2004) (bulge was not suspicious because "[t]he detective did not indicate that the bulge had the outline of a weapon, and he was unable to describe it in any further detail").

*Third*, even if a jury were to conclude that one of the young men did have a suspicious bulge, the record reveals no justification for the stop of the other two young men, or for <u>any</u> frisk. Reasonable suspicion to stop the young man who supposedly had a bulge did not create reasonable suspicion to stop the other two. *See United States v. Perez*, 732 F. Supp. 347, 348 (E.D.N.Y. 1999) (no reasonable suspicion to stop individual based solely on "the fact that the defendant was in proximity to or accompanied a person about whom the police had a particularized reasonable basis to stop and/or probable cause to arrest"). Further, with regard to the frisks, Officer Williams testified that he never feared for his safety, Pl. 56.1 ¶ 17, allowing a jury to conclude that no reasonable officer in that situation would have feared for his or her safety, and the frisks were thus unjustified. *See Perez*, 732 F. Supp. at 352 (describing frisk standard).

> **B.** **A reasonable jury could conclude that there was not probable cause to believe that Ms. Charles had committed disorderly conduct.**

A reasonable jury could also conclude that there was not probable cause to arrest Ms. Charles for disorderly conduct. Disorderly conduct includes three elements: "(i) the defendant's conduct must be 'public' in nature, (ii) it must be done with 'intent to cause public inconvenience, annoyance

---

883 (App. Div. 1991) (same, where stop was based on description of robbery suspects who were "four young male Orientals, dressed in dark clothing").

or alarm' or with recklessness as to 'a risk thereof,' and (iii) it must match at least one of the descriptions set forth in the statute." *Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001). The defendants contend that there was probable cause to arrest Ms. Charles for disorderly conduct because "the plaintiff's own admissions of what she did amounted to a 'commotion,'" Def. Br. at 15, and the "plaintiff admitted to refusing to comply with a non-arbitrary order to move back to a safe distance from the incident." Def. Br. at 16. As these assertions rely on hotly disputed facts, the defendants are unable to meet their burden of establishing that there was probable cause to arrest.

1. Unreasonable noise

The defendants seek summary judgment that the plaintiff caused a "commotion," creating probable cause for violating the section of the disorderly conduct statute barring "unreasonable noise." N.Y. Penal Law § 240.20(2). That term means "a 'noise of a type or volume that a reasonable person, under the circumstances, would not tolerate.'" *Provost*, 262 F.3d at 159 (quoting *People v. Bakolas*, 449 N.E.2d 738, 740 (N.Y. 1983)). Here, where the plaintiff was speaking in merely "an above normal tone of voice" only <u>after</u> Officer Benites pushed her, at or below the volume of the officer defendants on a busy Brooklyn street during daylight hours, Pl. 56.1 ¶¶ 37-46, a reasonable jury could conclude that there was not probable cause to believe that Ms. Charles's voice was intolerable <u>and</u> created public harm—an element of disorderly conduct whose "significance . . . cannot be overstated," *People v. Baker*, 20 N.Y.3d 354, 360 (2013).[6]

*Adonis v. Court Officer Coleman*, cited by the defendants, reflects the court's <u>post-trial conclusion</u> that "[b]ecause [the plaintiff] raised her voice and refused to leave, a crowd began forming in front of the [courthouse] elevators." 2009 WL 3030197, at *8 (S.D.N.Y. Sept. 23, 2009)

---

[6] The defendants' claim that Ms. Charles said that "'there was about to be a riot' <u>as a result of</u> her 'interceding' in the police interaction," Def. Br. at 15 (emphasis added), distorts her statement. She explained that onlookers became upset because defendants pushed and arrested her—not because of her actions—and numerous non-party witnesses testified that individuals were already outside but did not approach the interaction between her and the officers, Pl. 56.1 ¶ 40; Pl. Resp. to Def. 56.1 ¶ 27.

(emphasis added). That case does not support the defendants' position here, where a factfinder weighing the evidence could conclude that the volume of Ms. Charles's voice was not intolerable, *see Provost*, 262 F.3d at 159, and that "there [wa]s no basis to infer that the[] spectators were motivated by anything other than curiosity," *Baker*, 20 N.Y.3d at 363.

        2.      <u>Officer Benites's Third Order to "Step Back".</u>

The defendants also seek summary judgment that there was probable cause to arrest Ms. Charles for disorderly conduct for refusing to comply with Officer Benites's third order to "step back." Def. Br. at 15-16. They cite just one distinguishable case, Def. Br. at 15-16,[7] but ignore other case law that identifies the precise issue presented in this case: whether that order to step back was a <u>lawful</u> order, or was arbitrary because it was designed to thwart Ms. Charles's filming and protest of the stop-and-frisk, *see People v. Arko*, 199 N.Y.S. 402, 405 (App. Term 2d Dep't 1922) ("At times even a mere refusal to comply with the directions of a policeman, who may act in an arbitrary and unjustifiable way, does not constitute 'disorderly conduct.' Mere disobedience of an officer is not always an offense punishable by law, any more than his command is not always the law."); *People v. Benjamin*, 185 Misc.2d 466, 468 (Crim. Ct. N.Y. 2000) ("[N]ot every police instruction constitutes a 'lawful' order to leave, and the circumstances justifying such an order must be examined.")

The defendants claim that "plaintiff admitted to refusing to comply with a <u>non-arbitrary order</u> to move back to a safe distance from the incident," Def. Br. at 16 (emphasis added), but the plaintiff admits no such thing. Here, a reasonable jury could conclude that Officer Benites's order was arbitrary and unjustified because it was made with the goal of impeding Ms. Charles's effort to film the stop-and-frisk and in retaliation for her speech regarding the NYPD's stop-and-frisk practices rather than with the goal of promoting public order. *See* discussion *supra*, Section I.A.1 at 5-6.

---

[7] In *Crenshaw v. City of Mount Vernon*, 372 Fed. Appx. 202 (2d Cir. 2010), the plaintiff admitted to actively interfering with police questioning and preventing that activity from going forward.

**II.     Summary Judgment Is Inappropriate On The Plaintiff's First Amendment Claim Because A Reasonable Jury Could Conclude That The Defendants Arrested Ms. Charles In Retaliation For Her Speech And Her Filming Of The Stop-And-Frisk.**

The plaintiff claims that the defendants violated her First Amendment rights by arresting her in retaliation for (1) her filming of the stop-and-frisk on Clifton Place, (2) her request to file a complaint against Officer Benites, and (3) her speech about the stop-and-frisk she witnessed and the NYPD's stop-and-frisk practices generally.  *See* Pl. 56.1 ¶¶ 45, 51, 53, 55-58.  The defendants contend that they are entitled to summary judgment on this claim because "there was probable cause for the issuance of the summons to her and she can offer no specific proof of an improper motive on the part of the any of the defendant officers."  Def. Br. at 17.  To the contrary, as explained in Section I, *supra*, the defendants have failed to establish that no reasonable jury could conclude that the defendants arrested Ms. Charles without probable cause.  Further, she does offer proof of retaliatory intent.  Accordingly, the defendants are not entitled to summary judgment on this claim.

As the defendants do not contest that Ms. Charles's speech and filming were constitutionally protected and that these protected activities were chilled,[8] Def. Br. at 16-17, the only question before the Court is whether "the defendant's actions were motivated by or substantially caused by the plaintiff's exercise of that right," *Kerman v. City of New York*, 261 F.3d 229, 242 (2d Cir. 2001).  Proof of retaliatory motivation can be shown, *inter alia*, by "expressions by the officials involved regarding their state of mind," or circumstances suggesting that the plaintiff has been singled out.  *Blue v. Koren*, 72 F.3d 1075, 1084 (2d Cir. 1995).  The evidence strongly supports an inference of retaliatory motive.  Specifically, Ms. Charles was arrested after the defendants told her to stop filming and right after she asked to file a complaint because Officer Benites pushed her.  Pl. 56.1 ¶ 45.  Further, Officer Benites called Ms. Charles a "street lawyer" Pl. 56.1 ¶ 51, and told her, "this is what happens when you get involved."  Pl. 56.1 ¶ 53.  *Cf. Kerman*, 261 F.3d at 242 (denying

---

[8] Because the defendants have failed to raise such arguments, they are waived for the purpose of this motion.  *See Khaytin v. Stern & Stern, Esqs.*, 2013 WL 5520000, at *5 (E.D.N.Y. Sep. 13, 2013) (Townes, J.) (refusing to consider argument raised for the first time on reply).

summary judgment where defendant told plaintiff that "he would teach [him] a lesson and give him something to sue for"); *Genia v. N.Y. State Troopers*, 2007 WL 869594, at *23 (E.D.N.Y. Mar. 20, 2007) (denying summary judgment where defendant "stated an intent to silence the protestors" by "telling them to 'go home'").  In these circumstances, a jury could find a retaliatory motive.

**III.**      **The Defendants Are Not Entitled To Qualified Immunity**

     **A.**      **Factual disputes make it impossible to determine whether there was arguable probable cause to arrest Ms. Charles.**

Defendants Benites, Williams, and Famighetti also seek summary judgment on the basis of qualified immunity.  Def. Br. at 17-21.  "In general, public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights."  *Weyant*, 101 F.3d at 847. "Qualified immunity is an affirmative defense, and it is incumbent upon the defendant to plead[] and adequately develop that defense."  *Southerland v. City of New York*, 680 F.3d 127, 141 (2d Cir. 2012) (internal quotation marks and citations omitted), *cert. denied*, 133 S. Ct. 980 (2013).

As Ms. Charles claims that she was falsely arrested, the officer defendants are entitled to qualified immunity on that claim <u>only if</u> undisputed facts show that there was "arguable probable cause" to arrest Ms. Charles.  *See Provost*, 262 F.3d at 160.  "In other words, if any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment."  *Lennon*, 66 F.3d at 420-21.

In conducting this analysis, the fundamental principles that apply to adjudication of summary judgment motions—that courts "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," and that "reasonable inferences should be drawn in favor of the nonmoving party," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 1868 (2014) (*per curiam*)—remain intact. In the context of a claim of qualified immunity, "the court evaluates the objective reasonableness of the officers' behavior only when the factual record of the circumstances confronting the officers is

not in serious dispute." *Charles*, 2014 WL 1284975, at *7. Thus, material factual disputes preclude summary judgment on the basis of qualified immunity. *See, e.g.*, *McClellan*, 439 F.3d at 147-48 (reversing grant of qualified immunity because district court "resolv[ed] factual conflicts properly within the province of a jury"); *Weyant*, 101 F.3d at 857-58 (reversing where factual disputes did not allow court to conclude whether defendants had qualified immunity).

With these principles in mind, it is clear that the defendants are not entitled to qualified immunity here, where numerous serious factual disputes remain. *See* Sections I & II, *supra*. They contend, however, that they are entitled to qualified immunity for two reasons. *First*, they claim that "plaintiff cannot point to any applicable law that was 'clearly established' that the defendant officers violated at the time plaintiff was summonsed." Def. Br. at 20. It appears, however improbably, that the defendants question whether freedom from false arrest is a clearly established right. That proposition is obviously incorrect. *See, e.g.*, *Cook v. Sheldon*, 41 F.3d 73, 78 (2d Cir. 1994) ("It is now far too late in our constitutional history to deny that a person has a clearly established right not to be arrested without probable cause."). Moreover, numerous decisions in factually analogous cases reveal that the defendants cannot establish arguable probable cause here. In *Jackson*, *Dowling*, *Charles*, and *Lee v. McCue*, as here, the defendants claimed qualified immunity on the basis of arguable probable cause to arrest for OGA, and in all of those cases, courts did not grant summary judgment to officers because factual disputes left the courts unable to evaluate whether there was arguable probable cause. *See Charles*, 2014 WL 1284975, at *7; *Dowling*, 2013 WL 5502867, at *8; *Jackson*, 939 F. Supp. 2d at 232-33; *Lee v. McCue*, 410 F. Supp. 2d 221, 225-26 (S.D.N.Y. 2006). *Petway*, the one case cited by the defendants, is distinguishable because it lacked any material factual disputes precluding an analysis of arguable probable cause. *See* 2014 WL 839931, at *5-7; Section I.B, *supra*.

*Second*, the defendants argue that "it was reasonable for the defendant officers to believe that there was probable cause for the issuance of the summons to plaintiff based on her own admissions."

Def. Br. at 20.  However, the "admissions" that the defendants identify are nothing of the sort.

Among those "admissions" are only three facts that accord with the plaintiff's version of events: that,

at one point, Ms. Charles was within five feet of the officers; that she was speaking in an above-

normal tone of voice at some point; and that she was reciting statistics about the NYPD's stop-and-

frisk practices.[9]  Def. Br. at 20-21; Pl's Resp. to 56.1 8; Pl. 56.1 ¶¶ 32, 34-35, 46.  Excluded from this

discussion, however, are the following critical facts: at the point when Ms. Charles was five feet from

the officers, she complied with two orders from Officer Benites to step back, leaving her seven feet

away from the officers; and that she was not yelling or screaming.  Pl. 56.1 ¶¶ 32, 46.  These

circumstances are not sufficient to establish arguable probable cause for OGA or disorderly conduct.

*See Weyant*, 101 F.3d at 855 (reversing district court's grant of summary judgment because the

record did not establish that the plaintiff created unreasonable noise resulting in public harm);

*Dowling*, 2013 WL 5502867, at *8 (finding no arguable probable cause for OGA where, on

plaintiff's version of events, plaintiff was within three feet of arrest).

Further, regardless of how close Ms. Charles was to the stop-and-frisk, she submits that no

reasonable officer could have concluded that the stop-and-frisk was justified by reasonable suspicion

and therefore vigorously contests that it constituted an "official function" within the meaning of New

York law.  *See* Section I.A, *supra*.  She therefore submits that no reasonable officer could have

concluded that there was probable cause for her arrest for OGA because she physically interfered

with an "official function."  The officer defendants are therefore not entitled to qualified immunity.

**B.      The right to film in public was clearly established at the time of the arrest.**

The officer defendants separately contend that they are entitled to summary judgment on the

plaintiff's First Amendment claim because "neither the United States Supreme Court nor the Second

---

[9] The additional "admissions" cited by the defendants are hotly contested.  The plaintiff does <u>not</u> admit
that "there was about to be a riot as a result of her interceding in the police interaction," Def. Br. at 21,
and she does <u>not</u> admit that "she refused an order of the officers to move farther away from the incident
while videotaping and undertaking the other undisputed conduct outlined in the defendants' 56.1
statement," *id.  See* Pl. Resp. to Def. 56.1 ¶¶ 22, 27; Pl. 56.1 ¶¶ 32, 35.

Circuit Court of Appeals had ruled that plaintiff had a protected First Amendment right to film as of the date of this incident," and they therefore "could not have violated a 'clearly established' right of plaintiff." Def. Br. at 21. They are incorrect. Second Circuit precedent establishes that the public has a right to film in public. In addition, at the time of Ms. Charles's arrest, there was a consensus among courts that the right to film police activity was protected.[10]

The plaintiff notes that as explained in Section II, *supra*, the theory of her First Amendment claim is that she was arrested in retaliation for <u>both</u> her filming and her speech. Thus, even if the Court were to find that the right to film police activity was not clearly established at the time of Ms. Charles's arrest, the portion of Ms. Charles's First Amendment claim regarding retaliation for her speech would remain.

1. <u>Second Circuit authority establishes that there is a right to film in public.</u>

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "[T]he right . . . need not be limited to the specific factual situation in which that right was articulated. This is because the Supreme Court has declined to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, and has, instead, chosen a standard that excludes such immunity if in the light of pre-existing law the unlawfulness [is] apparent." *Husain v. Springer*, 494 F.3d 108, 131 (2d Cir. 2007) (internal citations and quotation marks omitted).

The First Amendment right to film in public was clearly established and the unlawfulness of Ms. Charles's arrest in retaliation for filming was apparent. The Supreme Court and Second Circuit have held that photography and videography are forms of speech protected by the First Amendment. *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952) (holding that films are a protected form

---

[10] The defendants do not assert that there is no right under the First Amendment to protest police activity or film police activity in public, but rather that the right was not clearly established at the time of Ms. Charles's arrest. Def. Br. at 21. Any argument that no such right exists is therefore waived for the purpose of their summary judgment motion. *See Khaytin*, 2013 WL 5520000, at *5.

of speech); *Bery v. City of New York*, 97 F.3d 689, 694-96 (2d Cir. 1996) (holding that visual media are entitled to full First Amendment protection). Further, the Second Circuit has more specifically held that the act of making photography is protected by the First Amendment. *Tunick v. Safir (Tunick II)*, 228 F.3d 135, 137 (2d Cir. 2000) (upholding preliminary injunction barring interference with photo shoot because of "clear likelihood of [photographer]'s success on the merits" of First Amendment claims); *Tunick v. Safir (Tunick I)*, 209 F.3d 67, 82 (2d Cir. 2000) (noting that photo shoot was "entitled to some First Amendment protection"). In *Tunick II*, the Second Circuit implicitly recognized that First Amendment protection for photographs and films would be meaningless if the act of creating photographs and films were not protected.

While these cases do not address the precise circumstances of this case—the filming of police activity in public—they are sufficiently close in nature to have provided the defendants with notice that retaliation for exercising that right was unlawful. "'[T]he very action in question' need not have been the subject of a holding in order for a right to be clearly established. If the 'contours of the right [are] sufficiently clear,' then 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Nagle v. Marron*, 663 F.3d 100, 115 (2d Cir. 2011) (quoting *Anderson*, 483 U.S. at 640; *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

The Second Circuit's decision in *Nagle* is instructive. There, the defendants attempted to create a carve-out from a clearly established First Amendment right, claiming that the First Amendment right to be free from retaliation in response to protected speech was not clearly established when the speech at issue took place several years before the alleged retaliation because no previous case had dealt with a similar span of years. *Id.* The Second Circuit rejected this argument—even though there was no Second Circuit case addressing those specific circumstances— because the defendants did not cite any precedent to support their position, and "[m]ore importantly, they point[ed] to no basis on which a reasonable official might conclude that [First Amendment

protection] would . . . wane, thereby permitting the official to retaliate for the speech." *Id.* It therefore concluded that the right at issue was clearly established.

Like the *Nagle* defendants, the defendants here cite no case suggesting that retaliation in response to videography in public is permissible under the First Amendment such that the defendant officers could reasonably have so believed. And, in light of longstanding precedent establishing First Amendment protections for "criticism and challenge directed at police officers," *Hill*, 482 U.S. at 461, it would be particularly incongruous for a carve-out to exist leaving the filming of police officers unprotected. Indeed, the defendants do not even attempt to argue that police officers should be allowed to retaliate against members of the public for videotaping their actions, and the NYPD's own policies recognize this right by explicitly barring the arrest of observers videotaping police activity. Karteron Decl., Pl. Exs. 19-20 (NYPD *Patrol Guide* and *Police Student's Guide*).

For these reasons, the First Amendment right to film police activity was clearly established.

> 2. At the time of Ms. Charles's arrest, there was also a consensus among courts that the First Amendment protects the right to record police activity in public.

Even if the Court were to conclude that Second Circuit case law has not established that the First Amendment protects the right to film police activity in public, the right was clearly established by a consensus of the Circuits at the time of Ms. Charles's arrest. The defendants cite a single district court case, Def. Br. at 21, but ignore numerous other decisions—including by four Circuit courts—that had held that such a right existed at the time of Ms. Charles's arrest. Their argument rests on a misapprehension of the correct standard for determining when a right is clearly established.

A recent decision of the Second Circuit leaves no question that precedent from outside the Second Circuit is sufficient to show that a right is clearly established. The Court held as follows:

> To determine whether the relevant law was clearly established, we consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law. *See Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). Even if this Court has not explicitly held a course of conduct to be unconstitutional, we may

nonetheless treat the law as clearly established if decisions from this or other circuits "clearly foreshadow a particular ruling on the issue." *Id.*

*Terebesi v. Torreso*, -- F.3d --, 2014 WL 4099309, at *8 (2d Cir. Aug. 21, 2014) (internal quotation marks omitted). *Accord Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (explaining that "a robust consensus of cases of persuasive authority" demonstrates that a right is clearly established (internal quotation marks omitted)). In light of the long-established right to observe and document the conduct of government officials, the First, Seventh, Ninth, and Eleventh Circuits had all unambiguously held that there was a right to film police activity in public before the time of Ms. Charles's arrest. That right therefore was clearly established. *See ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595-608 (7th Cir. 2012); *Gilk v. Cunnife*, 655 F.3d 78 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995); *see also Pomykacz v. Borough of W. Wildwood*, 438 F. Supp. 2d 504, 513 & n. 14 (D.N.J. 2006); *Robinson v. Fetterman*, 378 F. Supp. 2d 534, 541 (E.D. Pa. 2005).

In *Gilk*, the First Circuit considered the First Amendment right to film police activity in public where the plaintiff, after coming upon an arrest in a public park, videotaped the arrest from a distance of about ten feet because he was concerned that the police officers were engaging in misconduct. 655 F.3d at 79-80. The plaintiff was ultimately arrested for violating Massachusetts's wiretap statute. *Id*. at 80. The court answered the question before it—"is there a constitutionally protected right to videotape police carrying out their duties in public?" *id.* at 82—as follows: "Basic First Amendment principles, along with case law from this and other circuits, answer that question unambiguously in the affirmative." *Id.*

In accordance with the First Circuit's decision, the Seventh Circuit explicitly rejected the claim that "openly recording what police officers say while performing their duties in traditional public fora—streets, sidewalks, plazas, and parks—is wholly unprotected by the First Amendment." *ACLU of Illionis*, 679 F.3d at 594. It instead concluded that there was a clear likelihood that the

plaintiff would succeed on its claim that the statute at issue violated the First Amendment because the statute "interfere[ed] with the gathering and dissemination of information about government officials performing their duties in public." *Id.* at 600.

In addition, in 1995 and 2000, respectively, the Ninth and Eleventh Circuits reversed decisions granting summary judgment to police officers in cases where the plaintiffs alleged that they were subjected to retaliation for filming police activity in public. *See Smith*, 212 F.3d at 1333 ("[W]e agree with the Smiths that they had a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct."); *Fordyce*, 55 F.3d at 439 (holding that "a genuine issue of material fact . . . exist[ed] regarding whether Fordyce was assaulted and battered by a Seattle police officer in an attempt to prevent or dissuade him from exercising his First Amendment right to film matters of public interest"). In sum, there is no question that there was a consensus that the right to film police activity existed at the time of Ms. Charles's arrest.[11]

Further, this Court should disregard *Ortiz v. City of New York*, 2013 WL 5339156 (S.D.N.Y. Sept. 24, 2013), *see* Def. Br. at 21, because that court employed the wrong standard to determine whether the right to film police activity was clearly established. Specifically, *Ortiz* failed to acknowledge that authority from outside the Second Circuit may be sufficient to demonstrate that a right is clearly established. *See Terebesi*, 2014 WL 4099309, at *8; *Scott*, 616 F.3d at 105. It therefore did not accord the appropriate weight to the First and Seventh Circuit decisions cited above, and did not even cite the Ninth and Eleventh Circuit decisions. *Ortiz*, 2013 WL 5339156, at *3-4. These errors led the *Ortiz* court to wrongly conclude that the right to film police activity was not

---

[11] The two additional Circuit court cases addressing the question of whether officers were entitled to qualified immunity in cases where a plaintiff claimed a First Amendment right to record had been violated do not undermine this conclusion. *See Kelly v. Carlisle*, 622 F.3d 248 (3d Cir. 2010); *Szymecki v. Houck*, 353 Fed. Appx. 852 (4th Cir. 2009) (per curiam). *Kelly* is distinguishable because it did not involve the First Amendment right of bystanders to record police activity, but the right of a person subject to a traffic stop to film during the stop. 622 F.3d at 262. *Szymecki*, which is unpublished and without precedential effect, concluded that the right to record police activity was not clearly established at some point before 2009—before the First and Seventh Circuit decisions cited above—and did not analyze whether the right existed. 353 Fed. Appx. at 853.

clearly established. *Id.* at *4 (accepting defendants argument because "neither the Supreme Court nor the Second Circuit has addressed the right in question").[12] This Court should not credit *Ortiz*.

In consideration of the unanimous view of the Circuit courts that have addressed this issue in published opinions, the plaintiff submits that this Court should instead follow the two district courts that have recently ruled that the right to film police activity in public was clearly established <u>in 2012</u>, the year that Ms. Charles was arrested. *See Buehler v. City of Austin/Austin Police Dep't.*, No. 13-1100, slip op. at 20 (W.D. Tex. July 24, 2014) (citing the "robust consensus among circuit courts of appeals" in concluding that "the right to photograph and videotape police officers as they perform their official duties was clearly established at the time of [the plaintiff]'s arrests");[13] *Crawford v. Geiger*, 2014 WL 554469, at *10 (N.D. Ohio Feb. 10, 2014) ("[A]t the time of the August, 2012, encounter, the First, Seventh, Ninth, and Eleventh Circuits had issued clear and consistent opinion finding that the First Amendment right to openly record police activity existed. There was no indistinguishable circuit opinion to the contrary.").[14] In sum, the individual defendants are not entitled to qualified immunity.

IV. **The Plaintiff's Inadvertent Loss Of Her Cellular Phone Does Not Warrant The Extreme Sanctions Of Dismissal Or An Adverse Inference Instruction.**

Two nights after her arrest, Ms. Charles accidentally mislaid and ultimately was unable to locate her personal cellular phone. The defendants seek sanctions but have not and cannot carry their burden of proof for their request.

---

[12] The district court case cited in the *Ortiz* analysis, *Mesa v. City of New York*, committed the same error. *See* 2013 WL 31002, at *25 (S.D.N.Y. Jan. 3, 2013).

[13] The slip opinion in *Buehler* is attached to the Karteron Declaration as Plaintiff's Exhibit 17.

[14] The U.S. Department of Justice cited all of the Circuit court cases discussed above in a Maryland case in which the plaintiff asserted that police officers violated his First Amendment rights by arresting him in response to filming police activity. *See* Statement of Interest of the United States, *Sharp v. Baltimore City Police Dep't*, No. 11-cv-28888, at *4-5 (D. Md., filed Jan. 10, 2012) ("The First Amendment protects the rights of private citizens to record police officers during the public discharge of their duties," and "[t]here is no binding precedent to the contrary.") (Attached as Ex. 18 to Karteron Decl.)

The defendants' suggestion that dismissal of this entire action is appropriate should be rejected out of hand.  To support their request for this "drastic remedy" that "should be imposed only in extreme circumstances," *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779-80 (2d Cir. 1999), the defendants advance the outlandish theory that Ms. Charles destroyed her phone intentionally "because it was the best evidence of what she did unlawfully." Def. Br. at 24; *see also* Def. Supp. Br. at 2-3.  No evidence supports this inflammatory accusation.  Moreover, this case falls well outside of the narrow circumstances under which dismissal is appropriate: where litigation was already in progress and the sanctioned party violated a direct court order, often repeatedly.  *See, e.g.*, *Valentine v. Museum of Modern Art*, 29 F.3d 47 (2d Cir. 1994).  The defendants' justification for their request—that the video "was the evidence on which this entire case turned," Def. Br. at 25—is simply incorrect given the testimony of not just the parties, but also four non-parties who witnessed the events in question.  The Court should reject the defendants' request.

The defendants also fail to meet the requirements for the "extraordinarily harsh sanction" of an adverse inference instruction.  *Donato v. Fitzgibbons*, 172 F.R.D. 75, 82 (S.D.N.Y. 1997).  To carry their burden, they must establish that: (1) there was "an obligation to preserve [the evidence] at the time it was destroyed, which "usually arises when a party has notice that the evidence is relevant to litigation  . . . but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation."  *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 107 (2d Cir. 2001) (internal quotations omitted)); (2) "the records were destroyed with a culpable state of mind," *id.* at 109; and (3) "the destroyed records were relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense," *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).  The defendants have not met any of these requirements.

*First*, no duty to preserve the video existed at the time Ms. Charles lost her phone.  During the hours following her release from custody, the prospect of future litigation was the furthest thing

from her mind. On June 6, 2012, *i.e.*, the day after her arrest and the day before she lost her phone, she brushed off a friend's suggestion that she "had a case," saying that she was "not going to pursue it" and was "more concerned with the young men knowing their rights." Pl. Resp. to Def. 56.1 ¶ 40. Defendants seize upon a Facebook post Ms. Charles made the night of her release from custody while she was still in shock following her arrest, stating "I have to figure out how to make this summons disappear," Def. Br. at 23, but read in context that statement was simply a natural reaction to an unjust arrest. Pl. Resp. to Def. 56.1 ¶ 39. Moreover, Defendants fail to cite a single case for the breathtakingly broad proposition that mere disagreement with an arrest puts a person on notice of future litigation. Defendants also seize upon a single attempted call to the "ACLU," Def. Supp. Br. at 2-3, even though Ms. Charles did not communicate with any employee of the New York Civil Liberties Union until June 11, 2012—four days after she lost her phone. Pl. 56.1 ¶ 62. This call, moreover, was one among many other transmissions by which Ms. Charles sought to spread the word about her ordeal and to announce her intention to hold a "Know Your Rights" training. Ex. N to Zuckerman Aff. ("I am writing to share my story with you but more importantly I wanted to let you know that I plan on organizing a 'Know Your Rights' training for our block."). These communications indicate that she was focused on matters other than potential litigation.

*Second*, even assuming a duty to preserve arose, the defendants have made no showing that Ms. Charles had a culpable state of mind when she misplaced her phone. The defendants suggest that either she "lost her phone negligently" or that "a much higher culpable state of mind should be imposed on plaintiff," *i.e.*, that she intentionally lost her phone. Def. Br. at 23. They cannot, however, prove either theory, with the second being utterly implausible.

The defendants offer no support for the claim that Ms. Charles "lost her phone negligently," other than to baldly claim that she "admits" this without citation to <u>any</u> evidence. Def. Br. at 23. Ms. Charles makes no such admission, and the loss of such a small object is not *per se* negligent as the defendants apparently assume. Immediately upon realizing she had lost her phone, she searched her

home, repeatedly calling the phone in the hope that it might be found. Pl. 56.1 ¶ 62. She later attempted to locate her cab from the night before and also tried to use the "Find My iPhone" application linked to her phone. *Id.* These are the non-negligent actions of a reasonable person.

Further, the defendants do not cite a single case where a court found that mere negligence sufficed to justify sanctions. Def. Br. at 22. This is unsurprising given that in every factually analogous case the plaintiff has located, courts have uniformly declined to impose adverse inference instructions. *See Lutalo v. Nat'l R.R. Passenger Corp.*, 2013 WL 1294125, at *5 (D. Colo. Mar. 28, 2013) (finding adverse inference instruction "too harsh" and "unwarranted" where plaintiff had lost cell phone); *Christou v. Beatport, LLC*, 2013 WL 248058, at *14 (D. Colo. Jan. 23, 2013) (same, even where litigation hold for text messages was sent to commercial party represented by counsel); *McClain v. Norfolk S. Rwy. Co.*, 2009 WL 701001, at *2 (N.D. Ohio Mar. 16, 2009) (finding "no reason to impose any sanction whatsoever" where plaintiff was unable to retrieve pictures from cell phone). The defendants identify no support in case law because sanctions generally are reserved for instances of gross negligence and intentional conduct—not the mistake of misplacing a personal item. Moreover, the case they do cite is inapposite because there the nonmoving party had consciously and repeatedly failed to produce records promised to its adversary despite representing to the court that it would do so. *See Residential Funding*, 306 F.3d at 110 (describing party's actions as evincing "purposeful sluggishness" and suggesting that this was "intentional or grossly negligent").

In support of the audacious claim that Ms. Charles pursued a "willful and intentional legal strategy" to destroy evidence, the defendants offer as proof only that she had not lost a phone in five-to-seven years and that she dialed the "ACLU" on Thursday, June 7, 2012. Def. Br. at 23; Def. Supp. Br. at 3. The former does not indicate that she lost her phone intentionally but rather explains why she did not make special efforts to back up the video in the hours following her arrest. And the latter, especially in light of the context outlined above, is an extremely thin reed on which to base

such an extreme accusation—especially since Ms. Charles did not actually communicate with any NYCLU employee until Monday, June 11, 2012.  Pl. 56.1 ¶ 62.

*Third*, the defendants have failed to show that the video was "relevant" to their defense, a test requiring "that the destroyed evidence would have been favorable to the movant." *Zubulake v UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004).  As this is not a case where "bad faith alone is sufficient circumstantial evidence" to "conclude that the missing evidence was unfavorable to that party," the defendants here "must adduce sufficient evidence" for a reasonable trier of fact to infer that the evidence "would have been of the nature [they] allege[]."  *Residential Funding*, 306 F.3d at 109.  They adduce no evidence to this effect, and, contrary to their arguments, Def. Br. at 24, the plaintiff would expect the video to directly contradict their account of what transpired.  For example, the video likely captured Officer Benites pushing Ms. Charles—contradicting Benites' claim that she accidentally touched her—and any statement in reaction. *See* Pl. Resp. to Def. 56.1 ¶ 28.  Similarly, the video likely captured the defendants' instructions to stop filming, which directly undermines their claim that they told her she was free to record.  Pl. 56.1 ¶ 35.  In both cases, the testimony of non-parties confirms the plaintiff's version of events.  Pl. 56.1 ¶¶ 35-36.  As such, the defendants are plainly incorrect to claim that "[t]he prejudice to the defendants is unspeakable," Def. Br. at 24.  In sum, the defendants have made no showing that the video would have supported their defense.

## CONCLUSION

For the foregoing reasons, the plaintiff respectfully submits that the defendants' motion for summary judgment and sanctions should be denied.

_____ s/ Alexis Karteron _____

ALEXIS KARTERON
JORDAN WELLS
ROBERT HODGSON
CHRISTOPHER DUNN
New York Civil Liberties Union
  Foundation
125 Broad Street, 19th Floor
New York, New York 10004
Phone: (212) 607-3300
Fax: (212) 607-3318
Email: akarteron@nyclu.org

*Counsel for Plaintiff*