UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
HADIYAH CHARLES,

Plaintiff,

–against–

THE CITY OF NEW YORK, RAYMOND
KELLY, Commissioner of the New York City
Police Department, PAMELA BENITES, a
New York City Police Officer, RAYMOND
WILLIAMS, a New York City Police Officer,
and ANTHONY FAMIGHETTI, a New York
City Police Sergeant,

Defendants.
------------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 0 8 2017 ★

**BROOKLYN** OFFICE

<u>**MEMORANDUM AND ORDER**</u>

12-CV-6180 (SLT)(SMG)

**TOWNES, United States District Judge:**

Plaintiff Hadiyah Charles brings this civil rights action against the City of New York,

former New York City Police Department ("NYPD") Commissioner Raymond Kelly and three

police officers, alleging that her First and Fourth Amendment rights were violated when she was

arrested and briefly imprisoned following an incident in which she intervened in, and videotaped,

an encounter between the officers and three African-American teenagers. Defendants now move

for summary judgment, arguing that there was probable cause for Plaintiff's arrest, that there is

insufficient evidence that the arrest was motivated by Plaintiff's exercise of First Amendment

rights, and that the officers are entitled to qualified immunity on both the First and Fourth

Amendment claims. In addition, Defendants argue that spoliation sanctions are appropriate

because Plaintiff is no longer able to produce the videotape of the incident.

For the reasons stated below, Defendants' motion for summary judgment is denied.

Defendants' motion for spoliation sanctions is denied without prejudice to renewal if the

evidence adduced at trial establishes that the videotape of the incident was likely to favor Defendants.

## BACKGROUND

The following facts are not in dispute. On the early evening of June 5, 2012, while walking on the Brooklyn block on which she resided, Plaintiff observed an encounter between Officers Benites and Williams and teenagers on the sidewalk in front of 281 Clifton Place (Defendants' Statement of Material Facts Pursuant to Local Rule 56.1 ("Defendants' 56.1 Statement"), ¶ 2; Plaintiff's Response to Defendants' 56.1 Statement ("Plaintiff's 56.1 Statement"), ¶ 2). Plaintiff did not know any of the teens personally, although she claimed to recognize them "from being on the block [and] having lived there for six years." (Defendants' 56.1 Statement, ¶ 5; Plaintiff's 56.1 Statement, ¶ 5). However, after overhearing one of teens protesting that they had done nothing wrong, Plaintiff wondered why the police had stopped them. (Defendants' 56.1 Statement, ¶ 6; Plaintiff's 56.1 Statement, ¶ 6). Plaintiff believed that she, as a "taxpaying citizen that [*sic*] lives on the block," had a right to "ask a question about a process on the block." (Defendants' 56.1 Statement, ¶ 7; Plaintiff's 56.1 Statement, ¶ 7).

Standing about five feet from the officers, Plaintiff asked why they had stopped the teens. (Defendants' 56.1 Statement, ¶ 10; Plaintiff's 56.1 Statement, ¶ 10). According to Plaintiff, the officers ignored her question, prompting her to ask it a second time. (Defendants' 56.1 Statement, ¶¶ 11-12; Plaintiff's 56.1 Statement, ¶¶ 11-12). Officer Williams eventually responded, saying that it was "police business," and accusing Plaintiff of "interfering" in it. (Defendants' 56.1 Statement, ¶¶ 13, 15; Plaintiff's 56.1 Statement, ¶¶ 13, 15).

2

At some juncture, Plaintiff started to videotape the officers, using the recording features on her iPhone. (Defendants' 56.1 Statement, ¶ 20; Plaintiff's 56.1 Statement, ¶ 20). According to Plaintiff, she stepped backwards on two occasions at the request of Officer Benites, (Defendants' 56.1 Statement, ¶ 22; Plaintiff's 56.1 Statement, ¶ 22), but refused to comply with Benites' third request. (Defendants' 56.1 Statement, ¶¶ 22-23; Plaintiff's 56.1 Statement, ¶¶ 22-23). Thereafter, Benites made some sort of physical contact with Plaintiff, which Plaintiff characterized as a "shove." (Defendants' 56.1 Statement, ¶ 28; Plaintiff's 56.1 Statement, ¶ 28). After both Plaintiff and "people on the street" commented on the shove, Benites radioed her supervisor, Sergeant Anthony Famighetti. (Defendants' 56.1 Statement, ¶¶ 29-31; Plaintiff's 56.1 Statement, ¶¶ 29-31).

Shortly thereafter, Famighetti arrived, along with Police Officer Adam Dumelle. (Defendants' 56.1 Statement, ¶ 31; Plaintiff's 56.1 Statement, ¶ 31). Plaintiff was arrested and taken to the precinct. (Defendants' 56.1 Statement, ¶¶ 32-33; Plaintiff's 56.1 Statement, ¶¶ 32-33). She was detained in a holding cell for a period of 80 minutes or less before being released with a summons charging her with disorderly conduct in violation of New York Penal Law § 240.20(2). (Defendants' 56.1 Statement, ¶ 33; Plaintiff's 56.1 Statement, ¶ 33).

On June 6, 2012, Plaintiff viewed the video on her iPhone and confirmed that the video remained intact. (Defendants' 56.1 Statement, ¶ 37; Plaintiff's 56.1 Statement, ¶ 37). According to Plaintiff, the video depicted events until the time she was handcuffed. (*Id.*). However, Plaintiff claims that she lost her iPhone either during or immediately after a gala on the night of June 7, 2012, and that the video it contained, which had not been downloaded, was lost in the process. (Defendants' 56.1 Statement, ¶ 38; Plaintiff's 56.1 Statement, ¶ 38).

On December 17, 2012, Plaintiff, represented by the New York Civil Liberties Union, commenced this civil action against the City of New York, then-Commissioner Kelly, Benites, Williams and Famighetti, who was sued as a "John Doe" because his identity was then unknown to Plaintiff. The original complaint alleged that the NYPD has a "practice of interfering with the right of individuals to film police activity in public places," and suggested that Benites, Williams and Famighetti acted in retaliation for Plaintiff's "filming a stop and frisk that took place across the street from her residence." (Complaint, ¶ 1). The pleading principally advanced claims pursuant to 42 U.S.C. § 1983, alleging that "[a]s a direct result of the acts, omissions, and policies of the Defendants," Plaintiff was deprived of her rights under the First and Fourth Amendments of the United States Constitution. (*Id.*, ¶¶ 53-54). The complaint also advanced state-law claims, alleging that Defendants' acts, omissions, and policies violated Plaintiff's rights under Article I, sections 8 and 12, of the New York State Constitution and her common-law right "to be free from false arrest, false imprisonment, assault, and battery." (*Id.*, ¶¶ 55-57). The complaint sought declaratory relief, as well as compensatory and punitive damages.

In mid-April 2013, Plaintiff amended the complaint upon consent of Defendants. The Amended Complaint substituted Famighetti for the Doe defendant, and dropped the requests for declaratory relief. The Amended Complaint was identical to the original pleading in all other respects.

***The Instant Motion***

Defendants now move for summary judgment, advancing three arguments. First, Defendants argue that the individual officers had probable cause to arrest Plaintiff for both obstruction of governmental administration, N.Y. Penal Law § 195.05, and disorderly conduct, N.Y. Penal Law § 240.20. Defendants note that probable cause is a complete defense to an action for false arrest and malicious prosecution and imply that the Court should grant summary judgment with respect to Plaintiff's Fourth Amendment and Article I, section 8, claims, as well as Plaintiff's common-law claims for false arrest and false imprisonment.

Second, Defendants seek summary judgment with respect to Plaintiff's First Amendment retaliation claim. Defendants argue that the retaliation claim requires proof that the arrest was motivated by the videotaping and is unavailable when the arrest and subsequent prosecution was supported by probable cause. Implicitly relying on the analysis in Point I, Defendants argue that the officers had probable cause to arrest. Defendants also argue that Plaintiff has adduced no evidence of an improper motive for the arrest.

Third, Defendants argue that the officers are entitled to qualified immunity. With respect to the Fourth Amendment claim, Defendants argue that the officers had at least "arguable" probable cause to arrest Plaintiff. With respect to the First Amendment claim, Defendants argue that the right to videotape police stops was not "clearly established" as of June 5, 2012.

In addition, Defendants argue that the Court should impose spoliation sanctions for Plaintiff's loss of the cell phone on which the video of the incident was recorded. Defendants contend that the video contained evidence that Plaintiff acted unlawfully during the June 5, 2012, incident and that Plaintiff purposely destroyed the inculpatory evidence in furtherance of her

5

efforts to "make [the] summons disappear." (Defendants' Memorandum of Law in Support of Motion for Summary Judgment and Spoliation Sanctions ("Defendants' Memo"), p. 24). Defendants claim that dismissal of this action "is the only fair sanction in this instance," but argue, in the alternative, for an adverse inference charge. (*Id.*, pp. 24-25). Defendants also argue that if factual issues preclude determination of the motion for sanctions, the Court should conduct a hearing to resolve those issues.

Plaintiff opposes all of Defendants' arguments in her Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and Spoliation Sanctions ("Plaintiff's Memo"). Plaintiff principally argues that genuine issues of material fact preclude the Court from awarding summary judgment. In particular, Plaintiff either expressly argues or implies that factual disputes exist regarding whether the stop and frisk of the teenagers was authorized by law, whether Plaintiff physically interfered with the stop-and-frisk, whether Plaintiff made "unreasonable noise," whether Benites' third order to step back was lawful, and whether Plaintiff's loss of the cell phone was purposeful or inadvertent.

In support of the arguments contained in their memoranda of law, both Defendants and Plaintiff principally rely on excerpts from depositions taken during discovery. These excerpts are attached to declarations signed by the parties' attorneys: the Declaration of Mark D. Zuckerman (the "Zuckerman Declaration"); the Declaration of Alexis Karteron in Opposition to Defendants' Motion for Summary Judgment and Spoliation Sanctions (the "Karteron Declaration"); and the Supplemental Declaration of Mark D. Zuckerman (the "Second Zuckerman Declaration"). The excerpts attached to the Zuckerman and Karteron Declarations are largely drawn from the same depositions, although the particular pages excerpted from those depositions vary. For example,

6

portions of Officer Williams' deposition (the "Williams Deposition") are attached to the Zuckerman Deposition as Exhibit A and to the Karteron Declaration as Exhibit 5; portions of Officer Benites' deposition (the "Benites Deposition") are attached to the Zuckerman Deposition as Exhibit B and to the Karteron Declaration as Exhibit 4; and portions of Plaintiff's deposition (the "Charles Deposition") are attached to the Zuckerman Deposition as Exhibit D, to the Second Zuckerman Declaration as Exhibit P, and to the Karteron Declaration as Exhibit 10. In addition, the parties' declarations attach excerpts from the depositions of various non-party witnesses to the incident: one of the teenagers, D.C. (Zuckerman Declaration, Ex. E, and Karteron Declaration, Ex. 9); D.C.'s mother, Louise Cannon (Zuckerman Declaration, Ex. F, and Karteron Declaration, Ex. 12); Cannon's upstairs neighbor, Louisa Brown (Zuckerman Declaration, Ex. G, and Karteron Declaration, Ex. 11); another neighbor, Ivory Cannady (Zuckerman Declaration, Ex. H, and Karteron Declaration, Ex. 8), and Officer Dumelle (Zuckerman Declaration, Ex. J, and Karteron Declaration, Ex. 1).

### *The Varying Accounts of the Incident*

These depositions provide detailed, if often contradictory, accounts of how the officers came to stop the teenagers, how Plaintiff intervened, and what happened thereafter. In June 2012, Sergeant Famighetti and Officers Williams, Benites, and Dumelle were all assigned to the 79th Precinct's Conditions Unit, which "enforce[s] quality of life matters." (Karteron Declaration, Ex. 1, p. 11; Ex. 3, pp. 29, 33; Ex. 4, p. 15; & Ex. 5, pp. 13-14). Williams and Benites were partners and were patrolling in a marked police van on the evening of June 5, 2012. (Karteron Declaration, Ex. 4, pp. 32, 47, & Ex. 5, p. 31). Meanwhile, Sergeant Famighetti, the

supervisor of the unit, was patrolling in an unmarked car with Dumelle. (Karteron Declaration, Ex. 1, p. 47, & Ex. 3, p. 62).

The sergeant conducted roll call around 5:30 p.m. on June 5, 2012, at the start of the officers' shift. (Karteron Declaration, Ex. 1, p. 45; Ex. 4, p. 32; & Ex. 5, p. 21). Famighetti, Williams and Benites all recalled that Famighetti discussed a "robbery pattern" involving men on bicycles. (Karteron Declaration, Ex. 3, pp. 48-49; Ex. 4, pp. 29-31; & Ex. 5, pp. 20-21). However, these three witnesses' recollections of the description of the suspects and the location of the "robbery pattern" differed. Williams initially recalled that the pattern involved "gunpoint robberies" by "young teens on bicycles" "in the vicinity of Clifton Place from Nostrand to Classon"—a three block area which includes the block on which 281 Clifton Place is located. (Karteron Declaration, Ex. 5, pp. 20-21). He subsequently testified that the "entire area" in which robberies fitting the pattern occurred may have included Lafayette and Greene Avenues, which are one block north and one block south of Clifton Place, respectively. (*Id.*, p. 21).

Benites recalled that the robbery pattern involved "three to five males between the ages of 15 and 20, ... on bicycles, ... stealing cell phones." (Zuckerman Declaration, Ex. B, p. 34; *see* Karteron Declaration, Ex. 4, pp. 29-30). She recalled that pattern was in the "vicinity of Bedford Avenue and Nostrand Avenue"—the streets at the east and west ends of the block encompassing 281 Clifton Place—and "between Clifton" Place and some other street (Karteron Declaration, Ex. 4. P. 36). Benites could not recall if that unnamed street "was the block before or after [Clifton Place] or if it was both blocks." (*Id.*).

Famighetti testified that the pattern involved "three male blacks committing robberies on bicycles," but that the males were aged 18 to 30. (Karteron Declaration, Ex. 3, p. 49). While he,

8

too, recalled that the pattern involved the theft of cell phones, Famighetti recalled that robberies were reportedly "strong-arm robberies" in which no weapons were involved. (*Id.*). The sergeant could not recall whether all three men were alleged to be on bicycles. (*Id.*). However, he recalled that the robbery complaints encompassed the five blocks from DeKalb Avenue in the north to Lexington Avenue in the south and the two blocks from Bedford Avenue in the east to Marcy Avenue in the west—an area of 10 square blocks which encompasses 281 Clifton Place. (*Id.*).

The three witnesses' testimony was contradicted both by Dumelle's testimony and by physical evidence. First, although Dumelle recalled that Famighetti conducted roll call on June 5, 2012, he did not recall the sergeant saying anything about a robbery pattern. (Karteron Declaration, Ex. 1, p. 45). However, Dumelle also could not recall what Famighetti actually said at roll call or the first thing that occurred thereafter. (*Id.*, pp. 45-47).

Second, the description of the robbery pattern which was contained in the 79th Precinct's Command Conditions Report for the week from June 4 to June 12, 2012, differed from the description Famighetti allegedly gave to his officers. That Report, which is attached to the Zuckerman Declaration as Exhibit C, stated that the pattern involved one black man approaching victims on the street, snatching "property (electronics)," and fleeing on a bike. According to a declaration signed by Famighetti on July 17, 2014 (the "Famighetti Declaration"), which has been submitted to the Court by both Defendants and Plaintiff (Karteron Declaration, Ex. 6), the Command Conditions Report served as the basis of his discussion of the robbery pattern at the June 5, 2012, roll call. (Famighetti Declaration, ¶ 2). Yet, the Report did not mention the age of

9

the perpetrator or offer any descriptive details aside from his sex and race, did not mention any accomplices, and did not indicate precisely where the robberies had occurred.

***The Stop and Frisk***

At about 8:15 p.m., while driving their van on Clifton Place between Nostrand and Bedford Avenues, Williams and Benites saw a group of black teenagers on the sidewalk. (Zuckerman Declaration, Ex. A, p. 35, & Ex. B, p. 47; Karteron Declaration, Ex. 4, pp. 47, 51, & Ex. 5, pp. 32, 35-36). One of the teens was D.C., who was 18 years old and still in high school when he was deposed in October 2013—approximately 16 months after the incident at issue (Karteron Declaration, Ex. 9, p. 3). According to D.C., he was working to repair a flat tire on his bicycle at the time, and had the bicycle upside down on the sidewalk in front of 281 Clifton Place, the apartment building in which he lived with his mother. (Karteron Declaration, Ex. 9, pp. 3, 6, 10). D.C. testified that he was with three friends: J.M. and his brother, both of whom lived at 285 Clifton Place, and a male known to him only as "Els," who lived on the same block. (*Id.*, pp. 8-10). D.C. further testified that he was the only one of the four with a bicycle. (*Id.*, p. 10).

This portion of D.C.'s testimony was corroborated, to some extent, by that of his mother, Louise Cannon, and J.M.'s downstairs neighbor, Ivory Cannady. Cannon recalled that D.C. was with three friends whose names she did not know, and that her son was the only one with a bicycle. (Karteron Declaration, Ex. 12, pp. 12, 25-26). Cannady initially recalled seeing D.C. and "two or three ... younger kids," (Karteron Declaration, Ex. 8, p. 15), but later testified that there were only three boys, whom she identified as D.C., J.M., and Elmer. (*Id.*, p. 18). Cannady,

like Cannon, testified that D.C. was the only one with a bicycle, which was upside down on the ground. (*Id.*, p. 15).

Williams and Benites recalled seeing three individuals and more than one bicycle. Williams initially testified that he saw "two teens on bicycles," along with a third teen who did not have one. (Karteron Declaration, Ex. 5, p. 32). He subsequently clarified that the teens were not riding at the time, but either sitting on or standing next to bicycles that were stationary on the sidewalk. (*Id.*). Later, however, Williams testified that he saw "three young teens on bikes." (*Id.*, p. 35). This testimony was consistent with Benites' recollection that she "observed ... three males on bicycles." (Zuckerman Declaration, Ex. B, p. 47). Benites subsequently stated that she was unsure how many bicycles she saw. (Karteron Declaration, Ex. 4, p. 51).

Although both Williams and Benites testified to seeing a "bulge" in the clothing of one of the young men, their description of the bulge differed somewhat. Williams described it as "something large" or a "large object," and specifically recalled that it was in the right front pocket of the young man without a bicycle. (Zuckerman Declaration, Ex. A, pp. 36, 39; Karteron Declaration, Ex. 5, pp. 36, 39). Benites recalled that the object was less than six inches wide, but testified that it appeared to have "the shape of a firearm." (Karteron Declaration, Ex. 4, p. 58). She remembered that the bulge was "around the waistband." (Karteron Declaration, Ex. 4, p. 47).

Although the witnesses agree that the teens saw the officers before they exited the van, they disagree on whether the young men behaved suspiciously. D.C. testified that he saw "the van driving around," but that the police "didn't stop at first." (Karteron Declaration, Ex. 9, pp. 6-7). D.C. claimed that he "knew they were going to come back around, the way they slowed

11

down," but that he and his friends stayed outside while the van "circled around the block," "came back around" and stopped. (*Id.*, p. 7).

Williams testified that he and Benites observed the teens from a stationary van for a period of less than five minutes. (Karteron Declaration, Ex. 5, pp. 35-36, 38, 40). Although the teens were looking at the van, Williams saw nothing suspicious other than the bulge. (*Id.*, pp. 39-40). However, Benites recalled that the young man with the bulge "moved his body" in a way that she perceived as preventing the officers from observing the bulge. (Zuckerman Declaration, Ex. B, p. 47; Karteron Declaration, Ex. 4, pp. 47, 65-66).

According to Williams, he and Benites briefly discussed whether to exit the van. (Karteron Declaration, Ex. 5, p. 40). Although he could not recall what was said, (*id.*), both officers testified that they believed the young men fit the robbery pattern. Williams claimed that "three young teens on bikes ... roughly matched the robbery pattern," (*id.*, p. 35), while Benites claimed: "They matched the pattern that we were told, young males between 15 and 20 on bicycles." (Zuckerman Declaration, Ex. B, pp. 47-48; Karteron Declaration, Ex. 4, p. 47).

The officers agree that the police encounter began with a frisk. Benites testified that she immediately frisked the waistband of the man with the bulge, "patting ... the portion of the body where [she] observed the bulge." (Zuckerman Declaration, Ex. B, p. 73). She claimed that she did so because she feared for her safety, thinking the bulge could be a firearm. (*Id.*, pp. 74-75). At her deposition, Benites could not recall what caused the bulge, but testified that the pat down revealed that it was not a weapon. (Karteron Declaration, Ex. 4, p. 79).

Although Benites testified that she could not recall what Williams was doing at the time she was conducting the frisk, (*id.*), Williams testified that either he or Benites also frisked the

other teens. (Karteron Declaration, Ex. 5, pp. 167-68). Williams could not recall the details of those frisks, but stated that he or Benites "would have touched their pockets or waistband" to make sure that they did not have "something dangerous." (*Id.*, pp. 168-69). Williams also testified that he had no reason to believe that those teens posed a threat and did not suspect any of the teens of committing a crime. (*Id.*, pp. 169-70). D.C. corroborated Williams' testimony, stating that the female officer "checked" him and his friends by patting their pants pockets. (Karteron Declaration, Ex. 9, pp. 7, 19-20). Cannady testified that she observed "the female officer ... searching in the boys' pockets" and taking things out of Elmer's and D.C.'s pockets. (Karteron Declaration, Ex. 8, pp. 15, 32).

Both Williams and Benites testified that after the frisks failed to uncover any weapons, there was no evidence that the teens were engaged in criminal activity and they were free to leave. (Zuckerman Declaration, Ex. B, p.149; Karteron Declaration, Ex. 5, p. 47). Nonetheless, the officers continued to talk to the young men, asking for their names, addresses, and "[b]asic information." (Karteron Declaration, Ex. 5, p. 47). Although Plaintiff may have interrupted that process, as discussed below, Williams testified that the officers "finished copying down whatever information [they] needed from the teens." (*Id.*, p. 77). Indeed, Benites testified that she used that information to create three Stop, Question and Frisk Reports ("UF-250s"). (Karteron Declaration, Ex. 4, p. 224).

*Plaintiff Intervenes*

At some point during the verbal exchange between the two officers and the teens, Plaintiff intervened. According to Cannady, who claimed to have observed the incident from the time the police first pulled up in front of her apartment building, "maybe ten other people" were

13

outside at the time. (Karteron Declaration, Ex. 8, pp. 15, 31-32). These onlookers were on both sides of street and some, like Cannady herself, were in their front yards. (*Id.*, pp. 33, 35).

After observing the police stop and frisk the teens, some onlookers questioned the officers, asking why the teens had been stopped or, after the police removed the objects from the boys' pockets, why the officers were arresting them. (*Id.*, pp. 15-16, 32, 34). Cannady herself recalled asking: "Why are you arresting them? Are you arresting them?" (*Id.*, p. 35). However, according to Cannady, the onlookers remained in their yards and did not "engage in what was going on." (*Id.*, pp. 33-35). Indeed, when Cannady received no response to her questions, she alerted J.M.'s mother by ringing her doorbell rather than intervening herself. (*Id.*, pp. 19, 22, 35).

Sometime after Cannady rang J.M.'s doorbell, Plaintiff approached the officers. (*Id.*, pp. 35, 39). Five witness testified that they saw her arrive, but the witnesses' accounts differed substantially. Three of the witnesses—the two officers and Cannon—testified that Plaintiff arrived either screaming, yelling, or talking very loudly. Benites testified that Plaintiff "came in screaming and yelling" that the officers did not "have a reason to be annoying these kids." (Zuckerman Declaration, Ex. B, p. 85; Karteron Declaration, Ex. 4, p. 85). Williams also recalled that she was screaming, but testified that she directly addressed the officers, saying, "excuse me, why are you harassing these boys?" (Zuckerman Declaration, Ex. A, p. 55). Cannon variously described Plaintiff's tone as "talking really loud" and "kind of yelling," but could not testify as to what Plaintiff said because she "wasn't concentrating on what she was saying." (Zuckerman Declaration, Ex. F, p. 15; Karteron Declaration, Ex. 12, pp. 15, 20).

In contrast, two other witness, as well as Plaintiff herself, testified that Plaintiff's voice was never more than slightly raised throughout the incident. Cannady testified that Plaintiff's

14

voice was only "a little raised" when she began speaking to the officers and that she "wasn't yelling." (Zuckerman Declaration, Ex. H, p. 41). D.C. recalled that Plaintiff spoke first to the teens, asking if the police were "harassing" them, and was not screaming or yelling. (Zuckerman Declaration, Ex. E, p. 24; Karteron Declaration, Ex. 9, p. 35).

Plaintiff testified that she spoke first to the officers, twice asking them why the teens had been stopped. (Zuckerman Declaration, Ex. D, pp. 36-37). She recalled that one of the teens was "talking loudly" when she approached, but that she did not raise her voice. (Zuckerman Declaration, Ex. D, p. 58; Karteron Declaration, Ex. 10, p. 27). Indeed, Plaintiff claimed that she never screamed or yelled at the officers and only spoke "slightly above normal," in a "distressed voice," after Benites shoved her. (Zuckerman Declaration, Ex. D, p. 59; Karteron Declaration, Ex. 10, pp. 59-60).

There was also a dispute regarding whether Plaintiff's actions caused a crowd to gather, or whether the crowd had already gathered before she arrived. Williams testified that as Plaintiff "got louder and louder with her yelling," "more people started to come out of the apartment building behind where the kids were." (Zuckerman Declaration, Ex. A, pp. 56, 58). Benites attributed the crowd to Plaintiff's behavior, claiming that "people started coming out because [Plaintiff] was so loud." (Zuckerman Declaration, Ex. B, p. 91; Karteron Declaration, Ex. 4, p. 91). Although Plaintiff denied that she was loud, a social media post she made shortly after her release from detention stated that people "started to come out and get involved" after she intervened, and that "[t]here was about to be a riot." (Zuckerman Declaration, Ex. I, p. 1). In contrast, Cannady recalled that a crowd of "maybe ten" onlookers were already present and were

questioning the police actions before Plaintiff even arrived. (Karteron Declaration, Ex. 8, pp. 32-35).

Although all the witnesses agree that Plaintiff began to videotape the police activity using her iPhone, there is some dispute as to how close she was to the officers. Plaintiff testified that she was "[a]bout five feet" from the officers when she spoke to them initially, but that she had to step another foot away in order to "get[] a full shot of what was going on." (Zuckerman Declaration, Ex. D, pp. 36, 44; Karteron Declaration, Ex. 10, pp. 36, 44). When Plaintiff announced, "I am going to videotape your process," Benites said that Plaintiff was "interfering with police business and ... needed to step back." (Zuckerman Declaration, Ex. D, p. 45; Karteron Declaration, Ex. 10, p. 45).

Plaintiff claims that she responded to Benites by stepping back another foot, but that Benites kept asking her to move back. (Zuckerman Declaration, Ex. D, pp. 46-47; Karteron Declaration, Ex. 10, pp. 46-47). Plaintiff stepped back a second time, but believed that stepping back a third time "would have put [her] without reach of being able to videotape the process." (Zuckerman Declaration, Ex. D, p. 47; Karteron Declaration, Ex. 10, p. 47). Accordingly, when Benites asked her to move back a third time, Plaintiff did not comply, believing she "was within the law in terms of being so many feet away at that point." (Zuckerman Declaration, Ex. D, p. 48; Karteron Declaration, Ex. 10, p. 48).

Officers Benites and Williams recalled that Plaintiff approached, rather than backed away from them, during the videotaping. Williams testified that he and Benites continued to interview the teens until Plaintiff "began to put the cell phone up close to [his] face and up to [his] shield and ... nameplate." (Zuckerman Declaration, Ex. A, pp. 60-61; Karteron Declaration, Ex. 5, p.

16

61). When she was within six inches of him, Williams told Plaintiff: "Miss, you're free to record whatever you want, but you have to do it from a safe distance." (Zuckerman Declaration, Ex. A, p. 61; Karteron Declaration, Ex. 5, p. 61). According to Williams, Plaintiff then backed up six inches and demanded to know why the officers had stopped the teens. (Karteron Declaration, Ex. 5, pp. 62-63). Williams again told Plaintiff that she needed to back up, saying that the officers would "be happy to speak with her" when they finished interviewing the teens. (Zuckerman Declaration, Ex. A, p. 63; Karteron Declaration, Ex. 5, p. 63). Plaintiff not only refused to back up, even when asked repeatedly to do so, but again placed the cell phone "very close" to Williams' face. (Zuckerman Declaration, Ex. A, p. 63; Karteron Declaration, Ex. 5, pp. 63, 68).

Benites recalled that Plaintiff not only "had the phone in [her] face and [Williams'] face," but actually touched Benites' face with the iPhone. (Zuckerman Declaration, Ex. B, p. 92; Karteron Declaration, Ex. 4, p. 104). Benites described Plaintiff as "so close" that Benites "didn't even have space for [her]self." (Karteron Declaration, Ex. 4, p. 104). Both Benites and Williams testified that Benites told Plaintiff to back up. (Zuckerman Declaration, Ex. A, p. 66, & Ex. B., p. 92; Karteron Declaration, Ex. 4, p. 92, & Ex. 5, p. 68).

In contrast, several of the civilian witnesses recalled that Plaintiff remained further away from the officers. Cannady recalled that Plaintiff announced that she was "taking ... badge numbers," then held her phone up and appeared to film both officers' badges. (Zuckerman Declaration, Ex. H, p. 42; Karteron Declaration, Ex. 8, p. 42). However, according to Cannady, Plaintiff remained "[f]urther than an arm's length ... [m]aybe three or four feet away" from Williams as she attempted to film his badge. (Zuckerman Declaration, Ex. H, p. 42; Karteron Declaration, Ex. 8, p. 42). She then took two steps towards Benites, closing to within

17

"[a]pproximately three feet." (Karteron Declaration, Ex. 8, pp. 44-45). Although the officers told Plaintiff to stop recording or to turn the camera off, Plaintiff responded that it was "not illegal for [her] to record" and continued toward Benites. (Zuckerman Declaration, Ex. H, p. 41; Karteron Declaration, Ex. 8, pp. 16-17, 41, 45-46).

Cannady never heard the officers tell Plaintiff that she could record if she moved back. (Karteron Declaration, Ex. 8, p. 51). Rather, Cannady heard Williams repeatedly tell Plaintiff to move back and heard the officers tell Plaintiff at least five times to stop recording. (*Id.*, pp. 51, 70-71). According to Cannady, Plaintiff moved back two feet every time the officers asked, but refused to stop filming, saying: "It's not against the law to record." (Karteron Declaration, Ex. 8, pp. 52, 71).

Like Cannady, Brown recalled that Plaintiff's phone was three or four feet from the officers, (Zuckerman Declaration, Ex. G, p. 24; Karteron Declaration, Ex. 11, p. 24), and that Plaintiff and the officers argued about the filming. Brown variously testified that the officers told Plaintiff to "stop filming or to stop with the phone," to "turn that off," or that she couldn't film there. (Karteron Declaration, Ex. 11, pp. 25, 35). Brown also recalled that an officer told Plaintiff either to "move along" or that "she couldn't film there." (*Id.*, p. 35). However, Brown conceded that it was possible that the officers told Plaintiff that she could film from a safe distance. (*Id.*). According to Brown, Plaintiff moved back "a couple of steps"—maybe "four or five feet"—in response to police demands, but argued with the officers, maintaining that she had a right to film and saying: "I have my rights. I can stand here." (*Id.*, pp. 25, 35, 44).

D.C. recalled that Plaintiff was "about two feet" from the officers while she recorded them, although he characterized the distance as not "that close" or not "fairly close."

(Zuckerman Declaration, Ex. E, p. 27; Karteron Declaration, Ex. 9, p. 27). He further recalled that the officers told her to "stop recording" and that "one cop told her to leave." (Karteron Declaration, Ex. 9, pp. 8, 26).

### *The Physical Contact and Plaintiff's Arrest*

Although most of the witnesses recalled seeing physical contact between Benites and Plaintiff, they differed in their description of it. Benites testified that, after Plaintiff's phone touched her face, she turned to tell Plaintiff to move back. (Karteron Declaration, Ex. 4, p. 104). During that turn, Benites "touched [Plaintiff] with ... the left side of [her] elbow." (*Id.*). Benites claims that the contact was accidental and occurred only because Plaintiff was so close to her. (*Id.*, pp. 104, 107).

D.C. characterized the officer's contact with Plaintiff as "a little touch." (Zuckerman Declaration, Ex. E, p. 29). However, D.C. implied that the touch was not accidental, stating that the officers "were trying to push her away." (Karteron Declaration, Ex. 9, p. 28). D.C. could not remember where Plaintiff was touched, or if the touch was gentle or forceful. (*Id.*, p. 48).

In contrast, Plaintiff testified that, after she failed to comply with Benites' third order to move back, Benites approached and shoved her in the right shoulder. (Zuckerman Declaration, Ex. D, p. 52; Karteron Declaration, Ex. 10, pp. 52-53). Although she testified that Benites used only three fingers, Plaintiff claimed that it was "a significant shove," hard enough to cause her to move "a step and a half" backwards. (Karteron Declaration, Ex. 10, p. 53).

Plaintiff's testimony was corroborated by Cannady, who testified that Benites "came towards" Plaintiff and "pushed her back" after Plaintiff approached Benites to videotape her badge number. (Karteron Declaration, Ex. 8, p. 45). Although the contact caused Plaintiff to

move backwards, Cannady claimed "it wasn't a push for her to go ... on the ground." (*Id.*).
Rather, Cannady characterized it as a "defensive push," stating: "if someone is coming towards
me and I don't want them recording me, I'm going to ... push them back to get out of my face ...."
(*Id.*, p. 46).

It is not entirely clear what happened after the contact between Benites and Plaintiff.
Plaintiff testified that she was "really in shock" and "just remember[ed] constantly repeating ...
why did you shove me, why did you put your hands on me[?]" (Zuckerman Declaration, Ex. D,
p. 58; Karteron Declaration, Ex. 10, p. 58). According to Plaintiff, Benites did not respond, but
people on the street also began to comment on Benites' actions. (Zuckerman Declaration, Ex. D,
pp. 54, 57; Karteron Declaration, Ex. 10, pp. 54, 57).

Cannady recalled that Plaintiff's comments were addressed to the crowd more than to
Benites. First, Cannady testified that Plaintiff said something like: "Oh, my God. Did everyone
see that she pushed me?" (Karteron Declaration, Ex. 8, p. 46). Later, Cannady testified that
Plaintiff said, "Did you see that? She pushed me, and I have all of this on camera." (*Id.*, p. 71).

While Benites, Williams and Plaintiff agree that Benites radioed Sergeant Famighetti,
they offered different explanations as to why she did so. Benites testified that although Plaintiff
was making the crowd "angry and violent" by screaming that the police had improperly stopped
the teens, she radioed in response to Plaintiff's demand to speak to a supervisor. (Zuckerman
Declaration, Ex. B, pp. 108-09, 121; Karteron Declaration, Ex. 4, pp. 108-10). Williams recalled
that Plaintiff "demanded that our supervisor come," but also testified that the scene had become
so "chaotic" that he would have called for an additional car even absent Plaintiff's demand
because he felt "the crowd was on the verge of becoming violent." (Zuckerman Declaration, Ex.

A, p. 75). Plaintiff made no mention of having requested a supervisor, testifying that Benites spoke into her walkie-talkie after Plaintiff and the crowd questioned why Plaintiff had been shoved. (Zuckerman Declaration, Ex. D, pp. 57-58; Karteron Declaration, Ex. 10, p. 58).

Although several witnesses testified that Famighetti arrived on the scene, the Court has little evidence regarding what happened next. Famighetti testified that he arrived at Clifton Place to see "Benites and ... Williams and a small crowd of people and a woman yelling and screaming." (Karteron Declaration, Ex. 3, p. 66). However, neither party has provided Famighetti's account of what happened next. Williams testified that Famighetti and Dumelle arrived just after he and Benites had "finished copying down whatever information [they] needed from the teens," (Karteron Declaration, Ex. 5, p. 77), but neither party has provided testimony from Williams regarding what happened next. Benites testified that her supervisor arrived, (Karteron Declaration, Ex. 4, p. 110), but the parties have not provided those portions of the deposition in which Benites described what he said or did. D.C. recalled seeing two or three additional officers arrive in a black, unmarked car and knew that one was a supervisor because of his white shirt. (Karteron Declaration, Ex. 9, p. 38). Although D.C. claimed that he "paid attention" to the supervisor, (*id.*), the parties have not provided those portions of the deposition in which D.C. described what that supervisor did.

The only testimony provided by the parties regarding what happened after Famighetti arrived is contained in Plaintiff's deposition. She testified that Famighetti "approached the scene and said that he is not sure what is going on, but they are all going to leave now." (Zuckerman Declaration, Ex. D, p. 62; Karteron Declaration, Ex. 10, p. 62). Unsure what his comment meant, Plaintiff replied by saying that she wanted to file a formal complaint against Benites for

shoving her. (Zuckerman Declaration, Ex. D, p. 62; Karteron Declaration, Ex. 10, pp. 62, 64). After Benites denied having shoved Plaintiff, the officers conferred for about 45 seconds before deciding to arrest Plaintiff. (Zuckerman Declaration, Ex. D, p. 66; Karteron Declaration, Ex. 10, p. 64).

During her deposition, Plaintiff theorized that she was "arrested because [she] asked to file a complaint." (Karteron Declaration, Ex. 10, p. 148). However, in nearly identical memobook entries, Benites and Williams provided a different explanation for Plaintiff's arrest. (Karteron Declaration, Exs. 14 and 15). Those entries allege that Plaintiff was "told numerous times" that she could "video police activity from a safe distance," but that she not only "refused to back up," but "aggressively" videotaped Benites "directly in her face." (Karteron Declaration, Ex. 14, p. 2, & Ex. 15, pp. 2-3). Those memobook entries also allege that Plaintiff "interfere[d] with a lawful stop" and "behave[d] in a loud unreasonable manner causing public alarm." (Karteron Declaration, Ex. 14, p. 2, & Ex. 15, p. 2).

***Post-Arrest Developments***

According to Plaintiff, Williams and Benites drove her to the 79th Precinct in their van. (Karteron Declaration, Ex. 10, pp. 69-71). During the five-minute drive, Plaintiff asked why she was being arrested. (*Id.*, pp. 70-71). According to Plaintiff, Benites said, "[Y]ou were trying to be a street lawyer." (*Id.*, p. 71). Benites allegedly made a similar comment at the precinct, saying, "this is what happens when you get involved." (*Id.*, p. 85).

At the precinct, the police took Plaintiff's pocketbook and cell phone and placed her in a holding pen. (*Id.*, pp. 73, 81). Plaintiff testified that she remained in the cell for 80 minutes. (*Id.*, p. 88). However, the Prisoner Holding Pen Roster for June 5, 2012, indicates that Plaintiff

was placed in the pen at 8:37 p.m. and released at 9:10 p.m.—a period of 33 minutes. (Zuckerman Declaration, Ex. L). These times conflict with entries in Williams' and Benites' memobooks, which indicate that Plaintiff was transported to the precinct at 8:33 or 8:38 p.m. and was released with a summons at 8:54 p.m. (Karteron Declaration, Ex. 14, p. 3, & Ex. 15, p. 3).

While Plaintiff was in the cell, Benites asked her to unlock her iPhone. (Karteron Declaration, Ex. 10, p. 88). According to Plaintiff, Benites claimed that she wanted to call a person from the list of contacts stored on the phone to verify Plaintiff's identity. (Id., pp. 81, 88). Although Plaintiff offered to provide a friend's telephone number that she had memorized, Benites allegedly insisted that Plaintiff unlock the phone and choose a name from her "favorites" list. (Id., pp. 89-91). Plaintiff eventually complied, and Benites walked away with the unlocked phone. (Id., p. 92).

Benites did not mention the video or ask to see it and Plaintiff, who did not see what Benites did with the phone thereafter, did not know if she had viewed the video. (Zuckerman Declaration, Ex. D, pp. 92-93; Karteron Declaration, Ex. 10, p. 92). Plaintiff testified, however, that the phone was "unlocked for all purposes," (Karteron Declaration, Ex. 10, p. 92), implying that Benites could have viewed the video if she wanted. Both Benites and Williams expressly denied that they had viewed the video. (Zuckerman Declaration, Ex. B, p. 188; Karteron Declaration, Ex. 5, p. 170).

Before Plaintiff left the precinct, she was given a summons charging her with disorderly conduct in violation of New York Penal Law § 240.20(2). That document, a copy of which is attached to the Zuckerman Declaration as Exhibit K, alleged that Plaintiff "did engage in creating loud noise by yelling causing public alarm and inconvenience to the public." It did not charge, or

23

allege facts suggesting, obstruction of governmental administration in the second degree as defined in Penal Law § 195.05.

According to Plaintiff, Sergeant Famighetti asked to speak with her after giving her the summons. (Karteron Declaration, Ex. 10, p. 96). He then walked her outside of the precinct and Williams and Benites followed. (*Id.*). After a conversation in which he described Bedford-Stuyvesant as a "bad neighborhood" and stated that the police were "just doing [their] jobs" and trying to "get home safely," the sergeant asked if Plaintiff was still interested in filing a complaint. (*Id.*, pp. 97-98). Plaintiff responded in the negative. (*Id.*, p. 98). At her deposition, Plaintiff explained: "[I]t did not seem wise given the fact that when I first told him I wanted to file a complaint ... they proceeded to handcuff me and drag me to the precinct ...." (*Id.*, pp. 98-99). Although the deposition excerpts provided to this Court give no indication that either Williams or Benites testified about this conversation, Benites' memobook states that Plaintiff "was apologetic" and refused "IAB's number." (Karteron Declaration, Ex. 14, p. 3).

Within an hour or two after her release, Plaintiff went on social media to discuss the incident. She opined that the police "wanted to make an example out of [her]" because they "were not happy about the video tape nor the fact that [she] started spewing out the numbers around the stop and frisk law and it's [*sic*] disproportionate targeting of Black and Latino youth." (Zuckerman Declaration, Ex. I, p. 1.). However, she also observed that her intervention in the incident had caused people to "come out and get involved" to the point that "[t]here was about to be a riot." (*Id.*).

When asked about this post at her deposition, Plaintiff testified that, during the videotaping, she said something about the disproportionate number of blacks and Latinos who

were stopped and frisked. (Zuckerman Declaration, Ex. D, pp. 145-46; Karteron Declaration, Ex. 10, pp. 145-46). While she thought she "only said it loud enough so [her] ... phone would hear it," she did not know if she also "said it to the officers." (Zuckerman Declaration, Ex. D, p. 146; Karteron Declaration, Ex. 10, p. 146).

In a later post, Plaintiff alluded to the conversation with Famighetti, stating that she "understood" when the police explained that they "just want to go home safely to their families," and "really just wanted to ask them to revoke the summons." (Zuckerman Declaration, Ex. I, p. 2). She ended the post by stating: "Now I have to figure out how to make this summons disappear." (*Id.*).

Around 9:30 a.m. on June 6, 2012, Plaintiff sent a post which stated, *inter alia*, "I know that I have a case but I'm not going to pursue it." (*Id.*). Rather, Plaintiff expressed an intention "to organize a know your rights neighborhood training" that would "connect the parents and potentially targeted youth with advocates that are currently working on changing the stop and frisk law." (*Id.*).

Plaintiff watched the video of the incident twice on June 6, 2012: once in her apartment before she left for work and, later, at the office with one Erica Poellot and other co-workers. (Zuckerman Declaration, Ex. D, pp. 105-06; Karteron Declaration, Ex. 10, p. 107). On the first occasion, she did not view the entire footage but "looked to see if it was compromised in any way" by looking at the beginning and then scrolling to the end. (Zuckerman Declaration, Ex. D, p. 105). She verified that the video ended with her handcuffing. (*Id.*, pp. 105-06).

It is unclear how much of the video Plaintiff watched at work. Poellot recalled speaking about it for 10 or 15 minutes, but had only "vague recollections" of the video. (Karteron

Declaration, Ex.13, p. 10). She recalled only that it depicted "some sort of altercation between [Plaintiff] and the police." (*Id.*). Poellot could not recall what was said during the altercation, but understood that "there was a problem with her filming." (*Id.*, p. 20).

Sometime on June 7, 2012, Plaintiff telephoned the American Civil Liberties Union (the "ACLU"). (Karteron Declaration, Ex. 10, p. 181). Plaintiff did not "get through" to a person and did not testify as to whether the purpose of her call was to obtain representation, rather than to further her goal of organizing "neighborhood training." (Karteron Declaration, Ex. 10, p. 181). However, when asked at her deposition if June 7 was "the first time that you called the ACLU about your case," Plaintiff answered in the affirmative. (*Id.*).

Plaintiff claims that she lost her iPhone on the night of June 7, 2012. (Zuckerman Declaration, Ex. D, p. 111). According to Plaintiff, she attended a gala at a banquet hall on Park Avenue that night and brought a "really small purse," which apparently could not accommodate the phone and the other things Plaintiff needed to carry. (*Id.*, pp. 111-13; Karteron Declaration, Ex. 10, pp. 112, 116). As a result, Plaintiff either had to carry the phone in her hand or place it down somewhere. (Zuckerman Declaration, Ex. D, pp. 112-13; Karteron Declaration, Ex. 10, p. 112).

At the end of the gala, Plaintiff took a cab from Park Avenue to her home on Clifton Place. (Zuckerman Declaration, Ex. D, pp. 112-13; Karteron Declaration, Ex. 10, p. 112). The next morning, she was unable to find her phone. (Zuckerman Declaration, Ex. D, pp. 112, 114; Karteron Declaration, Ex. 10, pp. 112. 114). Plaintiff called her cell phone number from home and the office, called AT&T, and tried a "Find My Phone" app, all without success. (Zuckerman Declaration, Ex. D, p. 114; Karteron Declaration, Ex. 10, pp. 114-15). She claimed

that she also called "Yellow Cab," but was told that "there was no way they would be able to locate the phone." (Karteron Declaration, Ex.10, p. 117). Plaintiff did not call or visit the banquet hall, even though she recognized the possibility that she "could have left it at the venue ... and didn't realize" it. (Zuckerman Declaration, Ex. D, p. 112; Karteron Declaration, Ex. 10, pp. 112, 117).

## DISCUSSION

### I. The Summary Judgment Standard

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, *i.e.*, whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotation omitted; brackets added).

Initially, the moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must then "set forth specific facts showing that there is a genuine issue for trial." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotation omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation and brackets omitted). Moreover, a party cannot sustain its burden in opposing

summary judgment by relying on inadmissible hearsay evidence. *See G.I. Home Developing Corp. v. Weis*, 499 F. App'x 87, 90 (2d Cir. 2012) (summary order).

When evaluating a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all ambiguities in his favor. *See Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *see also Swartz v. Insogna*, 704 F.3d 105, 109 (2d Cir. 2013). No genuine triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996). "If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and brackets omitted).

## II. Probable Cause

In the first of their three arguments for summary judgment, Defendants assert that the undisputed facts establish that the officers had probable cause to arrest Plaintiff for either obstructing governmental administration in the second degree, as defined in New York Penal Law § 195.05, or disorderly conduct, as set forth in either subsection (2) or subsection (6) of New York Penal Law § 240.20. "The existence of probable cause gives an officer the privilege to arrest ...." *Marshall v. Sullivan*, 105 F.3d 47, 50 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). Accordingly, "the existence of probable cause is 'a complete defense to [a civil rights action arising from an arrest],' whether brought under state

law or Section 1983." *Daniels v. D'Aurizo*, 564 F. Supp. 2d 194, 197 (W.D.N.Y. 2008) (quoting *Bernard*, 25 F.3d at 102 (brackets added in *Daniels*)). Summary judgment dismissing a plaintiff's false arrest or false imprisonment claim is, therefore, "appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable." *Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007).

Probable cause for an arrest requires that an officer "have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012). To determine whether probable cause exists, "courts must consider those facts available to the officer at the time of the arrest and immediately before it, ... as probable cause does not require absolute certainty." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks, brackets, emphasis, and citations omitted). Courts must examine the "totality of the circumstances" and "be aware that 'probable cause is a fluid concept— turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

### *Obstructing Governmental Administration in the Second Degree*

Section 195.05 of the New York Penal Law provides, in pertinent part:

> A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act ....

29

Citing to *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995), which pre-dated the most recent amendment to § 190.05, Plaintiff and Defendants agree that there are four elements to this crime: "(1) prevention or attempt to prevent (2) a public servant from performing (3) an official function (4) by means of intimidation, force or interference." Defendants' Memo, p. 9; Plaintiff's Memo, p. 4. However, the elements listed by the parties not only differ somewhat from the elements contained in New York Criminal Jury Instructions (the "CJI")—the pattern jury instructions drafted by, and generally used by, members of the New York State judiciary—but also misstate and omit certain important details.[1]

First, the fourth element listed above misstates the statutory language by omitting the word "physical." The statute provides that a defendant must intentionally prevent or attempt to prevent a public servant from performing an official function "by means of intimidation, *physical* force or interference" or by other means listed. N.Y. Penal Law § 195.05 (emphasis added). The New York Court of Appeals has held that the word "physical" modifies the word "interference," as well as the word "force." *People v. Case*, 42 N.Y.2d 98, 101, 365 N.E.2d 872, 874 (1977).

---

[1] According to the CJI, the prosecution must prove the following three elements in order to establish that a defendant is guilty of the crime of obstructing governmental administration in the second degree:

> 1. That ... the defendant ... prevented or attempted to prevent a public servant from performing an official function;
>
> 2. That the defendant did so intentionally, and ... by means of intimidation, physical force or interference [or] by means of any independently unlawful act ...
>
> 3. That ... the official function was authorized.

CJI2d [NY] Penal Law § 195.05 (available at http://www.nycourts.gov/judges/cji/2-PenalLaw/195/art195hp.shtml).

Since "mere words alone do not constitute 'physical force or interference' such as to support the charge of obstructing governmental administration," *id.*, 42 N.Y.2d at 102, 365 N.E.2d at 875, "purely verbal interference may not satisfy the 'physical' component under Penal Law § 195.05." *Matter of Davan L.*, 91 N.Y.2d 88, 91, 689 N.E.2d 909, 910 (1997); *see Uzoukwu v. City of N.Y.*, 805 F.3d 409, 414 (2d Cir. 2015) "[T]he interference would have to be, in part at least, physical in nature." *Case*, 42 N.Y.2d at 102, 365 N.E.2d at 875.

Second, the elements listed by the parties omit the third element set forth in the CJI: "That ... the official function was authorized." Under New York law, "the official function being performed must be one that was 'authorized by law.'" *Lennon*, 66 F.3d at 424. Accordingly, a "defendant may not be convicted of obstructing governmental administration or interfering with an officer in the performance of an official function ... unless it is established that the police were engaged in authorized conduct." *United States v. Olavarria*, No. 09 CR. 870 (PGG), 2011 WL 1529190, at *7 (S.D.N.Y. Apr. 20, 2011) (quoting *People v. Lupinacci*, 191 A.D.2d 589, 589, 595 N.Y.S.2d 76, 77 (N.Y. App. Div. 1993)). A police officer's detention of an individual is not "authorized" unless the officer possessed "reasonable suspicion" that the individual was involved in criminal activity. *Lupinacci*, 191 A.D.2d at 589, 595 N.Y.S.2d at 77.

In this case, there is a genuine issue of material fact with respect to whether Plaintiff physically interfered with the officers' performance of an official function and whether the official function was authorized by law. First, it is unclear what, if any, official function the officers were prevented from performing. Plaintiff arrived sometime after the officers finished frisking the young men and, discovering no weapons, determined that there was no evidence of their involvement in criminal activity. Plaintiff may have delayed the process of questioning the

31

teens, but there is evidence that the officers were nonetheless able to do so. Williams testified that the officers "finished copying down whatever information [they] needed from the teens" sometime before Famighetti arrived, (Karteron Declaration, Ex. 5, p. 77), and Benites testified that she was able to complete three UF-250s using that information. (Karteron Declaration, Ex. 4, p. 224, & Exs. 14 &15). Moreover, there is no evidence that Plaintiff physically interfered with the officers' questioning of the teens, even though her alleged refusal to obey every command to back up and her insistence on videotaping "aggressively" and "directly in [Benites'] face" (Karteron Declaration, Ex. 14, p. 2, & Ex. 15, pp. 2-3) may have proved annoying and distracting.

Second, there is a genuine issue of material fact with respect to whether Officers Williams and Benites had reasonable suspicion that the teens were involved in a crime. Although the two officers testified that the young men fit a robbery pattern allegedly discussed during the roll call on June 5, 2012, there is a factual question regarding whether Famighetti ever discussed that robbery pattern. Officer Dumelle, who recalled attending that roll call, did not recall Sergeant Famighetti saying anything about a robbery pattern. (Karteron Declaration, Ex. 1, p. 45).

In addition, there is a very substantial issue of fact regarding what, if anything, Famighetti told the members of the 79th Precinct Conditions Unit about the robbery pattern. In a declaration dated July 17, 2014, Famighetti stated that the description of the robbery pattern was contained in the 79th Precinct's Command Conditions Report for the week of June 4 through June 12, 2012 (Karteron Declaration, Ex. 6, ¶ 2). That Report stated that the pattern involved one black man approaching victims on the street, snatching "property (electronics)," and fleeing on a bicycle.

(Zuckerman Declaration, Ex. C). The Report did not mention the age of the perpetrator or offer any descriptive details aside from his sex and race, did not mention any accomplices, and did not indicate precisely where the robberies had occurred.

Yet, Famighetti, Williams and Benites all claimed that the robbery pattern contained details which were not set forth in the Command Conditions Report. Famighetti testified that the pattern involved three black men, aged 18 to 30, committing "strong-arm robberies" on bicycles. (Karteron Declaration, Ex. 3, p. 49). Although Williams and Benites both learned of the robbery pattern from Famighetti, they recalled the pattern differently. Williams testified that the pattern involved "gunpoint robberies" by "young teens on bicycles," (Karteron Declaration, Ex. 5, pp. 20-21), while Benites recalled that the robbery pattern involved three to four or five males between the ages of 15 and 20, riding bicycles and stealing cell phones. (Zuckerman Declaration, Ex. B, p. 34; Karteron Declaration, Ex. 4, pp. 29-30).

Even assuming that the officers' recollections of the robbery pattern were correct, there is a question as to whether the teens on Clifton Place matched even the vague description the officers claimed to recall. Williams claimed that "three young teens on bikes ... roughly matched the robbery pattern," (Karteron Declaration, Ex. 5, p. 35), while Benites claimed: "They matched the pattern that we were told, young males between 15 and 20 on bicycles." (Zuckerman Declaration, Ex. B, pp. 47-48; Karteron Declaration, Ex. 4, p. 47). However, neither officer was certain how many bicycles the teens had at the time of the stop. Williams initially testified that he saw "two teens on bicycles," along with a third teen who did not have a bicycle, (Karteron Declaration, Ex. 5, p. 32), but later claimed to have seen "three young teens on bikes." (*Id.*, p. 35). Benites initially testified that she "observed ... three males on bicycles," (Zuckerman

33

Declaration, Ex. B, p. 47), but subsequently admitted that she was unsure how many bicycles she observed. (Karteron Declaration, Ex. 4, p. 51).

Furthermore, the officers' claims that they observed multiple bicycles was contradicted by the testimony of several lay witnesses. One of the teens, D.C., testified that he was repairing his bicycle in the company of three friends and that he was the only one with a bike. (Karteron Declaration, Ex. 9, p. 10). That testimony was corroborated by two other witnesses—Cannon and Cannady—both of whom testified that there was only one bicycle. (Karteron Declaration, Ex. 8, p. 15, & Ex. 12, pp. 25-26). In light of this testimony and the conflicting testimony regarding what Famighetti told Williams and Benites, it is unclear whether Officers Williams and Benites had reasonable suspicion that would justify the stop of the teens. Accordingly, there is a genuine issue of material fact as to whether the stop and frisk of the teens was authorized by law.

### *Disorderly Conduct*

New York Penal Law § 240.20 provides, in pertinent part:

> A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: ... (2) He makes unreasonable noise; or ... (6) He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse ....

Although Plaintiff was charged with violating subsection 2, Defendants contend that the officers had probable cause to arrest Plaintiff under either subsection 2 or subsection 6.

Before addressing those subsections specifically, it is important to note that "a finding that defendant's disruptive statements and behavior were of a public rather than an individual dimension" is "critical to a charge of disorderly conduct." *People v. Baker*, 20 N.Y.3d 354, 359, 984 N.E.2d 902, 905 (2013). As the New York Court of Appeals has explained, the disorderly

34

conduct statute is violated only in "situations that carried beyond the concern of individual disputants to a point where they had become a potential or immediate public problem." *People v. Munafo*, 50 N.Y.2d 326, 331, 406 N.E.2d 780, 783 (1980). "In deciding whether an act carries public ramifications, courts are constrained to assess the nature and number of those attracted, taking into account the surrounding circumstances, including, of course, the time and the place of the episode under scrutiny." *Id.*

The requirement that there be some "evidence of actual or threatened public harm ('inconvenience, annoyance or alarm')," *People v. Johnson*, 22 N.Y.3d 1162, 1164, 9 N.E.3d 902, 903 (2014), restricts the conduct that constitutes "disorderly conduct." For example, to establish a violation of § 240.20, there must be evidence of an "unreasonable noise," which the New York Court of Appeals defines as "a noise of a type or volume that a reasonable person, under the circumstances, would not tolerate." *People v. Bakolas*, 59 N.Y.2d 51, 53, 449 N.E.2d 738, 740 (1983). Section 240.20's requirement that the noise be intended to cause, or recklessly create a risk of, public inconvenience, annoyance or alarm further "narrows the definition, so that no inadvertently disturbing act may be punished." *Id.*, 59 N.Y.2d at 54, 449 N.E.2d at 740.

Similarly, § 240.20(6) requires more than evidence of a failure to disperse when directed to do so by a police officer. For example, in *People v. Johnson, supra*, a defendant was arrested for disorderly conduct after he and three other young men, reputed to be gang members, failed to move after being asked to do so by the police. The New York Court of Appeals held that the police lacked probable cause to arrest for a violation of § 240.20(6), noting that "[t]he only evidence of any possible impact on the public resulting from their presence was the officer's testimony that one of defendant's companions 'was partially blocking' the entrance to a store by

35

standing in front of it" and this evidence was "not sufficient to satisfy the public harm element of the statute." *Id.*, 22 N.Y.3d at 1164, 9 N.E.3d at 903.

In this case, there are genuine issues of material fact which preclude the Court from finding as a matter of law that there was probable cause to arrest Plaintiff for disorderly conduct. First, there is conflicting testimony as to whether Plaintiff ever made "unreasonable noise." Three witnesses—Cannon and Officers Benites and Williams—testified that Plaintiff arrived either screaming, yelling, or talking very loudly. However, three other witnesses—Cannady, D.C. and Plaintiff—testified to the contrary. Cannady testified that Plaintiff's voice was only "a little raised" when she began speaking to the officers, and that she "wasn't screaming," (Zuckerman Declaration, Ex. H, p. 41), while D.C. recalled that Plaintiff was not screaming, yelling, or talking loudly at any point before she was arrested. (Karteron Declaration, Ex. 9, p. 35). Plaintiff testified that she did not raise her voice at all before Benites touched her and that she only spoke "slightly above normal," in a "distressed voice," thereafter. (Zuckerman Declaration, Ex. D, pp. 58-59; Karteron Declaration, Ex. 10, pp. 58-60).

Second, there is no evidence that Plaintiff disobeyed a lawful order to disperse. According to Plaintiff, Sergeant Famighetti announced that he was not sure what was going on, but that "they are all going to leave now." (Zuckerman Declaration, Ex. D, p. 62; Karteron Declaration, Ex. 10, p. 62). The Court cannot find that any, much less all, reasonable jurors would construe this ambiguous statement as an order to disperse. Indeed, Plaintiff testified that she did not know what the sergeant meant by that statement, (*id.*), and there is no basis for finding that she deliberately disregarded the order with an intent to cause public inconvenience.

Even if this Court could find as a matter of law that Plaintiff was unreasonably loud or that Plaintiff deliberately refused to comply with an order to disperse, it could not find that Plaintiff's actions created "a potential or immediate public problem." To be sure, there is evidence that a group of onlookers witnessed Plaintiff's interaction with the police. Yet, Cannady testified that those onlookers were present at the scene before Plaintiff arrived and were themselves questioning the police action. (Karteron Declaration, Ex. 8, pp. 31-34). Although Plaintiff subsequently gave herself credit for prompting the neighbors to "come out and get involved," (Zuckerman Declaration, Ex. I, p. 1), Cannady recalled that onlookers were "saying the same thing" before and after Plaintiff arrived on the scene. (Karteron Declaration, Ex. 8, pp. 34-35).

In sum, the Court finds that genuine issues of material fact exist which preclude the Court from finding that probable cause existed. Accordingly, the Court denies Defendants' motion for summary judgment with respect to Plaintiff's Fourth Amendment and Article I, section 8, claims, and denies summary judgment with respect to Plaintiff's common-law claims for false arrest and false imprisonment.

### III. The First Amendment Retaliation Claim

Defendants' second argument for summary judgment relates to Plaintiff's claim that she was arrested in retaliation for exercising her First Amendment rights. To prevail on such a claim, a plaintiff must prove, *inter alia*, that "defendants' actions were motivated or substantially caused by his exercise of that right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (citing *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998)). "Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation

claim." *Id.* (citing *Blue v. Koren*, 72 F.3d 1075, 1082-83 (2d Cir. 1995)). Furthermore, "[t]he existence of probable cause will defeat ... a First Amendment claim that is premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive ...." *Mangino v. Inc. Vill. of Patchogue*, 808 F.3d 951, 956 (2d Cir. 2015) (quoting *Fabrikant*, 691 F.3d at 215) (first set of ellipses in *Fabrikant*). "This is because '[a]n individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause, even if that prosecution is in reality an unsuccessful attempt to deter or silence criticism of the government.'" *Id.* (quoting *Fabrikant*, 691 F.3d at 215 (brackets added in *Mangino*, internal quotation marks in *Fabrikant* omitted).

Defendants' second argument for summary judgment advances two separate bases for dismissing Plaintiff's First Amendment retaliation claim. The first is predicated on the same claim that undergirds Defendants' first argument: that the police undisputedly had probable cause to arrest and prosecute Plaintiff. As explained in section II, *ante*, genuine issues of material fact preclude the Court from finding that probable cause existed. Accordingly, the Court cannot grant summary judgment with respect to Plaintiff's First Amendment retaliation claim on this basis.

The second basis is that Plaintiff cannot provide specific proof of a retaliatory motive. In her opposition, Plaintiff theorizes that her arrest was "in retaliation for (1) her filming of the stop-and-frisk on Clifton Place, (2) her request to file a complaint against Officer Benites, and (3) her speech about the stop-and-frisk she witnessed and the NYPD's stop-and-frisk practices generally." Plaintiff's Memo, p. 12. There is at least circumstantial evidence to support all three theories.

First, there is at least some evidence suggesting that Plaintiff was arrested because she was filming the stop and frisk. Although Williams testified that he told Plaintiff that she was "free to record" the incident if she did so "from a safe distance," (Zuckerman Declaration, Ex. A, p. 61), most of the civilian witnesses recalled that the police repeatedly told Plaintiff to stop filming. Cannady testified that she heard the officers tell Plaintiff at least five times to stop recording. (Karteron Declaration, Ex. 8, pp. 51, 70-71). Brown variously testified that the officers told Plaintiff "to stop filming or to stop with the phone," to "turn that off," or that "she couldn't film there." (Karteron Declaration, Ex. 11, pp. 25, 32, 35). D.C. recalled that the officers told her to "stop recording" and that "one cop told her to leave." (Karteron Declaration, Ex. 9, pp. 8, 26). Although Plaintiff did not testify that the officers told her to stop filming, she claimed that Benites insisted that she move so far back as to "put [her] without reach of being able to videotape the process." (Zuckerman Declaration, Ex. D, p. 47; Karteron Declaration, Ex. 10, p. 47).

This evidence that Plaintiff's arrest was connected to the filming is further supported by Plaintiff's testimony regarding Benites' insistence that Plaintiff unlock her iPhone. According to Plaintiff, Benites maintained that she needed access to the phone in order to retrieve the telephone number of someone who could verify Plaintiff's identity, even though Plaintiff offered to provide a telephone number from memory. (Karteron Declaration, Ex. 10, pp. 88-91). Plaintiff did not see if Benites viewed the video after the telephone was unlocked, (Zuckerman Declaration, Ex. D, pp. 92-93; Karteron Declaration, Ex. 10, p. 92), and both Benites and Williams expressly denied having done so. (Zuckerman Declaration, Ex. B, p. 188; Karteron Declaration, Ex. 5, p. 170). However, the fact that the video was accessible once the iPhone was

39

unlocked would tend to explain Benites' otherwise inexplicable insistence that Plaintiff unlock her phone.

Second, there is some evidence to support the theory that the police arrested Plaintiff in order to dissuade her from filing a complaint. Famighetti testified that he arrived at Clifton Place to see a woman—presumably, Plaintiff—screaming and yelling in the presence of Benites, Williams, and a small crowd. (Karteron Declaration, Ex. 3, p. 66). Nonetheless, Plaintiff was not arrested until after she stated that she wanted to file a formal complaint against Benites for shoving her. (Zuckerman Declaration, Ex. D, pp. 62-63; Karteron Declaration, Ex. 10, p. 62, 64). According to Plaintiff, her statement prompted Famighetti to confer with the officers, after which he ordered Plaintiff arrested. (Zuckerman Declaration, Ex. D, p. 66; Karteron Declaration, Ex. 10, p. 64).

Although the police did not announce a reason for arresting Plaintiff, the temporal proximity permits the inference that there was a causal link between Plaintiff's statement and her arrest. The inference was further supported by the fact that Famighetti asked to talk to Plaintiff following her release and, standing outside the precinct in the presence of both Benites and Williams, broached the subject of whether she still wanted to file a complaint. These facts suggest that Famighetti wanted to dissuade Plaintiff from filing a complaint and was willing to use intimidating tactics to discourage her from doing so.

Third, there is evidence that Plaintiff may have been arrested because of statements she made. Plaintiff testified that, during the videotaping, she said something about the disproportionate number of blacks and Latinos who were stopped and frisked. (Zuckerman Declaration, Ex. D, pp. 145-46; Karteron Declaration, Ex. 10, pp. 145-46). While she thought

40

she "only said it loud enough so [her] ... phone would hear it," she said it in the presence of the officers and did not know if she also "said it to the officers." (Zuckerman Declaration, Ex. D, p. 146; Karteron Declaration, Ex. 10, p. 146). In addition, Plaintiff testified that during the drive to the 79th Precinct, Benites accused Plaintiff of being "a street lawyer" and stated, "this is what happens when you get involved." (Karteron Declaration, Ex. 10, pp. 70-71, 85). Taken together, this evidence may permit the inference that the police arrested Plaintiff because she voiced her objection to the stop and frisk of the teens and to the NYPD's stop-and-frisk policy.

## IV. Qualified Immunity

In their third argument for summary judgment, Defendants argue that the officers are entitled to qualified immunity with respect to Plaintiff's Fourth Amendment claim because the officers had at least "arguable" probable cause to arrest Plaintiff and with respect to the First Amendment claim because the right to videotape police activity in public was not "clearly established" as of June 5, 2012. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658,—, 132 S. Ct. 2088, 2093 (2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims, requiring that a court first decide whether the facts a plaintiff has shown make out a violation of a constitutional right and, if the plaintiff has satisfied this first step, then decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct. *Id.* at 201. In 2009, however, the Supreme Court abandoned this mandate, holding that "courts may grant qualified immunity on the ground that a purported

right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all." *Reichle*, 132 S. Ct. at 2093 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (brackets added in *al-Kidd*). There need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

"To determine whether the relevant law was clearly established, [courts] consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (citing *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010)). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (quoting *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir.1998)) (brackets in *Anderson*). With respect to the second element, courts "look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009) (citing *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004)). Generally, "[w]hen neither the Supreme Court nor [the Second Circuit] has recognized a right, the law of our sister circuits and

the holdings of district courts cannot act to render that right clearly established within the Second Circuit.'" *Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir. 2006) (citing *Anderson*, 317 F.3d at 197). However, even if the Second Circuit "has not explicitly held a course of conduct to be unconstitutional, [a court] may nonetheless treat the law as clearly established if decisions from this or other circuits 'clearly foreshadow a particular ruling on the issue.'" *Terebesi*, 764 F.3d at 231 (quoting *Scott*, 616 F.3d at 105).

"If the right at issue was not clearly established by then existing precedent, then qualified immunity shields the defendant." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007). Moreover, "[e]ven if the right at issue was clearly established in certain respects, ... an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). For example, if "'officers of reasonable competence could disagree' as to whether probable cause existed, 'immunity should be recognized.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quoting *Malley*, 475 U.S. at 341). Conversely, "'if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that' probable cause existed, '[d]efendants will not be immune ....'" *Id.*

"Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact." *Id.* (citing cases). "[A] conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts ...." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004). However, "if there is such a dispute, the factual questions must be resolved by the factfinder ...." *Id.* Accordingly, although "[t]he ultimate question of whether it was objectively reasonable for

the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court," *Zellner*, 494 F.3d at 367, that determination can be made only after "the jury has resolved any disputed facts that are material to the qualified immunity issue ...." *Id.* at 368.

### *Arguable Probable Cause*

In their third argument for summary judgment in this case, Defendants argue that they are entitled to qualified immunity on Plaintiff's Fourth Amendment claim because there was at least arguable probable cause to arrest Plaintiff. As discussed in detail in section II, *ante*, there exist genuine issues of material fact which preclude the Court from determining whether there was probable cause, or even arguable probable cause, at this juncture. That determination can be made only after the jury has resolved the disputed facts that are material to the qualified immunity issue. *See Zellner*, 494 F.3d at 368. Accordingly, Defendants' motion to dismiss Plaintiff's Fourth Amendment claim on qualified immunity grounds is denied at this time.

### *The Right to Film Police Activity*

Defendants also argue that they are entitled to qualified immunity with respect to Plaintiff's First Amendment claim. This argument assumes that Plaintiff's First Amendment retaliation claim is based solely on a violation of her right to videotape public police activity. Specifically, Defendants argue that "[P]laintiff contends that the protected First Amendment activity that she was engaged in was the videotaping of the underlying stop," but that the right to videotape was not a "'clearly established' right of [P]laintiff" because "neither the United States

Supreme Court nor the Second Circuit Court of Appeals had ruled that [P]laintiff had a protected First Amendment right to film as of the date of this incident." Defendant's Memo, p. 21.

In response, Plaintiff's Opposition cites to various Supreme Court and Second Circuit cases holding that photographs and films are speech protected by the First Amendment. Plaintiff's Memo, pp. 16-17 (citing cases). Plaintiff concedes that "these cases do not address the precise circumstances of this case—the filing of police activity in public," but argues that the "contours of the right" to film police activity in public was, nonetheless, "sufficiently clear" to place the officers on notice that their conduct violated Plaintiff's rights. *Id.*, p. 17.

Even though neither the Supreme Court nor the Second Circuit has explicitly held that there is a right to videotape or film police activity, the Court may nonetheless find that the right is clearly established "if decisions from this or other circuits 'clearly foreshadow a particular ruling on the issue.'" *See Terebesi*, 764 F.3d at 231; *Scott*, 616 F.3d at 105. Several other circuit courts have either held or implied that a right to film police activity exists, at least under some circumstances. First, in *Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995), the Ninth Circuit implied that there was a First Amendment right to film matters of public interest. *Fordyce* involved a journalist who alleged a violation of his "First Amendment right to gather news" after he was allegedly assaulted and arrested by police officers whom he had videotaped during a protest. *Fordyce*, 55 F.3d at 438. In addressing a portion of the district court opinion which found "no evidence that would permit a rational jury to find that [Fordyce] was assaulted," *Fordyce v. City of Seattle*, 840 F. Supp. 784, 788 (W.D. Wash. 1993), the Ninth Circuit held: "a genuine issue of material fact does exist regarding whether Fordyce was assaulted and battered by a Seattle police officer in an attempt to prevent or dissuade him from exercising his First

Amendment right to film matters of public interest." *Fordyce*, 55 F.3d at 439. However, the Ninth Circuit did not elaborate further on the First Amendment right.

Second, in *Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000), the Eleventh Circuit recognized a First Amendment right to photograph or videotape police conduct, subject to reasonable time, manner and place restrictions. In that case, the district court had, in an unreported opinion, granted the defendants' motion for summary judgment with respect to a claim that one of the plaintiffs had been prevented from videotaping police actions in violation of his First Amendment rights. The Eleventh Circuit found that the plaintiffs "had a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct." *Id.* at 1333. However, the Eleventh Circuit held that the plaintiffs had "not shown that the Defendants' action violated that right," *id.*, and did not elaborate on the limits of that right.

Third, in *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011), the First Circuit recognized a First Amendment right "to videotape police carrying out their duties in public." *Id.* at 82. However, citing to *Smith, supra*, the First Circuit noted that "the right to film is not without limitations," and "may be subject to reasonable time, place, and manner restrictions." *Id.* at 84. Noting, *inter alia*, that the complaint indicated that Glik filmed the officers "from a comfortable remove" and "neither spoke to nor molested them in any way," the First Circuit, like the Eleventh Circuit, found "no occasion to explore those limitations ...." *Id.*

Fourth, in *American Civil Liberties Union v. Alvarez*, 679 F.3d 583 (7th Cir. 2012), the Seventh Circuit implied that there was a right to make audiovisual recordings of police officers performing their duties in public places. In that case, the ACLU argued that Illinois'

eavesdropping statute, which proscribed audiovisual recordings of conversations unless all parties to the conversation consented, was unconstitutional as applied to its planned "police accountability program," which included a plan to openly make audiovisual recordings of police officers performing their duties in public places. A district court dismissed the ACLU's action, but the Seventh Circuit reversed that ruling and directed that the ACLU's application for a preliminary injunction be granted. Relying in part on *Glik*, the Seventh Circuit concluded that there was a First Amendment right to gather information about government officials performing their duties in public, *id*. at 600-01, and that the statute at issue was likely to fail intermediate scrutiny. *Id*. at 604-08. However, the court noted: "a regulatory measure may be permissible as a time, place, or manner restriction if it is justified without reference to the content of the regulated speech, ... narrowly tailored to serve a significant governmental interest, ... and ... leave[s] open ample alternative channels for communication of the information." *Id*. at 605 (internal quotations and citations omitted).

At least two other circuit court cases have held that the right to record police activity in public places is not clearly established. The first—*Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir. 2010)—involved a suit brought by a passenger who had been arrested following a traffic stop after a police officer noticed that he had been recording the stop without the officer's knowledge or consent. The district court granted summary judgment to the arresting officer on qualified immunity grounds, finding, with respect to the plaintiff's First Amendment claim, that it was "unclear whether plaintiff had a First Amendment right to videotape the police stop ...." *Kelly v. Borough of Carlisle*, No. 1:07-cv-7573, 2009 WL 1230309, at *8 (M.D. Pa. May 4, 2009). In affirming this portion of the district court's decision, the Third Circuit noted that *Smith*

and a district court opinion—*Robinson v. Fetterman*, 378 F. Supp. 2d 534 (E.D. Pa. 2005)—had

"announce[d] a broad right to videotape police," but held that "there was insufficient case law

establishing a right to videotape police officers during a traffic stop to put a reasonably

competent officer on 'fair notice' that ... arresting an individual for videotaping police during the

stop would violate the First Amendment." *Kelly*, 622 F.3d at 262. The Court also noted:

"[E]ven insofar as it is clearly established, the right to record matters of public concern is not

absolute; it is subject to reasonable time, place, and manner restrictions, as long as they are

'justified without reference to the content of the regulated speech, ... are narrowly tailored to

serve a significant governmental interest, and ... leave open ample alternative channels for

communication of the information.'" *Id.* at 262 (quoting *Ward v. Rock Against Racism*, 491 U.S.

781, 791 (1989)).

The second case—*Szymecki v. Houck*, 353 Fed. App'x 852 (4th Cir. 2009)—is an

unreported case in which the Fourth Circuit affirmed a district court's grant of summary

judgment to the defendants on qualified immunity grounds. Citing *Hope v. Pelzer*, 536 U.S. 730,

739 (2002), for the proposition that "the contours of the constitutional right 'must be sufficiently

clear that a reasonable official would understand what [she] is doing violates that right,'" the

Fourth Circuit concurred with the district court's view that the "First Amendment right to record

police activities on public property was not clearly established in [the Fourth C]ircuit at the time

of the alleged conduct." *Szymecki*, 353 Fed. App'x at 852-853. The Fourth Circuit did not

specify when the conduct occurred or address the facts of that case in any detail.

At least three district courts in this Circuit have held that the right to record police activity

is not clearly established. First, in *Mesa v. City of New York*, No. 09 Civ. 10464 (JPO), 2013 WL

31002 (S.D.N.Y. Jan. 3, 2013), Judge Oetken granted summary judgment on qualified immunity grounds with respect to a First Amendment retaliation claim brought by an individual who was arrested after photographing the police as they were dispersing a crowd of which he was a part. Citing to the six circuit court opinions discussed above, Judge Oetken implied that there was a split of authority in the circuits and noted that "no Second Circuit case has directly addressed the constitutionality of the recording of officers engaged in official conduct." *Id.* at \*24-\*25. The judge concluded that, while he was "inclined to agree" with the view that "the photography and recording of police officers engaged in their official duties 'fits comfortably' within First Amendment principles," the defendants were "nevertheless entitled to summary judgment on [the] First Amendment [retaliation] claim, as the right to photograph and record police is not clearly established as a matter of constitutional law in this Circuit." *Id.* at \*25 (brackets added).

In the second case—*Rivera v. Foley*, No. 14-CV-196 (VLB), 2015 WL 1296258 (D.Conn. Mar. 23, 2015)—Judge Bryant granted a motion to dismiss on qualified immunity grounds a claim that a police officer's order that the plaintiff stop flying a drone over an accident site constituted a violation of First Amendment rights. Relying on *Mesa*, Judge Bryant held that as of February 1, 2014, "the time of the acts alleged in the Complaint, the right to photograph and record police officers who are engaged in an ongoing investigation was not clearly established as a matter of constitutional law in this Circuit." *Id.* at \*9. The Court distinguished *Glik* and *Alvarez*, *supra*, stating:

> [I]n cases where the right to record police activity has been recognized by our sister circuits, it appears that the protected conduct has typically involved using a handheld device to photograph or videotape at a certain distance from, and without interfering with, the police activity at issue. ... By contrast, here

49

> Plaintiff directed a flying object into a police-restricted area, where
> it proceeded to hover over the site of a major motor vehicle
> accident and the responding officers within it, effectively
> trespassing onto an active crime scene.

*Id.* at *10.

In the third case—*Basinski v. City of New York*, 192 F. Supp. 3d 360 (S.D.N.Y. 2016)

—the plaintiff, the founder and director of the Street Vendor Project at the Urban Justice

Institute, intervened in an encounter between a police officer and a vendor. The plaintiff used his

cell phone to videotape the incident and ultimately refused to comply with the officer's repeated

orders to move, remaining within "striking distance" of the officer while holding his cell phone

at face-level with his elevated left hand. *Id.* at 366. After the plaintiff refused to comply with

repeated requests to move and to provide identification, the police arrested him for obstructing

governmental administration and disorderly conduct. *Id.*

Basinski subsequently filed a § 1983 action, alleging, *inter alia*, that the defendant

officers had violated his First Amendment right to record police conduct by arresting him. The

defendants then moved for summary judgment on qualified immunity grounds. Relying on *Mesa*

and *Rivera*, Judge Swain granted the motion, holding that "the right to record police activity is

not one that was 'clearly established' beyond debate within this Circuit [at] the time of Basinski's

[September 2013] arrest." *Id.* at 368. The court stated:

> Basinski has failed to proffer a case, and this Court can find none,
> wherein the Second Circuit has recognized that the right to record
> police activity is protected by the First Amendment. Nor has
> Basinski demonstrated that "the law [enshrining the right to record
> police activity] is defined with reasonable clarity[, that] a
> reasonable defendant [would] have understood from the existing
> law that [his] conduct was unlawful," *Anderson*, 317 F.3d at 197,

50

or that "the statutory or constitutional question beyond debate." *al-Kidd*, 131 S. Ct. at 2083.

*Basinski*, 192 F. Supp. 3d at 368. Like *Rivera*, *Basinski* distinguished *Glik* and *Alvarez*, *supra*, ruling that the cases were "clearly distinguishable" because "Basinski filmed [the police officer] from mere feet away and admitted to having drawn his attention from the police business at hand." *Id.*

At least one district court in this Circuit, however, has found that the First Amendment right to record police officers performing their duties in a public space is clearly established. In *Higginbotham v. City of New York*, 105 F. Supp. 3d 369 (S.D.N.Y. 2015), Judge Castel denied a motion to dismiss on qualified immunity grounds a lawsuit brought by a journalist who alleged that the police had arrested him in relation for his filming an arrest from atop a telephone booth. Judge Castel acknowledged that neither the Supreme Court nor the Second Circuit has decided whether a right to record police activity exists, but opined that "[a]ll of the circuit courts that have ... have concluded that the First Amendment protects the right to record police officers performing their duties in a public space, subject to reasonable time, place and manner restrictions." *Id.* at 379 (citing *Alvarez*, 679 F.3d at 608; *Glik*, 655 F.3d at 82; *Smith*, 212 F.3d at 1333; and *Fordyce*, 55 F.3d at 439). Based on these cases and five district court cases from other circuits which also recognized that right, Judge Castel concluded that "[a]t the time of Higginbotham's arrest [in November 2011], there was ... a 'robust consensus of persuasive authority' in favor of the right that 'clearly foreshadowed' an analogous ruling by the Second Circuit or the Supreme Court." *Id.* at 380 (brackets added).

*Higginbotham* acknowledged that *Mesa* had reached the contrary conclusion, but implied that *Mesa* was incorrect in finding that there was a circuit split on the right to record. *Higginbotham* noted that "*Kelly* and *Szymecki* did not decide whether the right existed," but merely held that, "even if it did exist, it was not clearly established for the purposes of qualified immunity in those cases' factual contexts." 105 F. Supp. 3d at 381 (citing *Kelly*, 622 F.3d at 262-63; *Szymecki*, 353 Fed. App'x at 853).

While holding that the plaintiff had a First Amendment right to film under the circumstances presented in that case, *Higginbotham* expressly limited the holding to the facts of that case. Judge Castel noted:

> Certainly, the right to record police activity in a public space is not without limits, and some uncertainty may exist on its outer bounds. For instance, it may not apply in particularly dangerous situations, if the recording interferes with the police activity, if it is surreptitious, if it is done by the subject of the police activity, or if the police activity is part of an undercover investigation. ... There is nothing in the complaint suggesting that [Higginbotham's] filming interfered with the arrest. Accordingly, and in light of the case law consensus described above, a reasonable police officer would have been on notice that retaliating against a non-participant, professional journalist for filming an arrest under the circumstances alleged would violate the First Amendment.

*Higginbotham*, 105 F. Supp. 3d at 381 (brackets added).

In light of the foregoing cases, the Court concludes that issues of material fact prevent the Court from determining whether Plaintiff had a right to record the police stop under the circumstances of this case. First, the Court agrees with *Higginbotham* that an argument could be made that a right to videotape police activity in public places was clearly established as of June 5, 2012. As *Higginbotham* correctly notes, *Szymecki* and *Kelly* do not hold that such a right does

not exist, but only that the right was not clearly established in the Fourth Circuit as of sometime prior to 2009 and in the Third Circuit as of late May 2007. In contrast, *Fordyce, Smith, Glik*, and *Alvarez* all either imply or hold that such a right exists, and *Glik* and *Alvarez* were both decided less than a year before the incident at issue. Accordingly, even though neither the Supreme Court nor the Second Circuit had explicitly held that there is a right to videotape or film police activity, one could argue that the "decisions from ... other circuits 'clearly foreshadow[ed]'" a ruling that such a right existed under certain circumstances. *See Terebesi*, 764 F.3d at 231; *Scott*, 616 F.3d at 105.

None of those decisions, however, suggest that the right to film police activity is without limitation. To the contrary, three of the four circuit opinions discussed above and cited in *Higginbotham* expressly note that the right to film police activity is not absolute, but subject to reasonable time, place and manner limitations. *See Glik*, 655 F.3d at 84 (noting "the right to film is not without limitations," and "may be subject to reasonable time, place, and manner restrictions"); *Alvarez*, 679 F.3d at 605 (noting that although the Illinois eavesdropping statute was unconstitutional as applied to the ACLU's "police accountability program," "a regulatory measure may be permissible as a time, place, or manner restriction if it is justified without reference to the content of the regulated speech, ... narrowly tailored to serve a significant governmental interest, ... and ... leave[s] open ample alternative channels for communication of the information."); *Smith*, 212 F.3d at 1333 (recognizing "a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct"). Although those cases held that a right to film police activity exists under some circumstances, *Rivera* correctly notes that, in those cases, "it appears that the protected conduct has typically

53

involved using a handheld device to photograph or videotape at a certain distance from, and without interfering with, the police activity at issue." *Rivera*, 2015 WL 1296258, at *10. Even *Higginbotham* concedes that "the right to record police activity in a public space is not without limits," and might not exist "if the recording interferes with the police activity." *Higginbotham*, 105 F. Supp. 3d at 381.

In this case, there is a substantial factual issue regarding whether Plaintiff's filming was interfering with police activity. Benites testified that, during the videotaping, Plaintiff not only "had the phone in [her] face and [Williams'] face," but actually touched Benites' face with the iPhone. (Zuckerman Declaration, Ex. B, p. 92; Karteron Declaration, Ex. 4, p. 104). Williams corroborated this, testifying that Plaintiff "put the cell phone up close to [his] face and up to [his] shield and ... nameplate" and was, at one point, within six inches of him. (Zuckerman Declaration, Ex. A, pp. 60-61; Karteron Declaration, Ex. 5, p. 61). D.C. recalled that Plaintiff was "about two feet" from the officers while she recorded them. (Zuckerman Declaration, Ex. E, p. 27; Karteron Declaration, Ex. 9, p. 27).

Although Plaintiff and other witnesses testified that Plaintiff was further away from the officers, Plaintiff own testimony establishes that the officers told her that she was too close. Plaintiff recalled that when she began to record the incident, Benites claimed that Plaintiff was "interfering with police business and needed to step back." (Zuckerman Declaration, Ex. D, p. 45; Karteron Declaration, Ex. 10, p. 45). Although Plaintiff responded to Benites' first and second requests by stepping back a foot each time, Plaintiff admits that she did not comply with Benites' third request. (Zuckerman Declaration, Ex. D, p. 48; Karteron Declaration, Ex. 10, p. 48). Plaintiff opined that she "was within the law in terms of being so many feet away at that

54

point," (*id.*), but Plaintiff, D.C. and Cannady testified that Benites shoved her further back. Plaintiff testified that the shove caused her to move "a step and a half" backwards. (Karteron Declaration, Ex. 10, p. 53). D.C. opined that the officers "were trying to push her away," (Karteron Declaration, Ex. 9, p. 28), while Cannady characterized it as a "defensive push," as if Benites was trying to get Plaintiff's cell phone "out of [her] face." (Karteron Declaration, Ex. 8, p. 46). A reasonable factfinder could conclude that this non-verbal act by Benites reflected her opinion that Plaintiff was still too close to the police activity.

Since there is a genuine issue of material fact as to whether Plaintiff was interfering in police activity, the Court cannot determine at this juncture whether Plaintiff had a clearly established right to film. However, even if this Court were to find that Plaintiff's videotaping interfered with police activity, that finding would not result in dismissal of Plaintiff's First Amendment retaliation claim on qualified immunity grounds. Plaintiff's First Amendment claim is not based solely on the theory that Defendants retaliated against Plaintiff for exercising her right to videotape police activity. Plaintiff also claims that the arrest was retaliation for Plaintiff's "request to file a complaint against Officer Benites" and "her speech about the stop-and-frisk she witnessed and the NYPD's stop-and-frisk practices generally." Plaintiff's Memo, p. 12.

## *V. Spoliation*

Finally, Defendants argue that they are entitled to spoliation sanctions because Plaintiff allegedly lost the iPhone on which she recorded the incident. "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d

776, 779 (2d Cir. 1999). "Although a district court has broad discretion in crafting a proper sanction for spoliation, ... the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Id.* (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). A sanction for spoliation of evidence should be designed to "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Id.* (Internal quotations and citation omitted).

Defendants primarily seek dismissal of Plaintiff's lawsuit, asserting that it is "the only fair sanction in this instance." Defendants' Memo, p. 24. However, as Defendants themselves recognize, dismissal is a "drastic remedy" that "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *Id.*, *see West*, 167 F.3d at 779 (internal quotations and citations omitted). "Although dismissal can be entered even absent a finding of bad faith or willfulness, *see Reilly v. Natwest Mkts. Group, Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (noting that gross negligence constitutes showing of 'fault' that could warrant sanction of dismissal), the degree of fault on the part of the plaintiff is a relevant consideration in fashioning an appropriate sanction, *see West*, 167 F.3d at 779." *Dahoda v. John Deere Co.*, 216 Fed. App'x 124, 125 (2d Cir. 2007) (summary order).

The Second Circuit has recognized that there exists "a continuum of fault ... ranging from innocence through the degrees of negligence to intentionality." *Reilly*, 181 F.3d at 267. Defendants contend that Plaintiff intentionally destroyed the cell phone because it contained "the best evidence of what she did unlawfully." Defendants' Memo, p. 24. The only evidence that

56

Defendants cite in support of that proposition is the fact that Plaintiff lost her cell phone two days after the incident, before downloading the video, and authored an undated social media post in which she stated: "I have to figure out how to make this summons disappear." *See* Zuckerman Declaration, Ex. I, p. 2.

Destruction of the cell phone, however, would not have derailed the prosecution. This was not a case in which the cell phone video was the only evidence of the incident. Rather, there were two police witnesses who could testify that Plaintiff engaged in disorderly conduct and several civilian witnesses, at least one of whom recalled that Plaintiff was unreasonably loud. Even assuming that the cell phone video might have substantiated this testimony and provided powerful evidence of Plaintiff's guilt, it was not essential to the prosecution.

Moreover, there is no evidence that the police made any effort to secure the video for use in the prosecution of Plaintiff. The notion that Plaintiff would destroy an expensive phone simply for fear that the prosecution might attempt to secure it in the future strikes the Court as far-fetched. After all, "the severity of the crime was unquestionably slight." *Brown v. City of New York*, 798 F.3d 94, 102 (2d Cir. 2015). Disorderly conduct is a violation, punishable by no more than 15 days in jail and a fine of no more than $250. *See* N.Y. Penal Law §§ 70.15(4), 80.05(4). Since it is almost inconceivable that Plaintiff would be sentenced to jail, the penalty she faced might well have been less than the cost of a new phone.

Absent evidence of intentional destruction, the Court finds Plaintiff's conduct not nearly so egregious as to warrant the harshest sanction of summary dismissal. The Court must, however, still address Defendants' alternative argument: that, even if Plaintiff's conduct was negligent, the Court should impose the lesser sanction of an adverse inference charge.

Except in cases involving electronically stored information, *see* Fed. R. Civ. P. 37(e), "a party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the [evidence was] destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-12 (2d Cir. 2001)). With respect to the first element, "[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (citing *Kronisch*, 150 F.3d at 126). With respect to the second element, "the 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or *negligently*.'" *Residential Funding*, 306 F.3d at 108 (quoting *Byrnie*, 243 F.3d at 109) (brackets and emphasis in *Residential Funding*).

With respect to the third element, Second Circuit cases "make clear that 'relevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." *Id.* at 108-09. The party seeking an adverse inference charge must also "adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'" *Id.* at 109 (quoting *Kronisch*, 150 F.3d at 127, and *Byrnie*, 243 F.3d at 110) (brackets added in *Residential Funding*). "[A] party's intentional destruction of evidence

relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Kronisch*, 150 F.3d at 126. "[A] showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." *Residential Funding*, 306 F.3d at 109 (citing *Reilly*, 181 F.3d at 267-68.). However, "where the destruction was merely negligent, ... it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him" or favorable to the party seeking spoliation sanctions. *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004).

In this case, the evidence presented by Defendants may be sufficient to make out the first two elements. First, Plaintiff testified that she called the ACLU on June 7, 2016. (Karteron Declaration, Ex. 10, p. 181). Although it is possible that Plaintiff called solely to further her plan to organize neighborhood training, she answered in the affirmative when asked at her deposition if June 7 was "the first time that you called the ACLU about your case?" (*Id.*). Since that call presumably took place during business hours, before Plaintiff went to the gala, this evidence suggests that Plaintiff was anticipating future litigation at the time she lost the cell phone which, as she undoubtedly realized, contained the best evidence of what transpired during the incident.

Second, there is some evidence that Plaintiff lost the cell phone due to her own negligence. Plaintiff testified that she elected to bring a "really small purse" to the gala, forcing her either to carry the phone in her hand all evening or to lay it down. (Zuckerman Declaration, Ex. D, pp. 112-13; Karteron Declaration, Ex. 10, p. 112). It is at least arguable that a reasonable person would have realized that this arrangement rendered it more likely to lose the phone or to

59

have it stolen. Moreover, while Plaintiff recognized the possibility that she could have left the phone at the gala, she did not call or visit the banquet hall. (Zuckerman Declaration, Ex. D, p. 112; Karteron Declaration, Ex. 10, pp. 112, 117). This, too, could be construed as negligence.

This evidence, however, suggests at most mere negligence, not gross negligence. Thus, one cannot infer from Plaintiff's conduct alone that the video would have been unfavorable to Plaintiff. *See Zubulake*, 229 F.R.D. at 431. Defendants have not adduced evidence that what was depicted on the video was favorable to Defendants. Indeed, the only witnesses other than Plaintiff who saw the video was Poellot, who had only "vague recollections" that it depicted "some sort of altercation between [Plaintiff] and the police" relating to Plaintiff's filming. (Karteron Declaration, Ex. 13, pp. 10, 20). Since there is a genuine issue of material fact regarding what transpired during the videotaping, the Court cannot find that the lost videotape was likely to favor Defendants.

For these reasons, the Court cannot find based on the evidence presented by the parties that an adverse inference instruction would be appropriate. The Court recognizes the possibility, however, that Defendants could adduce evidence at trial that would establish that the lost video recording was likely to be favorable to them. Accordingly, Defendants' motion for spoliation sanctions is denied without prejudice to renewal at trial.

## *CONCLUSION*

For the reasons stated above, Defendants' motion for summary judgment is denied.

Defendants' motion for spoliation sanctions is denied without prejudice to renewal if the

evidence adduced at trial establishes that the videotape of the incident was likely to favor

Defendants.

**SO ORDERED.**

/s/ *Sandra L. Townes*

SANDRA L. TOWNES
United States District Judge

Dated: February 7 , 2017
       Brooklyn, New York